**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL IMMIGRANT JUSTICE CENTER<br>224 S. Michigan Avenue, Suite 600<br>Chicago, IL 60604; | Case No.: |
| IMMIGRANT DEFENDERS LAW CENTER<br>634 S. Spring Street, 10th Floor.<br>Los Angeles, CA 90014; | **COMPLAINT** |
| FLORENCE IMMIGRANT & REFUGEE RIGHTS<br>PROJECT<br>P.O. Box 86299<br>Tucson, AZ 85754;* and | ***Document Electronically Filed***<br><br>No Jury Requested |
| LAS AMERICAS IMMIGRANT ADVOCACY<br>CENTER<br>1500 E. Yandell Drive,<br>El Paso, TX, 79902<br>　　　　　　　Plaintiffs, | |
| 　　vs. | |
| THE EXECUTIVE OFFICE FOR IMMIGRATION<br>REVIEW<br>c/o Office of the Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001; | |
| JAMES R. McHENRY III, *in his official capacity as*<br>*the Director of the Executive Office for Immigration*<br>*Review*,<br>c/o Office of the Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001; | |
| U.S. DEPARTMENT OF JUSTICE<br>c/o Office of the Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001; and | |

---

\* Motion to proceed without physical address forthcoming.

JEFFREY A. ROSEN, *in his official capacity as the*
*Acting Attorney General*,
c/o Office of the Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

                         Defendants.

       Plaintiffs National Immigrant Justice Center, Immigrant Defenders Law Center, Florence Immigrant & Refugee Rights Project; and Las Americas Immigrant Advocacy Center, by and through their attorneys, as and for their Complaint against Defendants Jeffrey A. Rosen, the United States Department of Justice, James R. McHenry III, and the Executive Office for Immigration Review, allege as follows:

## **INTRODUCTION**

      1.     Plaintiffs bring this case to challenge a sweeping final rule that will radically alter the asylum process: Procedures for Asylum and Withholding of Removal (the "Rule"), 85 Fed. Reg. 81,698 (Dec. 16, 2020).  This Rule will transform the means by which the United States adjudicates claims for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") by migrants fleeing persecution.  It purports to make mere procedural changes, but, if it is permitted to take effect on January 15, 2021, the Rule will impose often insurmountable barriers to the assertion of claims for asylum and withholding of removal, contrary to our country's longstanding commitment to provide safety to migrants fleeing persecution.

      2.     The Executive Office for Immigration Review ("EOIR"), a component of the United States Department of Justice ("DOJ"), promulgated the Rule on December 16, 2020, after an unusually short, 30-day comment period.  It was signed by Defendant James R. McHenry III, EOIR's Director.  The Rule imposes numerous arbitrary and unwarranted procedural barriers to

the assertion of valid claims for asylum, withholding of removal, and CAT.  If the Rule is allowed to take effect, it will result in the denial of many valid claims for protection and require the return of refugees to persecution or torture, contrary to the requirements of the Refugee Act of 1980, the Immigration and Nationality Act ("INA"), the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), the Constitution, and the United States' obligations under international law. Refugee Act of 1980, Pub. L. No. 96-212, § 101, 94 Stat. 107 (1980); INA, 8 U.S.C. § 1101 *et seq.* (2018); FARRA, Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); 1967 United Nations Protocol Relating to the Status of Refugees ("UN 1967 Protocol"), 19 U.S.T. 6223, TIAS No. 6577, 606 U.N.T.S. 267 (1967).

3.      *First*, the Rule imposes a 15-day filing deadline for a noncitizen in "asylum-and-withholding only" proceedings or "withholding only" proceedings to file an application for asylum and withholding of removal, with attached corroborating evidence, even though the INA mandates a much longer, one-year deadline.  The Rule does so despite ample evidence that many noncitizens will be unable to comply with the 15-day deadline, and without any evidence that the 15-day deadline will in fact promote EOIR's purported interest in the expeditious adjudication of asylum claims.

4.      *Second*, the Rule requires that asylum applications be rejected if they are not accompanied by proof of payment of a newly imposed application fee, despite clear evidence that many noncitizens—including those who are detained and those who are required to wait in Mexico for the duration of their proceedings—do not have access to funds or the payment methods the government requires for payment of the fee.

5.      *Third*, the Rule provides that EOIR must reject asylum applications if EOIR discovers *at any time* that even a single, plainly inapplicable question was not answered, and

requires that applications rejected on that basis be corrected within 30 days. The Rule does so even though it would lead to the irrational denial of applications for trivial omissions, such as failing to write "Not Applicable" in describing a child's non-existent work history.

6.      *Fourth*, the Rule adopts an evidentiary double-standard for asylum hearings, under which evidence from U.S. Government sources is automatically admitted and deemed credible while other evidence is subject to a heightened standard. The Rule therefore allows Immigration Judges ("IJs") to rely on evidence from the Government without assessing its accuracy or credibility, despite perennial and growing concerns that such evidence reflects political considerations rather than careful factual analyses.

7.      *Fifth*, the Rule authorizes IJs to become advocates rather than adjudicators by proffering their own evidence, even though the INA does not give them such power.

8.      *Sixth*, the Rule doubles-down on an unrealistic 180-day statutory deadline for the adjudication of asylum claims, which the government has consistently failed to meet. The Rule requires that asylum claims be adjudicated within 180 days of the filing of an application except in the absence of "exceptional circumstances," which the Rule defines in an extraordinarily narrow way, by applying an inapposite definition from a different part of the INA. The Rule also provides that IJs may not continue or adjourn hearings beyond 180 days if that definition of "exceptional circumstances" is not met. The Rule makes these changes without assessing whether or how IJs will be able to fairly adjudicate asylum claims within 180 days.

9.      In practice, these changes will often make it impossible for asylum-seekers with meritorious claims to apply for and obtain asylum. For example, NIJC represents Alicia,[1] a Central American survivor of severe gender violence, and her four-year-old daughter. Alicia and her

---

[1] This is a pseudonym.

daughter live in Indiana and have limited access to transportation or social services. Alicia and her daughter initially fled to the United States in November of 2019, but they were returned to Mexico under the Migrant Protection Protocols ("MPP"), where they were kidnapped, presumably by a cartel. Because of the kidnapping, Alicia missed her first master calendar hearing in February 2020. Though she was eventually paroled into the United States and scheduled for another hearing, she did not make her way to NIJC until January 2021, far more than 15-days had passed from her original hearing. If the Rule had been in place at the time Alicia and her daughter began their asylum process, they would have missed the 15-day application deadline and forfeited their right to seek asylum, withholding of removal, and CAT protection.

10. EOIR made these fundamental changes to the asylum process in a Rule that was issued without statutory authority, and that was signed by an official, Defendant McHenry, who lacks statutory or regulatory authority to issue regulations of this sort. EOIR issued the Rule after a curtailed, 30-day notice-and-comment period. And it failed meaningfully to address the feedback it received in public comments, which overwhelmingly opposed the Rule. Moreover, EOIR promulgated the Rule in the context of a tangled web of other contemporaneous, interrelated, and interlocking rulemakings—which are themselves being challenged in court—and other litigation concerning asylum procedures, which even EOIR admits means that "the interplay and impact of all of the rules is speculative at the present time." 85 Fed. Reg. 81,702.

11. EOIR sought to justify the Rule as an effort to "to increase overall efficiencies for the processing and adjudication of asylum applications." 85 Fed. Reg. 81,706. But it overlooked or unjustifiably downplayed the numerous, often insurmountable barriers that the Rule creates for applicants with valid asylum, withholding of removal, and CAT claims—migrants who are entitled

to legal protection under both domestic and international law.  In fact, the Rule creates more efficiency problems than it solves.

12.     The Rule is unlawful and unconstitutional.  If it is allowed to take effect, it will inflict grave, immediate, and irreparable harm to persons seeking refuge in the United States.  And because the arbitrary procedures imposed by the Rule will make the task of providing legal representation to noncitizens seeking protection in the United States much harder, it will frustrate the mission of Plaintiffs and other similar service providers.  Plaintiffs strive to protect the fundamental human right to seek refuge from persecution and to protect the due process rights of immigrants by providing legal representation to as many noncitizens as possible.  The Rule makes both of those tasks monumentally more difficult.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331.  This action arises under the laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.  The publication of the final Rule in the Federal Register on December 16, 2020, constitutes final agency action within the meaning of 5 U.S.C. § 704.

14.     Venue is proper in this district under 28 U.S.C. § 1391(e) because Defendants are agencies and officers of the United States, the action does not involve real property, and Defendants reside in this district.

## THE PARTIES

15.     Plaintiffs are legal service organizations that serve immigrants around the country.

16.     Plaintiff National Immigrant Justice Center is ("NIJC") is a program of Heartland Alliance, a nonprofit organization with its headquarters in Chicago, Illinois.  NIJC provides comprehensive legal services to noncitizens around the country.  NIJC maintains offices in San Diego, California; Washington, D.C.; and Goshen and Indianapolis, Indiana.  NIJC's mission is to

establish and defend the legal rights of immigrants, regardless of background, and to transform the immigration system to one that affords equal opportunity for all.  To advance that mission, NIJC provides high quality immigration legal services for as many low-income individuals and families as possible.  NIJC's key priority areas are: (a) ensuring access to counsel in immigration proceedings, which includes providing legal counsel and advocating for a guaranteed right to counsel; (b) defending, maintaining, and expanding access to asylum and other forms of immigration relief; and (c) decriminalizing immigration and reducing the detention of noncitizens. In 2020, NIJC provided consultations or legal information to more than 12,000 noncitizens and represented more than 5,000 clients in immigration-related cases.

17.     Plaintiff Immigrant Defenders Law Center ("ImmDef") is a nonprofit organization incorporated in California that serves immigrants and refugees throughout Southern California. ImmDef is based in Los Angeles with additional offices in Riverside, San Diego, and Santa Ana, California.  ImmDef's mission is to provide universal representation in immigration proceedings, ensuring that no immigrant faces removal proceedings without an attorney or accredited representative.  To achieve its mission, ImmDef manages several programs, including: the Children's Representation Program; the National Qualified Representative Program; the Family Unity Project; Local Funding Initiatives; and the Cross-Border Initiative.  The Cross-Border Initiative was established in response to the MPP and provides direct representation, pro se assistance, Know Your Rights presentations, and other support to individuals subject to MPP with cases pending in the San Diego immigration court.

18.     Plaintiff Florence Immigrant and Refugee Rights Project ("Florence Project") is a nonprofit organization headquartered in Tucson, Arizona, with additional offices in Phoenix and Florence, Arizona.  The Florence Project provides free legal and social services to adults and

unaccompanied children in immigration custody in Arizona, including at the U.S.-Mexico border. The vision of the Florence Project is to ensure that all noncitizens facing removal have access to counsel, understand their rights under the law, and are treated fairly and humanely. The Florence Project provides direct representation to immigrants in proceedings before both immigration courts and the Board of Immigration Appeals ("BIA"). It represents non-citizens detained in Arizona, including immigrants deemed incompetent to represent themselves due to mental health needs or disabilities. In addition, the Florence Project provides "Know Your Rights" trainings and other forms of *pro se* assistance to immigrants detained in Arizona. The Florence Project also creates and distributes written training materials, which are used by other organizations and individuals nationwide. In 2019, the Florence Project served over 10,000 detained adults and children; placed over 100 cases with *pro bono* attorneys; and provided over 500 noncitizens with social services.

19.     Plaintiff Las Americas Immigrant Advocacy Center ("Las Americas") is a nonprofit organization incorporated in Texas and based in El Paso, Texas, that serves immigrants and refugees in Ciudad Juarez, Mexico, West Texas, and New Mexico. The mission of Las Americas is to provide free and low-cost legal services to low-income immigrants, including refugees and asylum-seekers, families seeking reunification, and victims of crime. To achieve its mission, Las Americas manages several programs including a Detained Program that serves detained migrants in the El Paso Processing Center, Otero Service Center, and West Texas Detention Center; the Las Americas Mexico program representing clients who are awaiting their immigration court proceedings in Mexico pursuant to the Migrant Protection Protocols; and the Community Migrant Advocacy Program that represents clients including survivors of crime and provides *pro se* assistance in immigration court proceedings and in affirmative petitions to U.S. Citizenship and Immigration Services ("USCIS") through legal intake, consultations, and the

8

petitioning process to obtain deferred action and lawful status, work permits, and/or lawful permanent residency.  Las Americas employs attorneys, accredited representatives, coordinators, and paralegals, among others, to implement its programs and achieve its mission..

20.     Defendant EOIR is an office within DOJ that is responsible for managing removal proceedings, including the acceptance and adjudication of defensive applications for asylum, withholding of removal, and deferral under the CAT.  EOIR issued the Rule via its Director, Defendant James R. McHenry III.

21.     Defendant James R. McHenry III has been the Director of EOIR since January 2018. Defendant McHenry signed and purported to issue the Rule.  He is sued in his official capacity.

22.     Defendant DOJ is a cabinet agency of the United States Government.  DOJ is the agency that proposed and issued the Rule, via EOIR.

23.     Defendant Jeffrey A. Rosen is the Deputy Attorney General of the United States. He became the Acting Attorney General of the United States on December 24, 2020.  Defendant Rosen heads DOJ.  He is sued in his official capacity.

## FACTUAL ALLEGATIONS

## I.     ASYLUM, WITHHOLDING OF REMOVAL, AND CAT PROTECTION

24.     The United States has long had a policy of welcoming refugees fleeing persecution or violence in their home countries.  When Congress established the modern asylum system in 1980 with the Refugee Act of 1980, it declared that "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including, where appropriate, humanitarian assistance for their care and maintenance in asylum areas, efforts to promote opportunities for resettlement or voluntary repatriation, aid for necessary transportation and processing, admission to this country of refugees of special humanitarian concern to the United

States, and transitional assistance to refugees in the United States."  Pub. L. No. 96–212, 94 Stat. 102.

25.    International law also requires the United States to accept refugees.  The 1967 United Nations Protocol Relating to the Status of Refugees ("1967 Protocol") requires contracting states to "accord to refugees lawfully staying in their territory the most favourable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to engage in wage-earning employment."  United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, TIAS No. 6577, 606 U.N.T.S. 267 (1967).  The United States ratified the Protocol on November 1, 1968.

26.    In 1998, the United States assented to the Convention Against Torture, prohibiting noncitizens' deportation to counties where there are substantial grounds for believing that they would face torture.  *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998).  CAT protection is codified as a note to 8 U.S.C. § 1231.  *See also* 8 C.F.R. §§ 1208.16-1208.18.

27.    Under the INA, "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status" has the right to apply for asylum.  8 U.S.C. § 1158(a)(1).

28.    To succeed on an asylum claim, an applicant must meet the definition of a "refugee"—a person who has experienced persecution or who has a "well–founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  *Id.* §§ 1101(a)(42)(A), 1158(b)(1)(A).  Where that definition is met, a grant of asylum is discretionary.  *Id.* § 1158(b)(1)(A).

29.     Noncitizens who are not in removal proceedings may apply for asylum before USCIS, an agency within the Department of Homeland Security ("DHS").  Unaccompanied minors in removal proceedings also initially proceed before USCIS.  Adult noncitizens facing removal proceedings in immigration court, which is part of EOIR, may seek asylum as a defense to removal.

30.     Noncitizens facing removal may also apply to EOIR for withholding of removal and protection under CAT.  To obtain withholding of removal, a noncitizen must show that it is more likely than not he would be persecuted "because of" a protected ground if he were returned to a particular country—a higher standard than asylum.  8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.16(b).  Similarly, to obtain protection under CAT, a noncitizen must show that it is more likely than not that he would be tortured if he were returned to a particular country.  8 C.F.R. § 208.16(c)(2).

31.     Unlike asylum, which is discretionary, withholding of removal and CAT protection are mandatory forms of relief which noncitizens are entitled by law to receive when the requirements for them are met.  *See* 8 U.S.C. § 1231(b)(3)(A) (providing that "the Attorney General *may not remove* an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of" membership in a protected group (emphasis added)); *INS v. Stevic*, 467 U.S. 407, 422 & n. 15 (1984) (addressing the mandatory nature of withholding of removal).

## II.     THE TRUMP ADMINISTRATION'S LIMITATIONS ON ASYLUM

32.     The Rule is part of a larger, self-declared objective of the Trump administration to limit the availability of asylum and to deter future migrants.

33.     In 2018 and 2019, the Attorney General upended established law by reversing several BIA decisions.  Specifically, the Attorney General issued *Matter of A-B-*, 27 I. & N. Dec.

316 (A.G. 2018), and *Matter of L-E-A-*, 27 I. & N. Dec. 581 (A.G. 2019), which overturned BIA

decisions in those cases. The Attorney General's rulings in *Matter of A-B-* and *Matter of L-E-A-*

have made it significantly more difficult for individuals from Central America to obtain asylum.

34.     In November 2018, the President issued a proclamation and interim final rule

banning individuals who enter the United States between ports of entry from obtaining asylum.

*See* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for

Protection Claims, 83 Fed. Reg. 55,934 (Nov. 9, 2018); *E. Bay Sanctuary Covenant v. Trump,* 950

F. 3d 1242 (9th Cir. 2020) (affirming injunction of policy); *OA v. Trump,* 404 F. Supp. 3d 109

(D.D.C. 2019) (vacating rule under the APA), *appeal docketed*, No. 19-5272 (D.C. Cir.).

35.     Since January 2019, the government's adoption of the MPP program has required

more than 60,000 individuals seeking asylum to remain in life-threatening conditions in Mexico

while their asylum claims are adjudicated, instead of being released into the United States in

relative safety as was past practice. *See, e.g.*, Kirstjen M. Nielsen, DHS, *Policy Guidance for

Implementation of the Migrant Protection Protocols* (Jan. 25, 2019), https://www.dhs.gov/sites/

default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf. As a

result, many individuals are being forced to wait for months in dangerous tent camps in Mexican

border towns to await their immigration hearings. The program has made it impossible for many

asylum-seekers to obtain access to counsel and has led to an extraordinarily high rejection rate for

asylum claims. *See* Amnesty International USA Comment at 6 (Oct. 23, 2020),

https://www.regulations.gov/document?D=EOIR-2020-0005-1611; National Immigrant Justice

Center Comment at 17-18 (Oct. 23, 2020), https://www.regulations.gov/document?D=EOIR-

2020-0005-1677; *Details on MPP (Remain in Mexico) Deportation Proceedings*, TRAC

Immigration, https://trac.syr.edu/phptools/immigration/mpp/ (last visited Jan. 8, 2021) (Noting

that 32,678 noncitizens in MPP were subject to a removal order, and only 615 noncitizens in MPP were granted relief).

36.     In July 2019, the administration issued another interim final rule to disqualify from asylum eligibility any individual who transits through a third country before arriving at the United States' southern border, effectively preventing all non-Mexican asylum-seekers who arrive at the border from seeking asylum.  *See* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019).  This policy was preliminarily enjoined as arbitrary and capricious, *see E. Bay Sanctuary Covenant*, 964 F.3d at 848, and vacated due to the agencies' failure to subject it to notice and comment rulemaking, *see Capital Area Immigrants' Rights Coal. v. Trump*, Nos. 19-2117, 19-2530 (TJK), 2020 WL 3542481, at *58 (D.D.C. June 30, 2020), but the agencies have since sought to reimpose it, *see* Asylum Eligibility and Procedural Modifications, 85 Fed. Reg. 82,260 (Dec. 17, 2020).

37.     In November 2019, DOJ and DHS issued another interim final rule, which requires asylum-seekers be removed to third countries for them to seek protection in those third countries.  *See* Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act, 84 Fed. Reg. 63,994 (Nov. 19, 2019); *see U.T v. Barr*, No. 1:20-cv-00116 (D.D.C. filed Jan. 15, 2020).  The countries to which asylum-seekers must be removed under this policy include Guatemala, El Salvador, and Honduras—three of the countries from which the greatest numbers of refugees and asylum-seekers have fled in recent years.

38.     Finally, in December 2020 alone, in addition to the Rule, DHS and DOJ issued five other immigration related rules, all of which impact access to asylum, withholding of removal, and CAT protection.  *See* Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 80,274 (Dec. 11, 2020) ("the "December 11 Rule");

Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81,588 (Dec. 16, 2020); Procedures for Asylum and Withholding of Removal, 85 Fed. Reg. 81,698 (Dec. 16, 2020); Executive Office for Immigration Review; Fee Review, 85 Fed. Reg. 82,750 (Dec. 18, 2020); Security Bars and Processing, 85 Fed. Reg. 84,160 (Dec. 23, 2020).

39.     These policy changes and others—many of which have been challenged or are being challenged in court—are part of a systematic attempt, acknowledged by the current administration, to make it more difficult for migrants to apply for asylum, and to deter future asylum-seekers from attempting to make the journey in the first place.

## III.     THE CHALLENGED RULE

40.     EOIR proposed the Rule in a Notice of Proposed Rulemaking ("NPRM") published on September 23, 2020.  *See* Procedures for Asylum and Withholding of Removal, 85 Fed. Reg. 59,692 (proposed Sept. 23, 2020).  EOIR restricted the comment period to 30 days, and received a total of 2,016 comments.  *See* EOIR, *Procedures for Asylum and Withholding of Removal*, https://www.regulations.gov/docket?D=EOIR-2020-0005.  EOIR then published the final Rule on December 16, 2020.

41.     The Rule makes six changes to the asylum system, each of which is challenged here.  *First,* the Rule imposes an arbitrary, 15-day filing deadline for noncitizens in asylum and withholding-only proceedings to file an application for asylum, withholding of removal, and CAT protection, with attached corroborating evidence.   *Second*, the Rule requires that asylum applications be rejected if they are not accompanied by proof of payment of an application fee. *Third*, the Rule provides that EOIR must reject applications *at any time* if the answer to even a single, plainly inapplicable question is left blank.  *Fourth*, the Rule adopts an evidentiary double-standard for asylum hearings, under which evidence from U.S. Government sources is automatically admitted and deemed relevant and probative, while other evidence is subject to a

heightened standard.  *Fifth*, the Rule authorizes IJs to become advocates rather than adjudicators

by proffering their own evidence.  *Sixth*, the Rule doubles-down on an already unrealistic 180-day

statutory deadline for the adjudication of asylum claims, which the government has consistently

failed to meet, by adopting an inapposite, overly narrow definition of "exceptional circumstances"

that will almost never authorize IJs to continue asylum hearings beyond that 180-day period.[2]

### A.     The 15-Day Filing Deadline

42.     Congress itself established a deadline for submitting asylum applications in the

INA, which provides that noncitizens "may apply for asylum" so long as "the application [is] filed

within 1 year after the date of the [noncitizen's] arrival in the United States."  8 U.S.C.

§ 1158(a)(2)(B).   Congress established no deadline at all for submitting applications for

withholding of removal or protection under the CAT, which are also sought through the submission

of an asylum application.  *See id.* § 1231(b)(3).

43.     The Rule purports to impose a much shorter, 15-day application deadline applicable

to noncitizens in two categories of proceedings:  "asylum-and-withholding only" proceedings and

"withholding only" proceedings.  *See* 85 Fed Reg. 81,751 (to be codified at 8 C.F.R. § 1208.4(d)).

44.     The Rule's 15-day deadline applies to applications for asylum, for withholding of

removal and CAT protection that are submitted as part of those proceedings.  Withholding of

removal and CAT protection are mandatory forms of relief.  By applying the 15-day application

deadline to applicants for mandatory withholding of removal and CAT protection, the Rule will

lead to the denial of forms of protection that Congress required the government to provide.

---

[2] The Rule also deletes certain inapplicable regulations related to employment
authorization, which EOIR does not administer.  *See* 85 Fed. Reg. 81,750–51 (deleting 8 C.F.R.
§§ 1208.7 and 1208.9).  Plaintiffs do not challenge the substance of those deletions, although they
also must be set aside due to Defendant McHenry's lack of authority to issue the Rule and due to
Defendants' violations of the APA's procedural requirements.  *See infra* Parts IV and V.

45.     Under present law, "asylum-and-withholding only" proceedings are limited to those involving asylum claims by "alien crewmember[s]," "alien stowaway[s]," beneficiaries of the Visa Waiver Program, and certain noncitizens excluded from the United States on security grounds or with information relevant to criminal or terrorist investigations. *See* 8 C.F.R. § 1208.2(c)(1). In "asylum-and-withholding only" proceedings, only asylum, withholding of removal, and CAT protection—and not admissibility or removability—are at issue. *See id.*

46.     As explained below, *infra* ¶¶ 56–58, a recent, separate rulemaking, if allowed to take effect, will expand "asylum-and-withholding only" proceedings. Under that expansion, many more noncitizens will be subject to the Rule's new 15-day deadline for filing an asylum claim, because all noncitizens who assert asylum claims in expedited removal proceedings will be channeled to "asylum-and-withholding only" proceedings for the first time.

47.     "Withholding only" proceedings are those involving withholding of removal and CAT claims by noncitizens who are subject to reinstated removal orders or noncitizens who have been issued administrative removal orders due to the time and place of their apprehension or a conviction for an aggravated felony. *See* 8 C.F.R. § 1208.2(c)(2). In "withholding only" proceedings, only withholding of removal and CAT protection—and not asylum, admissibility, or removability—are at issue. *See id.*

48.     The Rule contravenes the current statutory one-year deadline for filing asylum applications, and Congress' decision not to impose any deadline for withholding of removal or CAT protection, by instead requiring noncitizens in "asylum-and-withholding only" and "withholding only" proceedings to apply for asylum, withholding of removal, and CAT protection within 15 days after their first hearing before an immigration judge.

49.     Specifically, the Rule provides that in "asylum-and-withholding only" proceedings,

> the immigration judge . . . shall set a deadline of fifteen days from the date of the alien's first hearing before an immigration judge by which the alien must file an asylum application, which includes an application for withholding of removal under section 241(b)(3) of the Act and protection under §§ 1208.16 through 1208.18.

85 Fed. Reg. 81,751.

50.     A similar provision governs "withholding only" proceedings:

> the immigration judge . . . shall set a deadline of fifteen days from the date of the alien's first hearing before an immigration judge by which the alien must file an application for withholding of removal under section 241(b)(3) of the Act, which includes an application for protection under §§ 1208.16 through 1208.18.

*Id.*

51.     Because the "mailbox rule" does not apply in immigration court proceedings, the 15-day deadline will require that the application be *received* by the immigration court within 15 days.  *See* Office of the Chief Immigration Judge, *Immigration Court Practice Manual* § 3.1(a)(iii) (Dec. 31, 2020), https://www.justice.gov/eoir/page/file/1343626/download.

52.     If the 15-day deadline is not met, "the immigration judge shall deem the opportunity to file such an application waived, and the case shall be returned to the Department of Homeland Security" for the noncitizen's removal.  85 Fed Reg. 81,751.

53.     Thus, the failure to meet the 15-day deadline by just one day, even if due to postal delay or other circumstances outside of the noncitizen's control, will result in a complete loss of the opportunity to apply for asylum, withholding of removal, and CAT protection.  The result will be removal to a country from which the noncitizen fled for fear of persecution or torture.

54.     The public was provided no opportunity to comment on this portion of the Rule because there were substantial changes made between the text of the proposed rule published in the Notice of Proposed Rulemaking and the final Rule.

55.     *First*, when the NPRM was published, "asylum-and-withholding only" proceedings were limited to claims by a small number of noncitizens: principally noncitizen crewmembers, stowaways, and beneficiaries of the Visa Waiver Program.  *See* 8 C.F.R. § 1208.2(c)(1) (2020). In Fiscal Year 2018, there were more than 150,000 asylum applications, but just 726 "asylum-and-withholding only" proceedings, which were then known as "asylum only" proceedings.  *See* DOJ, *Statistics Yearbook FY 2018*, fig. 18 & tbl.4, https://www.justice.gov/eoir/file/1198896/download.

56.     As mentioned above, *supra* ¶ 46, between the publication of the NPRM and the publication of the final Rule, EOIR published the December 11 Rule, which dramatically expands the number of cases that will be funneled through "asylum-and-withholding only" proceedings. *See* December 11 Rule, 85 Fed. Reg. 80,274.  Under the December 11 Rule, all noncitizens who express a credible fear of persecution during "expedited removal" proceedings under 8 U.S.C. § 1225(b)(1) will be sent to "asylum-and-withholding only" proceedings.  85 Fed. Reg. 80,399–400.  And "expedited removal" proceedings have themselves been expanded to include all noncitizens who have been in the United States for less than two years.  *See* Designating Aliens for Expedited Removal, 84 Fed. Reg. 35,409 (July 23, 2019).

57.     As a result of the December 11 Rule, the portion of asylum applicants who are subject to the Rule's new 15-day application deadline changed from almost none when EOIR issued the proposed rule to almost all when it promulgated the final Rule.

58.     Because the final December 11 Rule was not published until after the comment period for the Rule closed, commenters had no opportunity to address how the final text of the December 11 Rule interacts with the Rule's 15-day deadline.

59.     *Second*, the proposed rule would not have subjected noncitizens in "withholding only" proceedings to the proposed 15-day deadline.  Instead, the proposed rule subjected only

"asylum-and-withholding only" proceedings to the 15-day deadline.  85 Fed. Reg. 59,693.  In the final Rule, however, EOIR announced that it would apply the 15-day deadline to "withholding only" proceedings as well.  85 Fed Reg. 81,751.

60.    In Fiscal Year 2018, there were 3,236 noncitizens in withholding-only proceedings. DOJ, *Statistics Yearbook FY 2018*, tbl.4, https://www.justice.gov/eoir/file/1198896/download.

61.    By also subjecting "withholding only" proceedings to the 15-day deadline in the final Rule, EOIR added additional categories of proceedings to those governed by the 15-day deadline and significantly expanded the scope of proceedings governed by the 15-day deadline.

62.    The NPRM did not state that EOIR was considering subjecting proceedings other than "asylum-and-withholding only" proceedings to the proposed 15-day deadline for "asylum-and-withholding only" proceedings.

63.    One commenter out of more than 2,000 suggested that the 15-day deadline could be applied beyond "asylum-and-withholding only proceedings" to "withholding only" proceedings, and urged EOIR to expand the 15-day deadline to cover "withholding only" proceedings.  *See* Center for Immigration Studies Comment at 2–3, https://www.regulations.gov/document?D=EOIR-2020-0005-0488 (Oct. 1, 2020).  While a few other commenters mentioned "withholding only" proceedings in passing, no other commenter addressed the issue in any depth.

64.    EOIR admits that even today, the ultimate scope of the 15-day deadline remains unknowable, because "the interplay and impact of all of the rules is speculative at the present time, particularly due to ongoing and expected future litigation, which may allow all, some, or none of the rules to ultimately take effect."  85 Fed. Reg. 81,702.

65.    EOIR states that

the size of [the asylum-and-withholding only] category is both grossly speculative—because the number would depend on variables that cannot be

accurately predicted such as new inflows of illegal immigration, the validity of any claims made by aliens in those inflows subject to the credible fear screening process, and DHS's exercise of prosecutorial discretion—and wholly outside the Department's control.

*Id.*

66.     Even if the precise number of noncitizens who will be subjected to the 15-day deadline depends on unknowable variables, between EOIR's changes in the final rule and the issuance of a separate regulation after the close of the comment period, the percentage of noncitizens who are subject to the rule was greatly expanded after the proposed rule was issued and the comment period closed.  This change will have significant effects, including on the ability of legal services providers to represent noncitizens subject to the 15-day deadline.

### B.     The Proof-of-Payment Requirement

67.     The United States has never in its history required asylum applicants to pay a fee to apply for asylum.

68.     On August 3, 2020, DHS promulgated a final rule establishing a non-waivable $50 application fee.  *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 85 Fed. Reg. 46,788 (Aug. 3, 2020) (the "USCIS Fee Rule").

69.     The USCIS Fee Rule would have made the United States the only country in the world to charge a non-waivable application fee to asylum-seekers, and only one of four to charge any application fee to asylum-seekers.  *See Immigrant Legal Res. Ctr. v. Wolf*, No. 20-cv-05883, 2020 WL 5798269, at *2 & n.5 (N.D. Cal. Sept. 29, 2020).

70.     The USCIS Fee Rule was immediately challenged on multiple grounds, and its effective date has been stayed in full.  *See id.* at *19; *Nw. Immigrant Rights Project v. USCIS*, No. 19-3283, 2020 WL 5995206, at *33 (D.D.C. Oct. 8, 2020).

71.     The new Rule provides for the first time that applicants must pay any required asylum application fee *before* applying for asylum, because they must provide proof of payment simultaneously with their asylum application.  *See* 85 Fed. Reg. 81,750–51 (to be codified at 8 C.F.R. §§ 1003.24(c)(1), 1003.31(b), 1103.7(a)(3), 1208.3(c)(3), 1208.4(d)(2)).

72.     In the event that DHS's rule imposing a non-waivable asylum application fee takes effect, the Rule will therefore require that applicants pay that fee even before they apply for asylum, and provide proof of payment with their application, on pain of having their asylum applications rejected without review.  *See id.*

### C.     The Requirement that "Incomplete" Applications Be Rejected at Any Time

73.     Under existing regulations, if EOIR intends to reject an asylum application as incomplete, it must do so within 30 days after receiving it.  *See* 8 C.F.R. § 1208.3(c)(3).  If EOIR does not provide a rejection notice within 30 days, the application will be "deemed complete."  *Id.* And if EOIR does reject an application as incomplete, the applicant is entitled to cure any deficiencies and resubmit the application, with no deadline for doing so aside from the generally applicable one-year deadline.  *Id.*; *see also* 8 U.S.C. § 1158(a)(2)(B).

74.     The Rule amends these existing regulations to eliminate EOIR's 30-day deadline for rejecting an application as incomplete, and replaces it with a requirement that EOIR reject incomplete applications at any time.  85 Fed. Reg. 81,750–51 (to be codified at 8 C.F.R. § 1208.3(c)(3)).  The Rule also provides that a noncitizen whose application is rejected as incomplete must refile it "within 30 days of rejection," or the application will be deemed "abandoned" and "waived."  *Id.*

75.     The Rule further provides that "an asylum application is incomplete if it does not include a response to each of the required questions contained in the form, is unsigned, is unaccompanied by the required materials specified in paragraph (a) of this section [including

supporting evidence], [or] is not completed and submitted in accordance with the form instructions . . . ." *Id.* at 81,750–51.

76.     As a result of these changes, IJs will be required to reject asylum and withholding of removal claims if they discover at any time—even at a final asylum hearing—that a noncitizen's application did not contain an answer to a single question—and even if the question was plainly inapplicable.  Noncitizens therefore will face the possible rejection of their applications on technical grounds at all points in the process, and will not know until their claims are finally adjudicated whether EOIR will reject their applications as incomplete.

77.     USCIS is already denying applications based on blank answers to inapplicable questions under a similar rule.  *See Ombudsman Alert: Recent Updates to USCIS Form Instructions*, DHS (Jan. 23, 2020), https://www.dhs.gov/blog/2020/01/23/ombudsman-alert-recent-updates-uscis-form-instructions.  This USCIS policy has been challenged, *see Vangala v. USCIS*, No. 20-cv-08143 (N.D. Cal. filed Nov. 19, 2020), and USCIS has agreed in that litigation to revisit its policy.  This Rule would impose the same harms challenged in that litigation, as applied to applications filed with EOIR.

### D.     The Evidentiary Double-Standard for Non-Governmental Evidence

78.     The Rule adopts a new standard for evidence offered in support of an asylum or withholding of removal application.  85 Fed. Reg. 81,751 (to be codified at 8 C.F.R. § 1208.12(a)).

79.     Under existing law:

> In deciding an asylum application, or in deciding whether the alien has a credible fear of persecution or torture . . . , or a reasonable fear of persecution or torture . . . , the asylum officer may rely on material provided by the Department of State, the Office of International Affairs, other Service offices, or other credible sources, such as international organizations, private voluntary agencies, news organizations, or academic institutions.

8 C.F.R. § 1208.12(a).

80.    The Rule amends this provision to state:

[A]n immigration judge may rely on material provided by the Department of State, other Department of Justice offices, the Department of Homeland Security, or other U.S. Government agencies, and may rely on foreign government and nongovernmental sources if those sources are determined by the judge to be credible and the material is probative.

85 Fed. Reg. 81,751 (to be codified at 8 C.F.R. § 1208.12(a)).

81.    The Rule therefore entitles IJs to rely on U.S. Government evidence without assessing whether it is credible, while simultaneously erecting barriers to reliance on other sources of evidence, including evidence that contradicts U.S. Government evidence.

82.    Commenters stated that this change is contrary to the "perennial concern" that State Department country-conditions reports will reflect the State Department's policy agenda, rather than actual conditions on the ground. *See* National Immigrant Justice Center Comment, *supra*, at 21; Human Rights First Comment at 8–9 (Oct. 23, 2020), https://regulations.gov/document?D=EOIR-2020-0005-1668; s*ee also*, *e.g.*, *Gailius v. INS*, 147 F.3d 34, 46 (1st Cir. 1998).

83.    Commenters also pointed to a recent whistleblower report by a DHS employee that accused senior DHS officials of politicizing intelligence reports by asking him to change "the information outlining high levels of corruption, violence, and poor economic conditions" in Guatemala, Honduras, and El Salvador because it would "undermine President Donald J. Trump's . . . policy objectives with respect to asylum." DHS Office of Inspector General, *Whistleblower Reprisal Complaint, In the Matter of Brian Murphy*. (Sept. 8, 2020), https://intelligence.house.gov/uploadedfiles/murphy_wb_dhs_oig_complaint9.8.20.pdf; *see* Make the Road New Jersey Comment at 8–9 (Oct. 23, 2020), https://www.regulations.gov/document?D=EOIR-2020-0005-1632.

84.     Because of these concerns with U.S. Government reports, asylum-seekers must often rely on other sources of evidence to demonstrate real dangers of persecution that are not addressed in U.S. Government reports.  Even outside any allegations of bias, sources such as reports from international NGOs or local journalists are more likely to delve into specific issues or events that are relevant in particular asylum case.

85.     The Rule would allow IJs to rely on evidence from U.S. Government sources as a basis for denying an asylum claim without considering whether that evidence is credible or otherwise supported, while making it more difficult for asylum-seekers to offer evidence from other sources to demonstrate the gaps, inaccuracies, and omissions in government evidence.

### E.     The Authorization for IJs to Admit Their Own Evidence

86.     The INA provides that IJs "shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses."  8 U.S.C. § 1229a(b)(1).  It does not authorize IJs to admit their own evidence.

87.     In contrast, the prior version of the statute did authorize IJs' predecessors to admit evidence, providing that they "shall administer oaths, *present and* receive evidence, interrogate, examine, and cross-examine the alien or witnesses."  8 U.S.C. § 1252(b) (1994) (emphasis added).

88.     Congress deleted the statutory language "*present*" when it enacted the present statute in 1996, precluding IJs from admitting their own evidence.

89.     The Rule nevertheless would authorize IJs to add their own evidence to the record, providing that "[o]n his or her own authority, an immigration judge may submit relevant evidence into the record, if the source is credible and the evidence is probative, and may consider it in deciding an asylum application," including an application for withholding of removal.  85 Fed. Reg. 81,751 (to be codified at 8 C.F.R. § 1208.12(a)).

90.     The Rule will therefore allow IJs to serve as both advocates and adjudicators, provided only that the parties first "have had an opportunity to comment on or object to the evidence prior to the issuance of the immigration judge's decision." *Id.*

### F.     The 180-Day Case Completion Deadline

91.     The INA has provided since 1996 that "in the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed."   8 U.S.C. § 1158(d)(5)(A)(iii).   The Rule incorporates this statutory 180-day deadline into the regulations for the first time.

92.     Currently, IJs can grant continuances and adjournments "for good cause shown," with no restriction based on the 180-day goal.  *See* 8 C.F.R. §§ 1003.29, 1240.6.

93.     Until now, the primary circumstance that has justified delayed asylum applications is the overall backlog of cases pending before EOIR and the asylum office and the need to adjudicate them in an orderly fashion given the limited adjudication resources allocated.

94.     The Rule, however, adopts a much narrower definition of the "exceptional circumstances" that can excuse compliance, and one that is entirely inapposite to the context of the 180-day deadline.  Under the Rule:

> [T]he term *exceptional circumstances* refers to exceptional circumstances (such as battery or extreme cruelty to the alien or any child or parent of the alien, serious illness of the party or immigration judge, or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances) beyond the control of the parties or the immigration court.

85 Fed. Reg. 81,750 (to be codified at 8 C.F.R. § 1003.10(b)).

95.     The Rule's definition of exceptional circumstances is taken almost verbatim from the INA's definition of what circumstances will excuse a noncitizen's failure to appear for an

immigration court hearing.  *See* 8 U.S.C. § 1229a(e)(1).  The INA does not contain a similar definition of "exceptional circumstances" that applies to the 180-day deadline.

96.     The Rule also restricts IJs' discretion to grant continuances or adjournments that will result in the adjudication of an asylum claim extending longer than 180 days.  *See* 85 Fed. Reg. 81,750–51 (to be codified at 8 C.F.R. §§ 1003.29, 1240.6).

97.     Under the Rule, continuances or adjournments that will extend adjudication beyond 180 days can be granted only on a showing of exceptional circumstances, as defined above.  *See* 85 Fed. Reg. 81,750–51 (to be codified at 8 C.F.R. §§ 1003.29, 1240.6).

98.     There is no evidence that the government has *ever* managed to adjudicate most asylum claims within 180 days.

99.     Immigration cases before EOIR of all kinds took an average of 184 days to adjudicate in 1998, which steadily increased to an average of 533 days by 2019, according to Syracuse University's nonprofit data research center "TRAC."  *See Immigration Court Processing Time by Outcome*, TRAC Immigration, https://trac.syr.edu/phptools/immigration/court_backlog/court_proctime_outcome.php  (select "Average Days" under "What to Tabulate"; "All" under "Outcome Type"; and "Entire US" under "Fiscal Year 2021").

## IV.   THE ENTIRE RULE MUST BE INVALIDATED BECAUSE DEFENDANT MCHENRY HAD NO STATUTORY OR REGULATORY AUTHORITY TO ISSUE THE RULE

100.    The INA provides that "[t]he Attorney General shall establish such regulations, . . . delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" his powers and duties under the INA.  8 U.S.C. § 1103(g)(2).  And by statute, EOIR is made "subject to the direction and regulation of the Attorney General."  6 U.S.C. § 521.

101.    Consistent with these statutory provisions, the Attorney General issued and signed the final rules promulgating each of the very regulations that the at-issue Rule amends. *See* Executive Office for Immigration Review; Definitions; Fees; Powers and Authority of DHS Officers and Employees in Removal Proceedings, 69 Fed. Reg. 44,903 (July 28, 2004) (promulgating 8 C.F.R. §§ 1003.8, 1003.24, 1103.7, and signed by Attorney General Ashcroft); Authorities Delegated to the Director of the Executive Office for Immigration Review, and the Chief Immigration Judge, 72 Fed. Reg. 53,673 (Sept. 20, 2007) (promulgating 8 C.F.R. § 1003.10 and signed by Attorney General Gonzales); Aliens and Nationality; Rules of Procedure for Proceedings Before Immigration Judges, 52 Fed. Reg. 2931 (Jan. 29, 1987) (adopting what is now 8 C.F.R. § 1003.29 and signed by Attorney General Meese); Executive Office for Immigration Review; Rules of Procedures, 57 Fed. Reg. 11,568 (Apr. 6, 1992) (promulgating what is now 8 C.F.R. § 1003.31 and signed by Attorney General Barr); Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312 (Mar. 6, 1997) (promulgating what became 8 C.F.R. §§ 1208.3, 1208.4, 1208.12, and 1240.6 and signed by Attorney General Reno).

102.    Unlike all of those prior regulations, the final Rule was signed solely by Defendant McHenry as Director of EOIR, and not by the Attorney General or acting Attorney General.

103.    The Attorney General has never delegated authority to the Director of EOIR to engage in notice-and-comment rulemaking.

104.    The sole published delegation of authority from the Attorney General to the EOIR Director is 8 C.F.R. § 1003.0(b).  That provision allows the EOIR Director to "[i]ssue operational instructions and policy, including procedural instructions regarding the implementation of new statutory or regulatory authorities." *Id.* § 1003.0(b)(1)(i).  It therefore distinguishes between

"operational instructions," "policy", and "procedural instructions," on the one hand, and "new . . . regulatory authorities," on the other, and thus does not allow the EOIR Director to issue regulations. *Id.*

105.   The final Rule does not describe any other source of delegated authority for the Director of EOIR to issue the Rule, and Plaintiffs are aware of none.

106.   Because Defendant McHenry was without statutory or delegated authority to issue the Rule, the issuance of the rule was "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and "not in accordance with law," *id.* § 706(2)(A), and the Rule in its entirety should be set aside.

## V.   THE ENTIRE RULE MUST BE INVALIDATED BECAUSE DEFENDANTS ISSUED THE RULE IN VIOLATION OF THE APA'S PROCEDURAL REQUIREMENTS

107.   Under the APA, agencies must provide notice of proposed rules and the proposed legal bases for those rules, 5 U.S.C. § 552(b)(2), (3), in order to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation," *id.* § 553(c).

108.   To satisfy the APA, notice must afford interested parties "a reasonable opportunity to participate in the rulemaking process." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) (internal quotation marks omitted).

109.   EOIR's procedure for issuing the Rule failed to comply with the APA's notice requirements.

110.   Because the APA requires the Court to "hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law," 5 U.S.C. § 706(2)(D), the entire Rule must be invalidated.

### A.    The Comment Period EOIR Provided Was Insufficient

111.    Executive Order 12,866 provides that comment periods should "in most cases" be "not less than 60 days."  Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993); *accord* Exec. Order No. 13,563, 76 Fed. Reg. 3821 (Jan. 21, 2011) (comment periods "should generally be at least 60 days").

112.    According to the eRulemaking Management Office, which provides access to and collects comments on proposed regulations, "[g]enerally, agencies will allow 60 days for public comment.  Sometimes they provide much longer periods." Regulatory Timeline, Regulations.gov, https://www.regulations.gov/docs/FactSheet_Regulatory_Timeline.pdf (last visited Jan. 8, 2020).

113.    EOIR issued the rule on an expedited timeframe, providing only 30 days for comments.

114.    Many commenters and potential commenters objected to the Department's imposition of a 30-day comment period instead of a 60-day or longer period and requested an extension of the 30-day comment period.  *See* 85 Fed. Reg. 81,704.

115.    Numerous organizational and individual comments explained that the timeframe did not allow them a meaningful opportunity to gather and submit data, views, and arguments. *See, e.g.*, Tahirih Justice Center Comment at 7 (Oct. 22, 2020), https://www.regulations.gov/ document?D=EOIR-2020-0005-1105 ("[T]hese comments . . . cannot[] include all of the analysis and evidence that Tahirih would have provided if given at least 60 days to respond to the rule"); Amnesty International USA Comment, *supra*, at 2 (objecting to the comment period on the grounds that "the public should not be forced to engage in guesswork on the interplay among" rules issued in recent months).

116.    In the final rule, EOIR acknowledged that commenters "stated that the 30-day comment period [was] an insufficient period of time for them to adequately consider and respond

to the significance of the rule's proposed changes," particularly given many other recently-published "complex proposed rules on a wide range of immigration-related topics." *See* 85 Fed. Reg. 81,704.

117.    EOIR offered no adequate justification for the abbreviated comment period, and had no adequate response to commenters' concerns.

118.    EOIR claims that the 30-day period was sufficient because the issues addressed by the rule were "either already set by statute . . . , well-known to aliens and practitioners . . . , well-established as immigration court practices . . . , or the deletion of provisions that were practically inapplicable to EOIR." *Id.* at 81,705.  EOIR also argued that the Rule was "comparatively short." *Id.*

119.    EOIR's justifications are factually incorrect because the Rule made many significant changes to asylum that were not known or knowable to Plaintiffs or similar organizations, much less their clients.

120.    The 30-day comment period meant that EOIR closed notice-and-comment on the Rule before the finalization of the December 11 Rule upon which the framework for this Rule depends.  EOIR acknowledged that there is "interplay" between other rules, including the December 11 Rule, and this Rule.  *See* 85 Fed. Reg. 81,702.

121.    The shortened, 30-day comment period thus prevented interested parties from being able to comment on the combined impact of the December 11 Rule, this Rule, and the other asylum-related rules also promulgated in December, and limited both the quantity and quality of comments submitted.

**B.    EOIR Unforeseeably Changed the Scope of a Key Provision in the Final Rule**

122.    As described above, *supra* ¶¶ 59–61, in the final Rule, EOIR also applied the new 15-day application deadline to a category of applicants to which EOIR had not proposed applying

that deadline in the NPRM.  Specifically, the proposed rule applied the 15-day deadline only to "asylum-and-withholding only" proceedings, while the final rule also applies that deadline to "withholding only" proceedings.  85 Fed. Reg. 81,698–99.

123.    In Fiscal Year 2018 (the most recent year for which such statistics are available), there were just 726 "asylum-and-withholding only" proceedings, but 3,236 "withholding only" proceedings.  DOJ, *Statistics Yearbook FY 2018*, tbl.4, https://www.justice.gov/eoir/file/1198896/download.  (There were a total of more than 150,000 asylum claims.  *Id.* fig. 18)

124.    Nothing in the NPRM discussed withholding-only proceedings or provided notice that EOIR was considering expanding the 15-day deadline to cover withholding-only proceedings.

125.    Only one commenter out of more than 2,000 addressed the possibility that the 15-day deadline would be expanded to apply to withholding-only proceedings, and favored such expansion.  *See* Center for Immigration Studies Comment, *supra*, at 2–3.  None of the many commenters opposed to the 15-day deadline addressed the possibility that the 15-day deadline would be expanded to apply to withholding-only proceedings in any detail.

126.    EOIR's expansion of the 15-day deadline to cover withholding-only proceedings deprived commenters of the opportunity to comment on the implications of the deadline for that separate category of proceedings.

127.    Consequently, the Rule is not a logical outgrowth of the rule proposed in the NPRM.  *See, e.g.*, *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1115 (D.C. Cir. 2019).  Interested parties could not be expected to "divine [EOIR's] unspoken thoughts," *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1260 (D.C. Cir. 2005), of imposing a 15-day deadline on a separate category of proceedings when the NPRM provided no

hint that EOIR might take that course. "Something is not a logical outgrowth of nothing." *Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994).

C.   **Multiple Interlocking Rulemakings Prevented Commenters From Assessing the Combined Effect of the Administration's Changes to Asylum Policy**

128.   EOIR issued the final Rule in the context of numerous pending rulemakings and extensive ongoing litigation concerning changes the administration seeks to make to the asylum and withholding of removal system.

129.   *First*, EOIR published the December 11 Rule, which dramatically expanded the scope of the "asylum-and-withholding only" proceedings that are subject to the 15-day deadline, after the comment period on the new Rule had closed. *See* December 11 Rule, 85 Fed. Reg. 80,274; *supra* ¶¶ 56–58. The December 11 Rule has been challenged in its entirety, and it is unclear whether it will take effect. *See Pangea Legal Servs. v. DHS*, No. 3:20-cv-09253 (N.D. Cal. filed Dec. 21, 2020).

130.   *Second*, the effect of the December 11 Rule on the number of noncitizens subject to the 15-day deadline itself depends upon the administration's effort to expand expedited removal proceedings to cover all noncitizens who have been in the United States for less than two years. *See* Designating Aliens for Expedited Removal, 84 Fed. Reg. 35,409 (July 23, 2019). But that expansion, too, has been challenged in court. *See Make the Road N.Y., Inc. v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020).

131.   *Third*, the Rule's provisions regarding payment of an asylum application fee will take effect only if DHS's separate USCIS Fee Rule establishing an application fee for asylum applications takes effect. The USCIS Fee Rule has been challenged in court, and its effective date has been stayed in full. *See Immigrant Legal Res. Ctr. v. Wolf*, No. 20-cv-05883, 2020 WL

5798269, at *19 (N.D. Cal. Sept. 29, 2020); *Nw. Immigrant Rights Project v. USCIS*, No. 19-3283, 2020 WL 5995206, at *33 (D.D.C. Oct. 8, 2020).

132.    As a result of these and other pending rulemakings and litigation, EOIR admits that even today, the "the interplay and impact of all of the rules is speculative at the present time, particularly due to ongoing and expected future litigation, which may allow all, some, or none of the rules to ultimately take effect."  85 Fed. Reg. 81,702.

133.    This state of affairs prevented EOIR from analyzing the effects of the Rule, because EOIR does not know what the other, interlocking legal rules that affect the Rule will be.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made" (internal quotation marks omitted)).

134.    This state of affairs also prevented commenters from meaningfully analyzing and commenting on the Rule, as multiple commenters explained.  *See, e.g.*, Catholic Legal Immigration Network, Inc. Comment at 3 (Oct. 23, 2020), https://www.regulations.gov/document?D=EOIR-2020-0005-1607 (noting that "the public cannot reasonably comment on this proposed rulemaking since it is not possible to know" the effects of other recent proposed rules); Human Rights First Comment, *supra*, at 10 ("[I]t is impossible to provide well-informed and specific comments on the current proposed rule without an opportunity to review this rule in the context of whatever regulatory changes are ultimately adopted . . . .").

**D.**     **Defendants Improperly Ignored and Discounted the Impact of the Rule on Small Entities, Violating the Regulatory Flexibility Act**

135.    The Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601 *et seq.*, requires federal agencies to conduct a "regulatory flexibility analysis" analyzing how rules they promulgate will affect "small entities," and to publish final versions of that analysis. *Id.* § 604.

136.    Plaintiffs other than NIJC qualify as "small entities" under the RFA because each is a "not-for-profit enterprise which is independently owned and operated and is not dominant in its field," *Id.* § 601(4).

137.    An agency can forgo a regulatory flexibility analysis "if the head of the agency certifies that the rule will not . . . have a significant economic impact on a substantial number of small entities" and publishes that certification in the Federal Register when it publishes the final Rule. 5 U.S.C. § 605(b).

138.    Defendants did not conduct a regulatory flexibility analysis of the Rule. Rather, EOIR purported to certify under § 605(b) that the Rule would not impact a substantial number of small entities, on the ground that the Rule "applies to asylum applicants, who are individuals, not entities." 85 Fed. Reg. 81,747. The § 605(b) certification, like the rest of the Rule, was signed by Defendant McHenry. *Id.*

139.    The § 605(b) certification in the Rule is invalid because it was not made by "the head of the agency," the Attorney General.

140.    In addition, the § 605(b) certification is incorrect. In addition to regulating asylum applicants, the Rule also regulates organizations, like Plaintiffs, who represent asylum applicants, by requiring Plaintiffs to comply with the Rule's procedural requirements when they represent asylum-seekers. For example, if Plaintiffs represent asylum-seekers in "asylum-and-withholding-only" proceedings, the Rule requires Plaintiffs to complete asylum applications within 15 days.

141.    EOIR was therefore required to conduct a regulatory flexibility analysis in promulgating the Rule, but failed to do so.  *See Aeronautical Repair Station Ass'n v. FAA*, 494 F.3d 161, 176–77 (D.C. Cir. 2007).

## VI.    NEARLY ALL OF THE RULE IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS

142.    Under the APA, the Court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

143.    For starters, an "agency must have statutory authority for the regulations it wants to issue."  *Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451, 460 (D.C. Cir. 2017) (Kavanaugh, J.). "Congress's failure to enact" legislation "does not authorize [an agency] to act."  *Id.*

144.    Even where an agency acts with statutory authority, agency action is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43 (internal quotation marks omitted).

145.    Thus:

[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.*

146.    Moreover, "[w]hen an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into

account.  It would be arbitrary and capricious to ignore such matters." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (internal quotation marks and citations omitted).

A.     **The 15-Day Application Deadline Is Contrary to Statutory Authority and Arbitrary and Capricious**

147.    EOIR's decision to impose a 15-day deadline for many asylum, withholding of removal, and CAT applications was contrary to and unauthorized by the INA and arbitrary and capricious in violation of the APA.  EOIR has imposed a deadline that is dramatically shorter than the one-year deadline for asylum imposed by Congress.  The Rule's deadline also forms the basis for the denial withholding of removal and CAT protection, both of which are *mandatory* forms of relief subject to no filing deadline under the INA.  And EOIR offered no adequate response to the numerous commenters who explained that the deadline would be impossible for many or most noncitizens subject to it to meet, and would therefore bar many valid claims.  The record shows that far from making the adjudication of asylum claims more efficient, the 15-day deadline will simply preclude many noncitizens from obtaining relief to which they are entitled.

1.     The 15-Day Deadline Is Contrary to the INA

148.    As explained above, *supra* ¶ 42, Congress itself established the deadline for submitting asylum applications in the INA by providing that noncitizens "may apply for asylum" so long as "the application [is] filed within 1 year after the date of the [noncitizen's] arrival in the United States."  8 U.S.C. § 1158(a)(1), (2)(B).

149.    Congress adopted this one-year deadline after debating and rejecting a much shorter, 30-day deadline due to many of the very concerns raised by commenters in response to the Rule.  *See* Sen. Rep. 104-249, at 43 (1996) (explaining that "the persons most deserving of asylum status—those under threat of retaliation, those suffering physical or mental disability,

especially when abuse resulting from torture—would most be hurt by the imposition of any filing deadline, and particularly so, if the deadline was thirty days").

150.    Congress established no deadline at all for submitting withholding of removal applications or applications for CAT protection, which are mandatory forms of protection. *See* 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 1208.16-18; *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 & n. 25 (1987).

151.    Nothing in the INA authorizes the Attorney General or EOIR to set a different across-the-board deadline for filing asylum applications from the one-year deadline Congress set, nor to impose a deadline for filing withholding of removal and CAT protection applications, where Congress opted not to impose any such deadline.

152.    An "agency must have statutory authority for the regulations it wants to issue," so Congress' failure to enact" legislation "does not authorize [the agency] to act." *Mexichem Fluor, Inc.* 866 F.3d at 460.  An agency "literally has no power to act unless and until Congress confers power upon it." *Mozilla Corp. v. FCC*, 940 F.3d 1, 74 (D.C. Cir. 2019) (per curiam).

153.    EOIR asserted that it had authority to impose the new deadline as an exercise of gap-filling "in light of the [INA's] silence on a timeframe for filing applications in asylum-and withholding-only proceedings."  85 Fed. Reg. 81,720.

154.    But the INA is not silent on the timeframe for filing asylum applications—it provides a one-year deadline.  Where "Congress has supplied a clear and unambiguous answer to the interpretive question at hand," as here, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018) (quoting *Chevron U.S.A., Inc. v. Nat. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)).

155.    EOIR also portrayed the 15-day deadline as an extension of IJs' authority under existing regulations to enter and enforce case-specific filing deadlines in individual proceedings. 85 Fed. Reg. 81,725 (citing 8 C.F.R. § 1003.31(c)).  But EOIR's decision to impose an across-the-board deadline on IJs and noncitizens for all cases is not a decision by IJs and not an exercise of case-management authority, and it conflicts with Congress' decision to impose a one-year deadline.

156.    The 15-day application deadline is therefore invalid, because it is "in excess of statutory jurisdiction, authority, or limitations," and "not in accordance with law."  5 U.S.C. § 706(2)(A), (C).

157.    The 15-day deadline is also contrary to the statutory provisions entitling noncitizens, including asylum-seekers, to counsel of their choosing, as long as it comes at no expense of the government.  *See* 8 U.S.C. §§ 1229a(b)(4)(A), 1362.  As discussed in greater detail below, *infra* ¶¶ 169–186, by severely shortening the timeline in which an applicant has to obtain counsel before risking the denial of relief for failing to submit a form, the deadline all but eliminates the right to counsel in asylum proceedings for many applicants.

### 2.    The 15-Day Deadline Is Arbitrary and Capricious

158.    EOIR's imposition of the 15-day application deadline is also arbitrary and capricious, in violation of the APA.  *See* 5 U.S.C. § 706(2)(A).  In imposing the new deadline, EOIR entirely failed to consider important aspects of the problem EOIR was assertedly seeking to address, and EOIR offered implausible explanations that run counter to the evidence before the agency.  *See State Farm*, 463 U.S. at 43.  The Rule introduces unnecessary and burdensome procedural requirements that will lead to the denial of meritorious asylum, withholding of removal, and CAT protection claims.

(a)   *EOIR Entirely Failed to Consider How Noncitizens Could Comply With the 15-Day Deadline*

159.   The overwhelming evidence before EOIR showed that many noncitizens will be unable to meet the new 15-day deadline.  As commenters explained, noncitizens face a daunting succession of barriers when attempting to complete asylum applications.  *See, e.g.*, American Gateways Comment at 21 (Oct. 23, 2020), https://www.regulations.gov/document?D=EOIR-2020-0005-1665;   Frances   Geteles,   Ph.D.   Comment   at   2–3   (Oct.   14,   2020), https://www.regulations.gov/document?D=EOIR-2020-0005-0557.

160.   The common barriers faced by noncitizens include:

(i)   <u>Language barriers and translation needs:</u>

161.   The I-589 application form and its corresponding instructions are offered only in English, the form must be completed only in English, and all accompanying documentation must be translated into English.

162.   Commenters explained that many noncitizens seeking asylum cannot speak, read, or write English.  *E.g.*, American Gateways Comment, *supra*, at 21.  They therefore require a translator to understand and complete the form, and to translate all supporting documentation. Some others may be illiterate, requiring additional assistance to prepare the I-589 application even when translated to their native language.

163.   Many asylum applicants speak indigenous languages, for which it is especially hard for them to find qualified translators.  Commenters explained that finding translators is particularly challenging for detained noncitizens, who often have no access to translators while in custody. *E.g.*, National Immigrant Justice Center Comment, *supra*, at 11.

164.   EOIR acknowledged that the 15-day deadline "applies principally to detained" noncitizens.  85 Fed. Reg. 81,702.  But EOIR did not explain how detained noncitizens could obtain translator assistance in time to meet the Rule's 15-day deadline.

165.   EOIR asserted without evidence that it "believes the 15-day deadline provides sufficient time for the alien, in coordination with counsel, an interpreter, or translator if the alien so chooses, to apply for relief."  85 Fed. Reg. 81,713.

166.   EOIR also stated that "[t]ens of thousands of aliens—and hundreds of thousands in recent years . . . —whose first language is not English file for asylum every year, and there is simply no indication that applicants cannot complete the application and file it within a few weeks."  85 Fed. Reg. 81,713.

167.   There is currently no 15-day deadline, so the fact that many noncitizens are *currently* able to apply for asylum without a comparable deadline does nothing to suggest that they will be able to do so within 15 days.

168.   EOIR also pointed to an existing 10-day deadline for "alien crewmembers" to apply for asylum.  85 Fed. Reg. 81,715; *see* 8 C.F.R. § 1208.5(b)(1)(ii).  But crewmembers are subject to special statutory provisions, *see* 8 U.SC. §§ 1281–1288, and asylum claims by crewmembers have long been treated differently from other asylum claims.  EOIR offered no analysis addressing whether claims by alien crewmembers are in any way comparable to the vastly greater number of asylum claims for which the Rule imposes a 15-day deadline.  *See* 85 Fed. Reg. 81,715–16.

(ii)   <u>Access to counsel</u>:

169.   The I-589 is a complex, 12-page form with 14 pages of instructions and more than one hundred questions.

170.    Many of those questions raise technical legal issues.  For example, the I-589 asks noncitizens to identify their "status" upon entry into the United States (question A.I.19.c), and whether they are a member of a "particular social group" (Part B.1).

171.    The 14-page instructions add to the complexity, such as by requiring that applicants who do not submit corroborating evidence to explain why they failed to do so.  I-589 Instructions, part 1.

172.    Commenters explained that while these questions and requirements may make sense to immigration practitioners, they are impossible for even English-speaking non-lawyers to accurately understand without counsel.  *See, e.g.*, National Immigrant Justice Center Comment, *supra*, at 9.

173.    Providers of *pro bono* legal services to noncitizens explained that the 15-day deadline would impede their ability to represent asylum-seekers.  *See, e.g.*, Human Rights First Comment, *supra*, at 2; Ayuda Comment at 7 (Oct. 23, 2020), https://www.regulations.gov/ document?D=EOIR-2020-0005-1702 ("With a fifteen-day window to apply for asylum, Ayuda and other similar immigration legal services providers will be forced to turn away many, many more individuals with meritorious and even strong claims for relief whom we would otherwise represent."); Legal Aid Justice Center Comment at 5 (Oct. 23, 2020), https://www.regulations.gov/ document?D=EOIR-2020-0005-1678 ("For immigrants who begin the search for an attorney after their Master Calendar Hearing, the turn-around time for filing an I-589 would be less than fifteen days, preventing law clinics from being able to take these cases.").

174.    For example, Human Rights First explained that it "can take weeks or months" to "conduct a full legal intake of an asylum seeker, prepare a detailed case write-up of the asylum

claim, find a pro bono attorney to accept the case, and mentor that attorney through completion of the I-589 application." Human Rights First Comment, *supra*, at 2.

175.    No commenters who provide legal services to noncitizens favored the Rule's 15-day deadline or suggested that it would expand their ability to represent asylum-seekers.

176.    Although EOIR was obligated to "confront the problem[s] in a reasoned manner," *Mozilla Corp.*, 940 F.3d at 67, and "articulate a satisfactory explanation for its action," *State Farm*, 463 U.S. at 43, EOIR offered no response to the concrete ways in which commenters explained that a 15-day deadline would preclude representation.

177.    EOIR instead concluded that the 15-day deadline might *improve* representation. 85 Fed. Reg. 81,735.

178.    EOIR's sole support for the conclusion that the 15-day deadline might improve representation was a single, 2016 survey of legal services providers that addressed the effect of unspecified "delays at the immigration court," while saying nothing about EOIR's 15-day deadline, or even about the timing of asylum applications in general.  *See* 85 Fed. Reg. 81,735; *see also* Human Rights First, *The U.S. Immigration Court: A Ballooning Backlog that Requires Action*, https://www.humanrightsfirst.org/sites/default/files/HRF-Court-Backlog-Brief.pdf (as last visited Jan. 7, 2021).  EOIR cited no evidence that the 15-day deadline will do anything to alleviate the broader set of "delays at the immigration court" that the 2016 survey discussed.

179.    EOIR assumed—with no evidentiary basis—that most applicants subject to the 15-day deadline would have access to counsel if they wanted it.  *See* 85 Fed. Reg. 81,735.  In doing so, EOIR relied on the fact that *currently*, "85% of aliens with pending asylum cases have representation."  *Id.*  EOIR's statistic on current representation does not reflect the effects of the

15-day deadline, which has not yet been imposed, and which legal services providers uniformly explained would impair representation.

180.    EOIR measures representation over the life of an immigration case, so this data provides no information about how many noncitizens, especially detained noncitizens, have counsel within 15 days of their first master calendar hearing.

181.    Commenters explained that only 6.9% of respondents in immigration proceedings obtained counsel within one month of being issued an NTA.  *See Access to Attorneys Difficult for Those Required to Remain in Mexico*, TRAC Immigration (July 29, 2019), https://trac.syr.edu/ immigration/reports/568.   Four months later, 70% remained unrepresented.  *See id*; National Immigrant Justice Center Comment, *supra*, at 9.

182.    EOIR's statistic is also misleading.  First, it does not differentiate between detained and non-detained applicants, even though detained asylum-seekers are much less likely to be represented.  Second, as commenters explained, noncitizens who are fortunate enough to obtain representation are less likely to have their cases quickly dismissed, and are thus overrepresented among still pending asylum cases.   American Gateways Comment, *supra*, at 22, https://www.regulations.gov/document?D=EOIR-2020-0005-1665.

183.    The evidence before EOIR therefore showed that it is likely that noncitizens in "asylum-and-withholding only" proceedings will be unrepresented at their initial master calendar hearings and then unable to obtain counsel within the 15-day deadline.

184.    EOIR argued that even if noncitizens could not obtain representation within the 15-day deadline, noncitizens could obtain counsel "at any point in the proceedings, including after filing an application."  85 Fed. Reg. 81,735.

185.   This explanation is cold comfort for those asylum-seekers whose cases will be dismissed because they are unable to file an application in the first place.

186.   Commenters explained that noncitizens need representation to properly complete the application itself.  Human Rights First Comment, *supra*, at 2 ("Asylum seekers who lack [legal] assistance frequently misunderstand key questions on the form, do not realize the level of detail expected from them in response, and are, in many cases, attempting to reduce some of the most painful experiences of their lives to writing in a foreign language.").  For noncitizens who are unable to timely complete their applications on their own, there will be no later "point in the proceedings" at which they may obtain counsel, because their claims will be deemed forever waived.  85 Fed. Reg. 81,735.

187.   The deadline will also affect *pro se* detained individuals who receive assistance from EOIR's Legal Orientation Program ("LOP"), which is one of the central mechanisms for providing access to legal information to detained noncitizens.  Plaintiffs NIJC and the Florence Project are providers of services under LOP.  Statistics show that about 24% of LOP participants do not receive any services until after their first master calendar hearing.  *See* 85 Fed. Reg. 81,716.  That would leave them with fewer than 15 days in which to complete their application.

188.   Commenters raised this point, but EOIR discounted it by arguing that the LOP "provide[s] no benefit" to noncitizens, citing longer lengths of detention and similar outcomes for people served by LOP.  *See id.* at 81,717 n.32.  The longer detention time of LOP participants, however, is the result of LOP participants exercising their rights and filing applications for relief based on the information and help they receive from the LOP program, which causes them to have more merits hearings than other noncitizens.  EOIR, LOP Cohort Analysis at 4, 16 (Sept. 5, 2018),

https://www.justice.gov/eoir/file/1091801/download.    And LOP participants have a higher likelihood of being granted relief than non-LOP participants.  *Id.*

189.    EOIR's discounting of the importance of the LOP program is arbitrary and capricious in light of Congress' express requirement that EOIR continue to fund that program.  *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. B, tit. II (2020) (providing $734 million to EOIR, "of which not less than $22,500,000 shall be available for services and activities provided by the Legal Orientation Program"). [3]   In appropriating these funds, the House Appropriations Committee explained that "[t]he LOP improves the efficiency of court proceedings, reduces court costs, and helps ensure fairness and due process," and "direct[ed] [DOJ] to continue LOP without interruption, including all component parts."  H.R. Rep. 116-455, at 63; *see also* Senate Appropriations Committee, *Explanatory Statement for the Departments of Commerce and Justice, Science, and Related Agencies Appropriations Bill, 2021*, at 87–88, https://www.appropriations.senate.gov/imo/media/doc/CJSRept.pdf (similar).

(iii)    Corroborating Evidence:

190.    The I-589 and its accompanying instructions require that noncitizens provide a large amount of corroborating evidence, in addition to answering the questions on the form itself.

191.    Commenters explained that noncitizens often do not have this evidence with them, so they must obtain it from the countries from which they fled.  They therefore must coordinate with family members or agencies in the country they fled to arrange for these documents to be mailed to them.  Even once it is received, the evidence is often not in English, but the I-589 instructions require that foreign language evidence be translated.  *See, e.g.*, National Immigrant

---

[3] The Government Printing Office has not yet printed the Act in the Statutes at Large, but the text of the Act is the same as H.R. 133, 116th Cong., at 65 (2020), https://www.govinfo.gov/content/pkg/BILLS-116hr133enr/pdf/BILLS-116hr133enr.pdf

Justice Center Comment, *supra*, at 6–7.  Moreover, forensic medical and psychological exams that corroborate claims of past harm often take a minimum of weeks, and more often months, to obtain.

192.    EOIR provided no acknowledgment of these hurdles, nor any explanation for how noncitizens could carry out those steps within the 15-day deadline.  Indeed, EOIR appeared to concede that noncitizens generally could not do so, but argued that the application itself could be filed within 15 days, and that noncitizens could provide supporting evidence later "pursuant to an immigration judge's discretion."  *See* 85 Fed. Reg. 81,712.

193.    As that statement recognizes, however, IJs can and do refuse to allow supplementation, so noncitizens must ensure that their initial applications are complete.

194.    Even where corroborating evidence is not required, commenters explained that many questions require detailed historical information, such as the names, address, and dates of attendance of every school attended, all employers in the last five years, and immigration history, which applicants often do not know, and must learn from records available only in the countries from which they fled.  *See* National Immigrant Justice Center Comment, *supra*, 7–8.

195.    EOIR also argued that, "particularly for meritorious claims, an alien may not need extensive documentation to support his or her claim because an alien can meet the relevant burden of proof through credible, persuasive, and specific testimony."  85 Fed. Reg. 81,712.

196.    However, both the I-589 instructions and longstanding precedent require noncitizens to provide corroborating evidence where possible, and encourage IJs to discredit testimony that is uncorroborated.  I-589 Instructions, Part VII ("You must submit reasonably available corroborative evidence showing (1) the general conditions in the country from which you are seeking asylum, and (2) the specific facts on which you are relying to support your claim"); *see also, e.g.*, *Sidhu v. INS*, 220 F.3d 1085, 1091 (9th Cir. 2000), *as amended on denial of reh'g*

(Sept. 27, 2000) ("[W]here material corroborating evidence was easily available to the asylum seeker," such as "[m]embership records contained in the files of a Nicaraguan church," "failure to produce such evidence can constitute substantial evidence supporting an adverse credibility determination.").   Forgoing documentation is risky, and may lead to the denial of otherwise meritorious claims.

(iv)    <u>Trauma</u>:

197.    EOIR's consideration of the 15-day deadline entirely failed to consider the fact that asylum-seekers and torture survivors flee unspeakable violence in search of safety and suffer ongoing harm from trauma.  Many asylum-seekers are unable to disclose the extent and nature of the harm they endured at the outset of their cases before the immigration court.  In some instances, asylum-seekers do not recognize that harm like incest, genital mutilation, and rape are relevant to their claims for protection.

198.    Commenters explained that many refugees experience Post Traumatic Stress Disorder and other mental health challenges that make it difficult for them to recount their challenges.  *See, e.g.*, Frances Geteles, Ph. D. Comment *supra*, at 2 (describing how the legal process can be "extremely painful" for traumatized individuals because telling their story "re-activates the feelings of intense fear, terror and helplessness" from their original persecution); Human Rights First Comment, *supra*, at 1–2 (describing dual effect of trauma in asylum-seekers' countries of origin as well as conditions of detention).  They explained that some refugees may not even understand that their mistreatment amounted to persecution.  National Immigrant Justice Center Comment, *supra*, at 8.

199.    Commenters also explained that it is very common for these noncitizens to struggle to articulate their persecution, particularly at the early stages of their cases, and that this provides

another barrier to complying with the Rule's 15-day deadline. *See, e.g.*, Tahirih Justice Center Comment, *supra*, at 17–18.

200.    Having an attorney sometimes can assist with this process, but it still requires time to build a trusting relationship between attorney and client. Furthermore, the 15-day deadline will interfere with access to counsel. *Supra* ¶¶ 169–186.

201.    EOIR received numerous comments to this effect but rejected them as "generalizations and unpersuasive." 85 Fed. Reg. 81,713.

202.    EOIR failed to engage with or address the difficulties that this trauma raises for noncitizens seeking to comply with the 15-day deadline.

(b)    *EOIR Entirely Failed to Consider the Effect of the 15-Day Deadline on the Categories of Noncitizens Actually Subject to It.*

203.    Both the expansion of "asylum-and-withholding only" proceedings to include noncitizens in expedited removal and the expansion of expedited removal to include all noncitizens present for less than two years are being challenged in court. *Pangea Legal Servs.*, No. 3:20-CV-09253; *Make the Road N.Y., Inc.*, 962 F.3d 612.

204.    EOIR admits that "the interplay and impact of all of the rules is speculative at the present time, particularly due to ongoing and expected future litigation, which may allow all, some, or none of the rules to ultimately take effect." 85 Fed. Reg. 81,702.

205.    EOIR does not know what categories of noncitizens will ultimately have their asylum claims determined in "asylum-and-withholding only" or "withholding only" proceedings.

206.    While EOIR argues that it has weighed the benefits and drawbacks of the deadline "in tandem with other rules," the substance of EOIR's justifications do not address whether the 15-day deadline is properly applied to any particular group of noncitizens. *Id.*

      (c)     *EOIR Entirely Failed to Consider Whether and How the 15-Day Deadline Would Apply to Noncitizens in the Migrant Protection Protocols*

207.    Under the MPP, many asylum-seekers are required to wait in Mexico while their asylum claims are adjudicated.

208.    EOIR entirely failed to consider whether and how the 15-day deadline would apply to and affect noncitizens who are subject to the MPP, and provided no justification for imposing that deadline on such noncitizens.

209.    Commenters objected that the 15-day deadline would be especially problematic for noncitizens in the MPP. National Immigrant Justice Center Comment, *supra*, at 16–17; American Gateways Comment, *supra*, at 37 n.108.

210.    The multiple interacting rulemakings, along with ongoing litigation, leave it unclear whether noncitizens in the MPP are subject to the 15-day deadline. The government has argued that noncitizens in the MPP having their claims addressed under 8 U.S.C. § 1225(b)(2), which would place the proceedings outside the regulatory definition of "asylum-and-withholding only" proceedings and so not subject to the 15-day deadline. But the Ninth Circuit has suggested that noncitizens in the MPP are in fact governed by 8 U.S.C. § 1225(b)(1), *see Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1083–87 (9th Cir. 2020), in which case the proceedings are likely within the definition of "asylum-and-withholding only" proceedings as amended by the December 11 Rule, and thus subject to the 15-day deadline.

211.    Commenters pointed out this ambiguity, but the final Rule does nothing to resolve it.[4] *See* National Immigration Justice Center Comment, *supra*, at 16 n.30.

---

[4] The preamble to the final rule refers to the MPP in the context of the requirement to submit proof of payment of a $50 application fee, 85 Fed. Reg. 81,731—a requirement that applies to *all* asylum applications—but does not address whether noncitizens subject to MPP are also subject to the 15-day application deadline.

212. Noncitizens subject to the MPP would face even greater difficulties in meeting the 15-day deadline than other noncitizens.

213. Commenters pointed out that noncitizens subject to the MPP often spend months living in dangerous and squalid tent camps along the border, without access to any resources, that they are overwhelmingly unrepresented, and the humanitarian crisis created by this policy has caused thousands to experience hunger, homelessness, and violence. *See* National Immigrant Justice Center Comment, *supra*, at 16; *see also Migrant Protection Protocols: Implementation and Consequences for Asylum Seekers in Mexico*, Univ. of Tex. Strauss Ctr. For Int'l Security & Law (May 2020), https://www.strausscenter.org/wp-content/uploads/PRP-218_-Migrant-Protection-Protocols.pdf.

214. Commenters explained that noncitizens subject to MPP are more likely to be unrepresented and to lack access to translators, and may have a particularly difficult time finding interpreters and translators to help them understand and complete their I-589s. *See* Legal Aid Justice Center Comment, *supra*, at 13 (listing logistical challenges associated with paying the $50 filing fee for individuals subject to MPP); Human Rights First Comment, *supra*, at 4 (similar); Catholic Legal Immigration Network, Inc. Comment, *supra*, at 10 ("The vast majority of asylum seekers subjected to MPP are unable to secure full legal representation for their claims."); National Immigration Justice Center Comment, *supra*, at 16 (describing difficulties for individuals subject to MPP in finding interpreters, obtaining evidence, and mailing in their applications).

215. Commenters explained that noncitizens in MPP may also face additional challenges obtaining the necessary supporting documents and evidence, as they must rely on the Mexican postal system, may live in regions of Mexico without access to international carriers, and may not have an address of their own. National Immigrant Justice Center Comment, *supra*, at 17;

Meadowlark Immigration PC Comment at 6, (Oct. 23, 2020), https://www.regulations.gov/document?D=EOIR-2020-0005-1686.

216.    Commenters explained that it will also be difficult for noncitizens in MPP to determine where to send their completed applications.  For example, people in MPP in Laredo, Texas, must appear for their hearings in makeshift courts with judges appearing by video from a different location.  People in Laredo must then know to submit their I-589s to the San Antonio Immigration Court.  *See* National Immigration Justice Center Comment, *supra*, at 17.

217.    As a result, the Rule's 15-day deadline would have the effect of preventing most—if not all—of these noncitizens from timely filing their I-589s.

(d)    *EOIR's Argument that Noncitizens Will Have More Than 15-Days In Practice Does Not Justify the Rule*

218.    In the final Rule, EOIR argued that, in practice, noncitizens will have more than 15 days to complete their applications, because they could begin to work on their applications before their first IJ hearing.  85 Fed. Reg. 81,714.

219.    This argument ignores the reality that many asylum-seekers do not learn they may be eligible for asylum until they attend their first court hearing, and the fact that even noncitizens who are able to obtain counsel will often not be able to do so until their first IJ hearing, so counsel will still have no more than 15 days to complete asylum applications.

220.    Even if some noncitizens have a few extra days because they could begin their applications before their first IJ hearing, EOIR still provides no basis for concluding that noncitizens will be able to complete the applications in time, given all of the barriers described above.

> (e)   *The Possibility of an Extension for Good Cause Does Not Justify the Rule*

221.   EOIR referred in the final Rule to the possibility of an extension of the 15-day deadline for "good cause."  85 Fed. Reg. 81,701.

222.   Moving for such an extension would require the noncitizen to know that such relief is available and to request it, either orally at the first hearing or by written submission within that same 15-day period, before the opportunity to apply is deemed waived, and the noncitizen is removed.

223.   Many of the same barriers that will preclude noncitizens from completing application forms on time will also preclude them from filing motions for extensions of time in that same time period, especially for those who are *pro se*.

> (f)   *EOIR Offered No Evidence that the 15-Day Deadline Will Speed Up Asylum Adjudication*

224.   EOIR asserted that the 15-day deadline is intended to speed up the adjudication of asylum claims.  *E.g.*, 85 Fed. Reg. 81,701.

225.   Under current law, IJs already can and do impose their own case-specific filing deadlines, which enables IJs to ensure that asylum applications are filed promptly enough that they do not delay the adjudication of a noncitizen's claims.  *See* 85 Fed. Reg. 81,720; 8 C.F.R. § 1003.31(c).

226.   EOIR did not provide any explanation of how the 15-day deadline will better promote prompt adjudication of asylum claims than this current, case-by-case approach.  Imposing a one-size-fits-all deadline based on the date of the first hearing does nothing to ensure timely case completion.  On the contrary, this new deadline will cause many more motions to amend or supplement to be filed, which could ultimately even slow down the adjudication process.

**B.    The Provision that EOIR Must Reject Substantially Complete Applications At Any Time Is Arbitrary and Capricious**

227.    EOIR's decision to require IJs to reject asylum applications as incomplete at any time if they discover that even a single inapplicable question is left unanswered, and then to permanently reject those applications if the issue is not corrected within 30 days, is also arbitrary and capricious in violation of the APA.

228.    Commenters pointed out that this requirement will lead EOIR to reject applications with blanks in response to clearly inapplicable questions, such as leaving dates of employment blank after stating "none" for employment history, or leaving a middle name blank because the noncitizen does not have one.  *E.g.*, La Raza Centro Legal Comment at 6–7 (Oct. 23, 2020), https://www.regulations.gov/document?D=EOIR-2020-0005-1643; National Immigration Justice Center Comment, *supra*, at 12–13.

229.    Commenters also explained that without a lawyer, and often with no or limited English literacy, applicants will not know that leaving a question blank will result in their application being rejected.  *See* Human Rights First Comment, *supra*, at 4–6; National Immigrant Justice Center Comment, *supra*, at 18.

230.    EOIR does not deny that the Rule will cause applications to be rejected for these reasons but instead points out that the previous regulations contained that same language about responding to each question.  85 Fed. Reg. 81,727.

231.    The effect of that existing language has been tempered by the previous regulation's provision that applications be "deemed complete" if EOIR does not return them to the applicant within 30 days.  8 C.F.R. § 1208.3(c)(3).  The Rule eliminates that provision.

232.    Under the Rule, noncitizens could have their applications rejected even at their final asylum hearings for failing to respond to questions that plainly did not apply to them.

233.    Rejection for failure to respond to inapplicable questions has already occurred under a similar rule applicable to USCIS, which USCIS agreed to revisit.  *See* DHS, *Ombudsman Alert:* Recent *Updates to USCIS Form Instructions* (Jan. 23, 2020), https://www.dhs.gov/blog/2020/01/23/ombudsman-alert-recent-updates-uscis-form-instructions; Am. Immigration Lawyers Ass'n, *USCIS Agrees to Stop Rejecting Applications and Petitions for Blank Spaces as of December 28, 2020* (Dec. 21, 2020), https://www.aila.org/advo-media/issues/all/featured-issue-usciss-blank-space-policy.

234.    EOIR offered no explanation for why rejecting applications for failing to respond to inapplicable questions will serve the purposes of the asylum system Congress created, or lead to any other efficiencies or advantages for EOIR.  To the contrary, rejecting applications on such technicalities turns the form into a trap to justify denial of asylum claims regardless of their ultimate merit.

235.    Even as it eliminates EOIR's deadline and therefore gives EOIR unlimited time to review asylum applications for completeness, the Rule introduces a new, 30-day deadline for noncitizens to correct any inadequacies in their asylum applications.  *See* 85 Fed. Reg. 81,750.

236.    This 30-day deadline will cause particular problems for noncitizens in MPP.  Commenters explained that noncitizens in MPP are far less likely to have counsel.  *See* Amnesty International USA Comment, *supra*, at 6 (noting that only 5% of individuals forced to remain in Mexico under MPP have legal counsel); National Immigrant Justice Center Comment, *supra*, at 17–18 (noting that only 2.7% of respondents in MPP were represented).

237.    Commenters also pointed out that if EOIR returns a rejected I-589, most people in MPP will be unable to receive them due to lack of fixed address.  *See* National Immigrant Justice

Center Comment, *supra*, at 18.  Commenters submitted evidence that shelters housing noncitizens in MPP have been unable to deliver hundreds of letters to their residents for that reason.  *Id.*

238.    Commenters raised all of these issues, but EOIR ignored them in promulgating the final Rule, and thus entirely failed to consider them.

### C.    Requiring Asylum-Seekers to Provide Proof of Payment of Any Asylum Fee in Their I-589 Is Arbitrary and Capricious

239.    EOIR's decision to require up-front proof of payment of any applicable asylum application fee is also arbitrary and capricious.

240.    Commenters explained that noncitizens applying for asylum are very often of limited means and will have difficulty paying the fees in advance, particularly in advance of the Rule's new 15-day deadline, for those noncitizens who are subject to that deadline.  *E.g.*, Central American Legal Assistance Comment at 10 (Oct. 23, 2020), https://www.regulations.gov/document?D=EOIR-2020-0005-1590; Northwest Immigrant Rights Project Comment at 3–5 (Oct. 23, 2020), https://www.regulations.gov/document?D=EOIR-2020-0005-1691.

241.    Commenters also explained that it will be logistically impossible for some people, especially those in who are detained or in MPP, to pay the fee in the manner required by the Rule, because they will not have access to the methods of payment by which the fee may be paid. National Immigrant Justice Center Comment, *supra*, at 14; Innovation Law Lab Comment, *supra*, at 5.

242.    Applicants inside the United States must pay filing fees with a credit card; by mail with a credit card, check, or money order; or in person at a field office.  USCIS, *Filing Fees*, https://www.uscis.gov/forms/filing-fees (Oct. 30, 2020).  Commenters explained that by virtue of their detention, detained noncitizens do not have access to credit cards, checks, or money orders,

and often do not even have internet access.  *See* National Immigrant Justice Center Comment, *supra*, at 14; Innovation Law Lab Comment, *supra*, at 5.

243.    Commenters further explained that payment will be even more difficult for noncitizens required to remain in Mexico under the MPP, as USCIS "do[es] not accept all forms of payment abroad."  USCIS, *Filing Fees*, *supra*; *see* National Immigrant Justice Center Comment, *supra*, at 17.

244.    Despite comments to this effect, EOIR had no response—it simply failed to consider whether and how, as a practical matter, the required fees could be paid.  EOIR did list certain methods of payment that USCIS accepts, but did not address commenters' explanation that many noncitizens subject to the Rule, including detained noncitizens and noncitizens in MPP, will not have access to those payment methods.  85 Fed. Reg. 81,733.

245.    EOIR objected that "concerns about the ability of aliens to pay the $50 fee given USCIS's available methods of payment" were "far beyond the scope of this rulemaking and more appropriately addressed to DHS."  *Id.*  But the USCIS Fee Rule merely set the fee for an asylum application at $50 and made it non-waivable.  *See* 85 Fed. Reg. 46,917.  The USCIS Fee Rule did not address how the fee could be paid, when it must be paid, or the consequences of nonpayment. *See id.*

246.    EOIR thus entirely failed to consider *how* noncitizens would be able to make payments that the Rule requires them to make, or provide proof of those payments, in the face of commenters' evidence that they would not be able to do so.

247.    As a result of this provision, Plaintiffs may have to pay for their clients' asylum applications, simply to preserve the ability to seek protection.  Plaintiffs do not ordinarily pay

government fees for clients, nor do they have existing funding streams to draw from for this purpose.

248.    Plaintiff NIJC represented more than 1,800 asylum-seekers in 2020.  If NIJC had to pay the filing fee for even one third of those applicants, the total would be $30,000.  Likewise, if Las Americas (a smaller organization as compared NIJC) had to pay the asylum filing fee just for the current participants in its MPP program (setting aside the other asylum-seekers it represents), the cost would be approximately $4,000.

### D.    Heightening the Evidentiary Burden For Non-Governmental Sources Prejudices Noncitizens, Is Unnecessary, and Further Politicizes EOIR Proceedings

249.    The Rule's changes to 8 C.F.R. § 1208.12(a) to lower the evidentiary standard for admitting evidence from U.S. Government sources while heightening the standard for nongovernmental and foreign sources is also arbitrary and capricious.

250.    The Rule creates a new, two-tiered system in which evidence by nongovernmental sources can be considered only if deemed "credible and probative," whereas IJs "may rely" on evidence authored by the U.S. Government without such an analysis.

251.    This new standard results in a system in which the Executive Branch not only prosecutes and adjudicates asylum cases, but also provides favored evidence even though there is no basis for assume that such evidence is not *per se* more reliable than evidence from non-governmental sources.

252.    EOIR contends that U.S. Government evidence "warrant[s] particular consideration because of [its] credible source."  85 Fed. Reg. 81,737.

253.    Commenters explained, however, that U.S. Government sources are not inherently credible in the asylum context.  *E.g.*, Make the Road New Jersey Comment, *supra*, at 8–9 (noting that a recent whistleblower accused DHS senior officials of requesting him to alter reports that

would otherwise undermine the President's policy objectives with respect to asylum); Northwest Immigration Rights Project Comment at 9 (Oct. 23, 2020), https://www.regulations.gov/document?D=EOIR-2020-0005-1691 (citing evidence that "Department of State (DOS) reports are subject to political pressure"); Human Rights First Comment, *supra*, at 7–9 (noting that State Department human rights reports have "reduced coverage of gender discrimination and domestic abuse"); Tahirih Justice Center Comment, *supra*, at 25 ("Meddling by political appointees in the timing and content of DHS reports, including reports on countries that generate migrants, is commonplace.").

254.    By establishing a presumption that U.S. Government evidence is credible and probative and making it very difficult to introduce contrary evidence, the two-tiered standard in the Rule will allow IJs to consider and rely on evidence from U.S. Government sources that has not been determined to be, and may not be, credible or probative.

255.    EOIR did not explain why allowing IJs to consider and rely on non-credible or non-probative U.S. Government sources would aid in the adjudication of asylum claims, and thus failed to justify the regulatory change actually being made.  Nor did EOIR not acknowledge or consider persistent and growing concerns with the accuracy and credibility of U.S. Government sources like State Department reports.

256.    This provision also will make it harder for noncitizens to introduce specific evidence from local sources that may not be covered at all by U.S. Government sources, thereby prejudicing their claims.  Here too, EOIR did not explain or justify why this outcome would help adjudication of asylum claims.

### E.      Allowing Immigration Judges to Enter Evidence Into the Record Is Contrary to the INA and Arbitrary and Capricious

257.     The Rule's amendment to 8 C.F.R. § 1208.12(a) to authorize IJs to enter their own evidence into the record is both contrary to the INA and arbitrary and capricious.

258.     Congress expressly set forth IJs' authority in the INA, by providing that the IJ "shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1).  Absent from the statute is any authority for the IJ to admit his or her own evidence.  In contrast, the statute expressly provides that "the alien shall have a reasonable opportunity . . . to present evidence on the alien's own behalf." 8 U.S.C. § 1229a(b)(4)(B).  Consequently, authorizing IJs to enter their own evidence into the record is contrary to the INA.

259.     The prior version of that same statutory provision authorized IJs' predecessors, "special inquiry officers," to "administer oaths, *present and* receive evidence, interrogate, examine, and cross-examine the alien or witnesses." 8 U.S.C. § 1252(b) (1994) (emphasis added).

260.     Congress' decision to delete the words "present and" when it amended and renumbered this provision in 1996, while otherwise leaving the provision intact, can only be understood as reflecting Congress' determination that IJs should *not* present their own evidence. The Rule would overturn this congressional decision without statutory authority.

261.     EOIR entirely failed to consider this statutory change in issuing the rule.  The Court must therefore set the Rule aside as "not in accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. § 706(2).

262.     EOIR argued that IJs already had authority to offer their own evidence.  85 Fed. Reg. 81,738.  EOIR is wrong.

263.    EOIR relies principally on the Board of Immigration Appeals' decision in *In re S-M-J-*, 21 I. & N. Dec. 722, 727 (BIA 1997), but the BIA in *S-M-J-* construed the pre-1996 language quoted above.  The same is true of *Constanza-Martinez v. Holder*, 739 F.3d 1100, 1102 (8th Cir. 2014), on which EOIR also relied, *see* 85 Fed. Reg. 59,695.  *S-M-J-* and *Constanza-Martinez* therefore did not address the current statutory language, which does not allow IJs to "present . . . evidence" of their own.

264.    EOIR's reliance on other authorities conflates IJs' duty to "establish the record" and "develop the record"—which IJs can carry out by examining and cross-examining witnesses, as the INA authorizes—with the power to admit evidence of their own, which the INA does not authorize and these other authorities do not address.  *See, e.g.*, *Yang v. McElroy*, 277 F.3d 158, 162 (2d Cir. 2002); *Richardson v. Perales*, 402 U.S. 389, 410 (1971).

265.    EOIR's reliance on these inapposite authorities, and its false claim that IJs have existing authority to admit their own evidence, provide no adequate justification for the Rule.

266.    In addition, 8 U.S.C. § 1229a(b)(4)(B) guarantees noncitizens a "reasonable opportunity to examine the evidence."  The Rule undermines and is contrary to that guarantee by allowing IJs to admit their own favored evidence on their own motion, subject only to an opportunity for the noncitizen to object.  This portion of the Rule is therefore arbitrary and capricious in addition to being contrary to law.

### F.    Requiring IJs to Adjudicate Applications Within 180 Days Absent Exceptional Circumstances Such as Battery, Extreme Cruelty, Serious Illness, or Death Is Contrary to the INA and Arbitrary and Capricious

267.    The Rule's provisions requiring IJs to adjudicate asylum claims within 180 days, absent an extraordinarily narrow and logically inapposite definition of exceptional circumstances, and restricting IJs' authority to grant continuances or adjournments that will extend adjudication past 180 days, are also contrary to the INA and arbitrary and capricious in violation of the APA.

268.    The INA states that asylum claims should be adjudicated within 180 days, absent "exceptional circumstances." 8 U.S.C. § 1158(d)(5)(A)(iii). The INA does not define "exceptional circumstances" for purposes of that provision.

269.    The Rule renders that existing statutory deadline much more restrictive by adopting a narrow definition of exceptional circumstances:

> the term *exceptional* circumstances refers to exceptional circumstances (such as battery or extreme cruelty to the alien or any child or parent of the alien, serious illness of the party or immigration judge, or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances) beyond the control of the parties or the immigration court.

8 C.F.R. § 1003.10(b).

270.    That definition comes, with slight modifications, from the definition of "exceptional circumstances" that Congress drafted in the INA to set forth the circumstances that would an excuse a noncitizen's failure to appear for a scheduled hearing. *See* 8 U.S.C. § 1229a(b)(5)(A), (e)(1).

271.    Congress expressly limited that definition so that it applied *only* for purposes of excusing a failure to appear, *see id.*, even though the term "exceptional circumstances" also appears elsewhere in the INA, including in the asylum statute's 180-day deadline, *id.* § 1158(d)(5)(A)(iii).

272.    EOIR's decision to apply that definition to the use of "exceptional circumstances" in § 1158 is contrary to Congress' decision to limit the definition to the failure-to-appear context.

273.    EOIR's decision to require that asylum claims be adjudicated within 180 days absent such narrowly defined exceptional circumstances is also arbitrary and capricious.

274.    Unlike in the failure-to-appear context, which addresses a noncitizen's failure to meet his or her obligations, the 180-day deadline is addressed to EOIR—it requires that *EOIR* adjudicate asylum cases quickly. *See id.* As used in the INA's 180-day deadline, the phrase

"exceptional circumstances" should therefore be interpreted to include exceptional circumstances affecting EOIR, such as EOIR's chronic case backlogs that, as noted above, *supra* ¶¶ 98–99, have almost never allowed it to meet the 180-day deadline, and the need to provide sufficient time to afford due process to noncitizens' asylum applications.

275.    EOIR did not consider how IJs could meet the 180-day deadline in the absence of the narrowly defined exceptional circumstances, given that they have almost never been able to do so before.

276.    The National Association of Immigration Judges explained that "the overwhelming numbers of applicants in 2020 make it impossible to meet the 180-day deadline while ensuring due process."   National Association of Immigration Judges Comment at 2 (Oct. 23, 2020), https://www.regulations.gov/document?D=EOIR-2020-0005-1701.

277.    The Rule does not make any other changes that could assist IJs in meeting the deadline.  The Rule's 15-day application deadline will not help, because the 180-day deadline runs from the submission of the application.   And while the Rule restricts continuances and adjournments, EOIR offers no showing that unnecessary continuances or adjournments are to blame for the fact that many asylum claims currently take longer than 180 days to adjudicate.

278.    EOIR entirely failed to consider what changes IJs will need to make to their handling of asylum claims in order to meet the newly restrictive deadline, and thus did not consider the inevitable side-effects of requiring IJs to dramatically speed up asylum adjudication.

## VII.    THE RULE VIOLATES INTERNATIONAL LAW AND THE CONSTITUTION

### A.    The Asylum Procedure Rule Is Inconsistent with the United States' Obligations Under Treaties & International Law

279.    The Rule violates the United States' *non-refoulement* obligation under: (1) the 1967 Protocol (which binds adhering parties to the Refugee Convention with respect to "refugees"), 19

U.S.T. 6223, TIAS No. 6577, 606 U.N.T.S. 267 (1967), (2) the CAT, 465 U.N.T.S. 85, and (3) the International Covenant on Civil and Political Rights (ICCPR), Dec. 16, 1966, T.I.A.S. No. 92-908, 999 U.N.T.S. 171.  *See also supra* ¶¶ 25–26.

280.    In general terms, these treaties define the *non-refoulement* principle as an obligation to not expel a person to another state "in pursuance of a decision reached in accordance of law" where that person's life or freedom would be threatened on account of her race, religion, nationality, membership in a particular social group, or political opinion, or where there are substantial grounds to believe that person would be in danger of being subjected to torture.

281.    Despite those commitments, the Rule accords more weight to compliance with its procedural obstacles than it does to the risk of unlawfully returning noncitizens to their persecutors.

282.    In particular, the United States' *non-refoulement* obligations require that noncitizens never be removed to countries in which they will face persecution, and the Rule violates those obligations by *requiring* IJs to dismiss asylum, withholding of removal, and CAT claims submitted by noncitizens who are unable to submit an application before the 15-day deadline (or, for asylum claims, who lack the resources to pay the $50 asylum application fee up front), purely on the basis of these noncitizens' inability to meet procedural and financial requirements, and even if the noncitizen will face persecution if removed.

### B.    The Rule Violates Due Process

283.    The Fifth Amendment of the United States Constitution declares that "[n]o person . . . shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

284.    A "fundamental requirement" of the Due Process Clause of the Fifth Amendment is the "opportunity to be heard at meaningful time and in meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted).

285.    The Supreme Court has held that the fundamental requirements of procedural due process include: notice of the government's proposed action, an opportunity for a fair hearing before an impartial decisionmaker, the right to present evidence and confront the government's evidence, and the right to be represented by counsel. *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 533, 539 (2004); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985); *Ward v. Village of Monroeville*, 409 U.S. 57, 61-62 (1972); *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972).

286.    This procedural due process right provides a right to fundamental fairness in the adjudication of their asylum claims, which are often a matter of life and death for the respondent. *See, e.g.*, *Salazar-Gonzales v. Lynch*, 798 F.3d 917, 921 (9th Cir. 2015); *Rodrigues-Laira v. INS*, 282 F.3d 1218, 1226 (9th Cir. 2002); *Olabanji v. INS*, 973 F.2d 1232, 1234 (5th Cir. 1992).

287.    Despite these requirements, the Rule violates due process by imposing the unnecessary procedural obstacles described above, including the 15-day application deadline and the requirement to pay all filing fees in advance, whether or not any payment method is as a practical matter available, which will be impossible for many noncitizens to surmount.

288.    The Rule also violates due process by allowing IJs to rely on non-credible evidence from U.S. Government sources while restricting non-governmental evidence, and by allowing IJs to admit their own favored evidence.

## VIII.   THE RULE IRREPARABLY HARMS PLAINTIFFS AND THE NONCITIZENS THEY SERVE

289.    Plaintiffs NIJC, ImmDef, the Florence Project, and Las Americas are nonprofit and nonpartisan organizations that provide legal services to immigrants.  If the Rule is allowed to take effect, then in addition to the severe and irreparable harms to noncitizens already detailed above, it will also case severe and irreparable harm to Plaintiffs themselves, by jeopardizing Plaintiffs'

ongoing programs, forcing them to divert resources, putting their funding at risk, and frustrating their missions by gravely harming their clients.

290.   *First*, the Rule's 15-day filing deadline will interfere with Plaintiffs' representation of many of their clients.  Many potential clients may be removed for failing to file a timely application before Plaintiffs are even able to meet them.  And even where Plaintiffs meet potential clients in advance of the 15-day deadline, Plaintiffs will need to arrange meetings with clients, obtain reliable interpretation and translation services, build rapport, fill out required forms, gather supporting evidence, and pay a fee, all within a two-week period.  For detained clients, this process will require multiple trips to a remote detention center, scheduling and rescheduling calls that are routinely capped at 15 or 30 minutes, and vying for limited visitation appointment slots.  For clients in MPP, it may involve multiple long waits at the border and the inability to reliably contact clients via email, mail, or telephone.  Plaintiffs will need to adjust staff workloads, schedules, and intake procedures in an effort to make this possible.

291.   Reducing caseloads, in turn, is likely to put Plaintiffs' funding at risk.  Plaintiffs receive funding from various sources, including private foundations, governmental funds (federal, state, and local), and private donors.  In some cases, the performance metrics for funding are tied to the number of clients served.  Plaintiffs anticipate that the Rule will decrease the number of clients they can serve, and that their funding is likely to similarly decrease.

292.   *Second*, the Rule's fee requirement will impair Plaintiffs' missions.  Many of Plaintiffs' clients will be unable to pay a $50 fee in advance of filing their applications, so Plaintiffs may often need to pay it on their clients' behalf.  To do so, Plaintiffs may need to divert money from other areas of their budgets.

293.    *Third*, the Rule's adoption of an evidentiary double-standard for asylum hearings will require Plaintiffs to spend more time gathering evidence and arguing for its acceptance into the record at every asylum hearing.

294.    *Fourth*, the Rule's changes to the 180-day deadline for the adjudication of asylum claims, including the narrow "exceptional circumstances" definition and the restrictions on continuances, may impair Plaintiffs' ability to represent many of their most vulnerable clients, by preventing adequate interviews and evidence gathering.  Expediting these processes may harm the client, hinder the lawyer, and increase Plaintiffs' costs.  Plaintiffs may have to stop accepting the more complicated cases that would require this kind of costly support.

295.    The changes to the 180-day deadline will also make it harder for Plaintiffs to place cases with *pro bono* counsel.  It takes time to recruit, refer, and train *pro bono* teams.  As a result of the deadline, more work will fall on Plaintiffs' in-house staff as their capacity is being squeezed by the Rule.

296.    The changes to the 180-day deadline will also affect Plaintiffs' representation of noncitizens who are seeking relief from USCIS while their claims are pending, such as applicants for U Visas, which are available to survivors of crimes.  Under the Rule, Plaintiffs' clients may have their asylum claims denied, and be removed from the country, before USCIS processes their applications for other relief.  While relief from USCIS may still be pursued from abroad, it will be more expensive and difficult for Plaintiffs to continue representing clients who are no longer in the United States.

297.    All of these changes will come at the expense of other, priority work.  It will also take a health toll on the employees at Plaintiff organizations, who will have more work, worse

outcomes, and higher rates of burnout and attrition.  In turn, this will cost Plaintiffs more in recruitment, hiring, and training staff.

## LEGAL CLAIMS

### COUNT ONE
### (Violation of the APA, 5 U.S.C. § 706(2)(C) – Lack of Statutory Authority)

298.   Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth within.

299.   The APA provides that a "reviewing court shall—hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

300.   The INA grants authority to the Attorney General to issue regulations.  8 U.S.C. § 1103(g)(2).

301.   The final Rule was signed solely by Defendant McHenry as Director of EOIR, and not by the Attorney General or acting Attorney General.

302.   The Attorney General has never delegated authority to the Director of EOIR to engage in notice and comment rulemaking.  *See* 8 C.F.R. § 1003.0(b).

303.   Because Defendant McHenry was without statutory or delegated authority to issue the Rule, the issuance of the rule was "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and not in accordance with law, *id.* § 706(2)(A), and the Rule should be set aside.

### COUNT TWO
### (Violation of the APA, 5 U.S.C. § 706(2)(D) – Procedural Rulemaking Violations)

304.   Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth within.

305.     The APA provides that a "reviewing court shall—hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(C).  Defendants failed to engage in an appropriate rulemaking process.

306.     First, the Rule was issued after an inadequate, 30-day comment period that did not provide interested parties "a reasonable opportunity to participate in the rulemaking process." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) (internal quotation marks omitted).  "[A] sixty-day period" is considered "a more reasonable minimum time for comment" on a typical rule. *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (internal quotation marks omitted).  Defendants violated the APA by allowing the public only 30 days to comment on this sprawling Rule in the midst of a global pandemic and in close succession to the comment periods for numerous other NPRMs.

307.     Second, the Rule incorporated material changes that were not the logical outgrowth of the proposed rule, depriving interested parties of the opportunity to comment on those changes.

308.     Third, the Rule was issued in the context of multiple interlocking rulemakings and adjudications that made it impossible for commenters to analyze and comment on the full effects of the Rule.

309.     Because the entire Rule was issued "without observance of procedure required by law," it is unlawful under the APA.

## COUNT THREE
**(Violation of the APA, 5 U.S.C.§ 706(2)(A) – Contrary to Law)**

310.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth within.

311.    The APA provides that a "reviewing court shall—hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law."  5 U.S.C. § 706(2)(A).

312.    The Rule is not in accordance with the INA.  Specifically, it:

a.    **Violates 8 U.S.C. § 1158(a)(2)(B).**  That provision gives asylum-seekers one-year to seek asylum, but the 15-day window imposed by the Rule impermissibly shortens that timeframe.

b.    **Violates 8 U.S.C. §§ 1158(a)(1) and 1231(b)(3) and 8 C.F.R §§ 1208.16-18.**  The first of these provisions allows "any alien" to apply for asylum if she is present in the United States.  The latter provisions provide mandatory relief from deportation in cases where there is a probability that the individual will be persecuted or tortured abroad**.**  By mandating the denial of protection claims for failure to meet a 15-day deadline, produce proof of payment, or for blanks on the application form, the Rule deprives many noncitizens of their ability to pursue these forms of relief.

c.    **Violates 8 U.S.C. § 1229a(b)(4)(B).**  Under that provision, noncitizens have a right to a "reasonable opportunity to examine the evidence" against them and to present evidence of their own.  The Rule violates this provision by allowing IJs to provide evidence on their own, and permitting IJs to weigh government evidence over other sources.

d.    **Violates 8 U.S.C. §§ 1229a(b)(4)(A) and 1362.**  Those provisions afford noncitizens the right to counsel of their choosing, as long as it is not at the Government's expense.  By reducing the timetable for seeking asylum and

related protection, the Rule, all but eliminates the right to counsel for purposes of filing an asylum application.

e. **Violates 8 U.S.C. § 1158(d)(5)(A)(iii).** That provision codifies the expectation that asylum applications will be adjudicated within 180 days absent "exceptional circumstances." By adopting a definition of "exceptional circumstances" that has no rational relation to the adjudication of asylum claims, the Rule violates this provision.

313. The Rule violates international treaty obligations requiring the United States to refrain from returning individuals to places where they face a significant possibility of persecution or torture. Article 33.1 of the 1951 United Nations Convention Relating to the Status of Refugees "imposed a mandatory duty…not to return an alien to a country where his 'life or freedom would be threatened on account of one of the enumerated reasons." *INS v. Cardoza-Fonseca,* 480 U.S. 421, 429 (1987) (quoting the Refugee Convention, 19 U.S.T. at 6259, 6278, T.I.A.S. No. 6577 (1968)). Likewise, FARRA, Pub. L. No. 10-277, div. G, tit. XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231), codified the United States' prohibition on deportation to counties where there are substantial grounds for believing that the person would face torture. *See also* 8 C.F.R. §§ 1208.16–1208.18. By eliminating the opportunities for applicant to seek protection from deportation to persecution or torture, the Rule violates the United States' obligation to provide for these mandatory protections.

314. Finally, the Rule is contrary to law in that it violates the Due Process Clause, see *infra* Count V, and the Regulatory Flexibility Act, *see infra* Count VI.

315. Because the Rule violates these legal provisions, it is unlawful under the APA.

## COUNT FOUR
### (Violation of the APA, 5 U.S.C.§ 706(2)(A) – Arbitrary and Capricious)

316.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth within.

317.     The APA provides that a "reviewing court shall—hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

318.     EOIR failed to adequately justify the six provisions of the Rule described in *supra* ¶ 41, including by entirely failing to consider important aspects of the problems it was considering, by offering explanations for the Rule that run counter to the evidence before the agency, and by offering explanations that are so implausible that they cannot be ascribed to a difference in view.

319.     Because those six provisions of the Rule are arbitrary and capricious, they are unlawful under the APA.

## COUNT FIVE
### (Violation of the Fifth Amendment – Due Process)

320.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth within.

321.     The Fifth Amendment of the United States Constitution declares that "[n]o person . . . shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

322.     A "fundamental requirement" of the Due Process Clause of the Fifth Amendment is the "opportunity to be heard at meaningful time and in meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted).

323.    The combined effect of the Rule deprives noncitizens of their Fifth Amendment rights by taking away their meaningful right to be heard on their eligibility for asylum, withholding of removal, and the Convention Against Torture.

324.    Defendants' violation of the Due Process Clause causes ongoing, imminent, and irreparable harm to the Plaintiffs.

**COUNT SIX**
**(Violation of the Regulatory Flexibility Act, 5 U.S.C. 601, *et seq.*)**

325.    The RFA, as amended, requires federal administrative agencies to analyze how rules they promulgate will affect "small entities," and to publish final versions of those regulatory flexibility analyses.  5 U.S.C. §§ 603–604.

326.    Plaintiffs the Florence Project, Las Americas, and ImmDef are small entities within the meaning of the RFA, as each is a "not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[5]  *Id.* 601(4).

327.    EOIR did not publish a regulatory flexibility analysis concerning the Rule.

328.    EOIR instead purported to certify that the Rule would not "have a significant economic impact on a substantial number of small entities," so that no regulatory flexibility analysis was required.  85 Fed. Reg. at 81748.

329.    The RFA requires that such certifications be made by "the head of the agency."  5 U.S.C. § 605(b).

330.    The "head of the agency" of which EOIR is a part is the Attorney General.

---

[5] Plaintiff NIJC is an entity of a larger nonprofit organization, Heartland Alliance. Because NIJC is not an independent nonprofit, this claim is not being brought on behalf of NIJC or Heartland Alliance.

331.   EOIR's certification was made by Defendant McHenry, not by the Attorney General, and is therefore invalid.

332.   In addition, EOIR's certification is incorrect, because the Rule is a rule that affects small entities within the meaning of the RFA.  5 U.S.C. § 601(2).  If the Rule goes into effect, it will directly regulate Plaintiffs, including by requiring them to comply with the Rule's procedural requirements, such as the 15-day application deadline, when they represent asylum-seeking clients.

333.   The RFA requires agencies to describe and estimate the number of small entities that would be affected by a rule that they promulgate, including reporting and other compliance requirements.  *Id.* § 604(a)(4), (5).  It also requires agencies to describe:

> the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

*Id.* § 604(a)(6).

334.   Defendants violated the RFA when they failed to undertake and publish a final regulatory flexibility analysis before promulgating the Rule.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court:

(A)      Grant a temporary restraining order staying the effective date of the Rule;

(B)      Stay the implementation or enforcement of the Rule under 5 U.S.C. § 705

           pending the Court's final adjudication of the claims herein;

(C)      Stay the implementation of the Rule pending a remand to the agency to

           conduct a regulatory flexibility analysis under 5 U.S.C. § 611(a)(4);

(D)      Hold unlawful and set aside the Rule under 5 U.S.C. § 706(2);

(E)      Declare the Rule arbitrary, capricious, an abuse of discretion, otherwise

           not in accordance with law, in excess of statutory authority, and without

           observance of procedure as required by law, in violation of the APA;

(F)      Declare the Rule unconstitutional for violating the Due Process guarantee

           of the Fifth Amendment of the United States Constitution;

(G)      Enter a preliminary and permanent nationwide injunction, enjoining

           Defendants, their officials, agents, employees, and assigns from

           implementing or enforcing the Rule;

(H)      Award Plaintiffs reasonable attorneys' fees and costs pursuant to 28

           U.S.C. § 2412;

(I)      Grant any other and further relief this Court may deem just and proper.

Dated: January 8, 2021

Respectfully submitted,

Keren Zwick (D.D.C. Bar. No. IL0055)             /s/ Kristen A. Lejnieks
Mark Fleming                                     Kristen A. Lejnieks (DC Bar No. 502136)
NATIONAL IMMIGRANT JUSTICE CENTER                Parker A. Rider-Longmaid (DC Bar No. 1552207)[*]
224 S. Michigan Ave., Suite 600                  JONES DAY
Chicago, IL 60604                                51 Louisiana Ave, NW
Telephone:  (312) 660-1370                       Washington, DC 20001-2113
Email:  kzwick@heartlandalliance.org             Telephone:  (202) 879-3939
Email:  mfleming@heartlandalliance.org           Facsimile:  (202) 626-1700
                                                 Email:  kalejnieks@jonesday.com
                                                 Email:  priderlongmaid@jonesday.com
Sarah Thompson (D.D.C. Bar No. CA00073)
NATIONAL IMMIGRANT JUSTICE CENTER                David R. Fox (DC Bar No. 1015031)
PO Box 124975                                    Laura Diss Gradel
San Diego, CA 92112                              JONES DAY
Telephone:  (312) 660-1370                       100 High Street, 21st Floor
Email:  sthompson@heartlandalliance.org          Boston, MA 02100
                                                 Telephone:  (617) 960-3939
                                                 Facsimile:  (617) 449-6999
                                                 Email:  drfox@jonesday.com
                                                 Email:  lgradel@jonesday.com

                                                 David Ledet
                                                 JONES DAY
                                                 500 Grant Street Suite 4500
                                                 Pittsburgh, PA 15219
                                                 Telephone:  (412) 394-7271
                                                 Facsimile:  (412) 394-7959
                                                 Email:  dledet@jonesday.com


                                                 Counsel for Plaintiffs

---

[*] D.D.C. Bar application pending.