# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL IMMIGRANT JUSTICE CENTER, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, et al. <br><br> Defendants. | Case No.: 1:21-cv-00056-RBW <br><br> ***Document Electronically Filed*** <br><br> **ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND STAY OF EFFECTIVE DATE UNDER 5 U.S.C. § 705**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND .............................................................................................. 2

  I.    ASYLUM, WITHHOLDING OF REMOVAL, AND CAT PROTECTION .................. 2

  II.   THE CHALLENGED RULE AND ITS IMPACT ON PLAINTIFFS ......................... 3

ARGUMENT ....................................................................................................................... 6

  I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
       CLAIMS BECAUSE THE RULE IS CONTRARY TO LAW, ARBITRARY
       AND CAPRICIOUS, INCONSISTENT WITH U.S. OBLIGATION'S UNDER
       TREATIES & INTERNATIONAL LAW, AND UNCONSTITUTIONAL ................... 7

     A.   Count 1:  Defendant McHenry Lacked Authority to Issue the Rule ........................ 7

     B.   Count 2:  The Rule Violates the APA ................................................................... 8

         1.    EOIR Provided an Insufficient Comment Period ............................................. 9

         2.    EOIR Unforeseeably Added an Additional Category of Asylum
            Applicants to Whom the 15-Day Deadline Would Apply ............................. 10

         3.    Multiple Interlocking Rulemakings Prevented Commenters From
            Assessing the Combined Effect of the Administration's Changes to
            Asylum Policy ............................................................................................... 11

     C.   Count 3:  The Rule Is Contrary to Law ............................................................. 11

         1.    The 15-Day Application Deadline Is Contrary to the INA ............................. 12

         2.    Allowing Immigration Judges to Enter Evidence into the Record
            Contradicts the INA and Improperly Turns Adjudicators into
            Advocates ...................................................................................................... 13

         3.    Requiring IJs to Adjudicate Applications within 180 Days Absent
            Exceptional Circumstances Misinterprets the INA and Prioritizes
            Expediency over Fairness ............................................................................. 15

         4.    The Rule Is Inconsistent with the United States Obligations Under
            Treaties & International Law ......................................................................... 16

     D.   Count 4:  The Rule Is Arbitrary and Capricious ................................................ 17

         1.    The 15-Day Deadline Is Arbitrary and Capricious ....................................... 17

            a.    EOIR Failed to Consider How Noncitizens Could Comply with
               the Deadline ........................................................................................... 18

               (1)   Language barriers and translation needs ...................................... 18

               (2)   Access to counsel .......................................................................... 19

               (3)   Corroborating Evidence ................................................................ 22

(4)    Trauma ............................................................................. 23

    b.    EOIR Completely Failed to Consider the Effect of the 15-Day Deadline on the Categories of Noncitizens Actually Subject to It ....... 23

    c.    EOIR Entirely Failed to Consider Whether and How the Deadline Would Apply to Noncitizens Subject to the Migrant Protection Protocols .................................................................................... 24

    d.    EOIR's Argument that Noncitizens Will Have More Than 15-Days to Apply In Practice Does Not Justify the Rule ........................... 25

    e.    The Rare Possibility of an Extension for Good Cause Does Not Justify the Rule ..................................................................................... 26

    f.    EOIR Offered No Evidence that its 15-Day Deadline Will Speed Up Asylum Adjudication ..................................................................... 26

    2.    The Provision that EOIR May Reject Trivially Incomplete Applications At Any Time Is Arbitrary and Capricious ............................... 27

    3.    Requiring IJs to Adjudicate Applications Within 180 Days Absent Exception Circumstances Is Arbitrary and Capricious ................................... 29

    4.    Heightening the Evidentiary Burden for Non-Governmental Sources Prejudices Noncitizens, Is Unnecessary, and Further Politicizes EOIR Proceedings ................................................................................................ 30

    5.    Allowing Immigration Judges to Enter Evidence into the Record is Arbitrary and Capricious ................................................................................ 31

E.    Count 5:  The Rule Violates Due Process and Is thus Unconstitutional ................ 31

F.    Count 6:  Defendants Violated the Regulatory Flexibility Act by Improperly Ignoring and Discounting the Impact of the Rule on Small Entities, in Violation of the Regulatory Flexibility Act ........................................................... 32

II.    PLAINTIFFS AND THE ASYLUM SEEKERS THEY REPRESENT FACE IMMEDIATE AND IRREPARABLE HARM ABSENT PRELIMINARY RELIEF ................................................................................................................... 33

    A.    The Rule Will Directly Jeopardize Plaintiffs' Ability to Carry Out Their Missions and Require Plaintiffs to Divert Significant Resources Away From Their Work ....................................................................................................... 34

    B.    The Final Rule Deprived Plaintiffs of Procedural Protections Under the APA, Causing Immediate and Irreparable Harm ................................................... 39

    C.    The Rule Will Contravene Plaintiffs' Organizational Visions by Precluding Meritorious Claims of Asylum Seekers ................................................................ 39

III.    THE BALANCE OF THE EQUITIES FAVORS PLAINTIFF AND IMMEDIATE INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST ..................... 40

IV.    THE FINAL RULE SHOULD BE STAYED PURSUANT TO 5 U.S.C. § 705 AND ENJOINED IN ITS ENTIRETY .......................................................................... 42

CONCLUSION.................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aamer v. Obama*,
   742 F.3d 1023 (D.C. Cir. 2014) ..................................................................41

*Aeronautical Repair Station Ass'n v. FAA*,
   494 F.3d 161 (D.C. Cir. 2007) ....................................................................32

*\*Am. Radio Relay League, Inc. v. FCC*,
   524 F.3d 227 (D.C. Cir. 2008) ......................................................................8

*Arizona v. United States*,
   567 U.S. 387 (2012) ....................................................................................44

*Cane Growers Co-op. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) ......................................................................39

*Cleveland Bd. of Education v. Loudermill*,
   470 U.S. 532 (1985) ....................................................................................31

*Constanza-Martinez v. Holder*,
   739 F.3d 1100 (8th Cir. 2014) ....................................................................14

*\*Dist. of Columbia v. U.S. Dep't of Agric.*,
   444 F. Supp. 3d 1 (D.D.C. 2020) .............................................................7, 43

*Doe v. Chao*,
   540 U.S. 614 (2004) ....................................................................................14

*E. Bay Sanctuary Covenant v. Barr*,
   964 F.3d 832 855 (9th Cir. 2020) ...............................................................43

*E. Bay Sanctuary Covenant v. Trump*,
   950 F. 3d 1242 (9th Cir. 2020) ...................................................................44

*Fuentes v. Shevin*,
   407 U.S. 67 (1972) ......................................................................................31

*\*Gomez v. Trump*,
   2020 WL 5367010 (D.D.C. Sept. 4, 2020) ....................................42, 43, 44

*\*Grace v. Barr*,
   965 F.3d 883 (D.C. Cir. 2020) ...............................................................17, 22

*Hamdan v. Rumsfeld*,
   548 U.S. 557 (2006) ....................................................................................14

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004) ....................................................................................31

*\*Hias, Inc. v. Trump*,
   No. 20-1160, 2021 WL 69994 (4th Cir. Jan. 8, 2021) ...........................43, 44

*Immigrant Legal Res. Ctr. v. Wolf,
  No. 20-CV-05883-JSW, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020) ............40, 41, 42, 43

In re S-M-J-,
  21 I. & N. Dec. 722 (BIA 1997) .................................................................................................14

*Innovation Law Lab v. Wolf,
  951 F.3d 1073 (9th Cir. 2020) .................................................................................17, 25, 44

INS v. Cardoza-Fonseca,
  480 U.S. 421 (1987)....................................................................................................................12

INS v. Stevic,
  467 U.S. 407 (1984).......................................................................................................................2

Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,
  407 F.3d 1250 (D.C. Cir. 2005) ...............................................................................................11

Kooritzky v. Reich,
  17 F.3d 1509 (D.C. Cir. 1994) .................................................................................................11

*League of Women Voters of United States v. Newby,
  838 F.3d 1 (D.C. Cir. 2016) ...............................................................................................33, 34, 41

Make the Rd. New York v. McAleenan,
  405 F. Supp. 3d 1 (D.D.C. 2019) .......................................................................................24, 39

Make the Rd. N.Y., Inc. v. Wolf,
  962 F.3d 612 (D.C. Cir 2020) ...................................................................................................24

*Mathews v. Eldridge,
  424 U.S. 319 (1976)....................................................................................................................31

Mexichem Fluor, Inc. v. EPA,
  866 F.3d 451 (D.C. Cir. 2017) .................................................................................................11

Michigan v. EPA,
  576 U.S. 743 (2015)....................................................................................................................26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
  463 U.S. 29 (1983).........................................................................................................11, 17, 20

*Mozilla Corp. v. FCC,
  940 F.3d 1 (D.C. Cir. 2019) (per curiam) ...............................................................12, 20, 25

N. Mariana Islands v. United States,
  686 F. Supp. 2d 7 (D.D.C. 2009) .............................................................................................42

Nat'l Lifeline Ass'n v. FCC,
  921 F.3d 1102 (D.C. Cir. 2019) ...............................................................................................10

Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,
  145 F.3d 1399 (D.C. Cir. 1998) ...............................................................................................43

Nat'l Parks Conservation Ass'n v. Semonite,
  282 F. Supp. 3d 284 (D.D.C. 2017) .........................................................................................33

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) ...................................................................34

*Nken v. Holder*,
    556 U.S. 418 (2009) ..........................................................................................41

*\*Nw. Immigrant Rights Project v. USCIS*,
    No. 19-3283, 2020 WL 5995206 (D.D.C. Oct. 8, 2020) .................................5, 7, 33

*O.A. v. Trump*,
    404 F. Supp. 3d 109 (D.D.C. 2019) ...............................................................13

*Olabanji v. INS*,
    973 F.2d 1232 (5th Cir. 1992) .......................................................................31

*Open Communities All. v. Carson*,
    286 F. Supp. 3d 148 (D.D.C. 2017) .........................................................33, 41

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*,
    901 F. Supp. 2d 54 (D.D.C. 2012) ...............................................................41

*\*Pangea Legal Serv. v. DHS*,
    No. 20-cv-09258-JD, 2021 WL 75756 (N.D. Cal. Jan. 11, 2021) ............5, 10, 23, 24

*People for the Ethical Treatment of Animals v. USDA*,
    797 F.3d 1087 (D.C. Cir. 2015) .....................................................................33

*Petry v. Block*,
    737 F.2d 1193 (D.C. Cir. 1984) .......................................................................9

*Ramirez v. U.S. Immigration & Customs Enf't*,
    310 F. Supp. 3d 7 (D.D.C 2018) ....................................................................42

*Richardson v. Perales*,
    402 U.S. 389 (1971) ..........................................................................................15

*Rodrigues-Laira v. INS*,
    282 F.3d 1218 (9th Cir. 2002) .......................................................................31

*Ross v. Blake*,
    136 S. Ct. 1850 (2016) ......................................................................................14

*\*Russello v. United States*,
    464 U.S. 16 (1983) ............................................................................................14

*Safe Extensions, Inc. v. FAA*,
    509 F.3d 593 (D.C. Cir. 2007) .......................................................................26

*Salazar-Gonzales v. Lynch*,
    798 F.3d 917 (9th Cir. 2015) .........................................................................31

*Serono Labs., Inc. v. Shalala*,
    158 F.3d 1313 (D.C. Cir. 1998) .....................................................................41

*Sidhu v. INS*,
    220 F.3d 1085 (9th Cir. 2000) .......................................................................23

*Stone v. INS,*
  514 U.S. 386 (1995)......................................................................................14

*\*United Keetoowah Band of Cherokee Indians in Okla. v. FCC,*
  933 F.3d 728 (D.C. Cir. 2019).................................................................18, 29

*Ward v. Vill. of Monroeville,*
  409 U.S. 57 (1972)........................................................................................31

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)............................................................................................7

*Yang v. Elroy,*
  277 F.3d 158 (2d Cir. 2002)..........................................................................15

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

U.S. Const. amend. V.........................................................................................31

5 U.S.C. § 553................................................................................................8, 39

5 U.S.C. § 603......................................................................................................32

5 U.S.C. § 604......................................................................................................32

5 U.S.C. § 605......................................................................................................32

5 U.S.C. § 705........................................................................................2, 7, 42, 45

5 U.S.C. § 706............................................................................................. *passim*

Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. B, Title II (2020) ...............22

Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*

  8 U.S.C. § 1101.................................................................................................2

  8 U.S.C. § 1103.................................................................................................7

  8 U.S.C. § 1158...................................................................................... *passim*

  8 U.S.C. § 1225.........................................................................................24, 25

  8 U.S.C. § 1229a...............................................................................13, 16, 31

  8 U.S.C. § 1231..................................................................................2, 3, 4, 12

  8 U.S.C. § 1252 (1994).................................................................................14

  8 U.S.C. § 1362...............................................................................................13

Refugee Act of 1980, Pub. L. No. 96–212, 94 Stat. 102 ...................................2

**OTHER AUTHORITIES**

8 C.F.R. § 208.2....................................................................................................3

8 C.F.R. § 208.9....................................................................................................3

8 C.F.R. § 208.16..................................................................................................3

8 C.F.R. § 1003.0.............................................................................................7, 8

8 C.F.R. § 1003.10 ...................................................................................................16

8 C.F.R. § 1003.24 .....................................................................................................5

8 C.F.R. § 1003.31 ..................................................................................................5, 12

8 C.F.R. § 1103.7 .......................................................................................................5

8 C.F.R. § 1208.3 ............................................................................................5, 27, 28

8 C.F.R. § 1208.4 .......................................................................................................5

8 C.F.R. § 1208.5 ......................................................................................................19

8 C.F.R. § 1208.12 .........................................................................................6, 13, 30, 31

8 C.F.R. § 1208.16 ....................................................................................................12

8 C.F.R. § 1208.17 ....................................................................................................12

8 C.F.R. § 1208.18 ....................................................................................................12

85 Fed. Reg. 59,695 (Sept. 23, 2020) .......................................................................14

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment
   or Punishment, Dec. 10, 1984, 119 STAT. 2740, 1465 U.N.T.S. 85 .....................16

Dept. of Homeland Security, *Annual Flow Report, Refugees and Asylees: 2019* ..........9

DOJ, Statistics Yearbook FY 2018 ............................................................................10

*Executive Order 13,563: Improving Regulation and Regulatory Review,*
   76 Fed. Reg. 3721 (Jan. 21, 2011) ........................................................................9

*Executive Order No. 12,866,*
   58 Fed. Reg. 51,735 (Oct. 4, 1993) .......................................................................9

*Immigration Court Processing Time by Outcome*, TRAC Immigration.........................6

Int'l Covenant on Civil and Political Rights,
   Dec. 16, 1966, T.I.A.S. No. 92-908, 999 U.N.T.S. 1057.......................................16

Local Civil Rule 65.1 .................................................................................................45

National Association of Immigration Judges, Comment (Oct. 23, 2020) ...................29

Kirstjen M. Nielsen, DHS, *Policy Guidance for Implementation of the Migrant
   Protection Protocols* (Jan. 25, 2019) ....................................................................24

*Ombudsman Alert: Recent Updates to USCIS Form Instructions,*
   Dep't. of Homeland Sec. (Jan. 23, 2020).............................................................28

*Procedures for Asylum and Withholding of Removal,*
   85 Fed. Reg. 81,698 (Dec. 16, 2020) .......................................................... *passim*

Protocol Relating to the Status of Refugees art. 1,
   Oct. 4, 1967, T.I.A.S. No. 6577, 606 U.N.T.S. 267..............................................16

Sen. Rep. 104-249 (1996) .........................................................................................12

## **INTRODUCTION**

On December 16, 2020, as part of the Trump administration's self-declared effort to limit the availability of asylum and deter future migrants, the Executive Office for Immigration Review ("EOIR") issued *Procedures for Asylum and Withholding of Removal* (the "Rule"), 85 Fed. Reg. 81,698 (Dec. 16, 2020). The sweeping final Rule—issued after a truncated 30-day comment period in the midst of COVID-19—will severely limit the ability of noncitizens to seek asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), and will transform the adjudication of asylum claims, stacking the odds against applicants. The Rule purports to make mere procedural changes, but if it is permitted to take effect on January 15, 2021, noncitizens will face severe and often insurmountable barriers to the assertion of valid claims for protection, contrary to our country's longstanding commitment to provide safe harbor to migrants.

This case challenges six procedural changes included in the Rule that make it more difficult for migrants to apply for asylum and related relief, each of which are described further herein. Compl. ¶ 41, *Nat'l Immigrant Justice Center v. EOIR*, ECF No. 1, No. 21-cv-56, (D.D.C. Jan. 8, 2021). These changes, ranging from a shortened application deadline designed to preclude asylum seekers' claims from even being filed and heard, let alone fairly adjudicated, to an evidentiary double-standard that prizes U.S. Government evidence over that from other sources, erect new barriers to obtaining asylum at every stage of the process.

Plaintiffs—four nonprofit organizations that provide legal services to immigrants, including noncitizens seeking asylum subject to the Rule—are likely to succeed on their claims because the Rule is unlawful and unconstitutional. Compl. ¶¶ 15–19; 298–334. EOIR promulgated the Rule without statutory authority and through a fundamentally flawed process in violation of the Administrative Procedure Act ("APA"). *Id.* If it is allowed to take effect, the Rule will inflict grave, immediate, and irreparable harm to persons seeking refuge in the United States.

And because the Rule will make the task of providing legal representation to noncitizens much harder, it will also gravely and irreparably harm Plaintiffs.  The dramatic changes proposed by the Rule will affect a significant percentage of each Plaintiff's caseload, requiring Plaintiffs to restructure their operations, reduce the number of clients they can serve, hire more staff, and divert funding from other program areas to address changes impose by the Rule.  *See infra* Argument, § II (describing irreparable harms).  Given these injuries to Plaintiffs and their clients, and because the balance of equities weighs in favor of injunctive relief and such relief is in the public interest, *see infra* Argument § III, the Court should grant a temporary restraining order and preliminary injunction staying the effective date of the Rule, or else grant a stay of the Rule's effective date under 5 U.S.C. § 705 pending adjudication of this case.

## **FACTUAL BACKGROUND**

### I.   ASYLUM, WITHHOLDING OF REMOVAL, AND CAT PROTECTION

The United States has long welcomed refugees, because "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands." Refugee Act of 1980, Pub. L. No. 96–212, 94 Stat. 102.  As such, the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, has for decades allowed "[a]ny alien who is physically present in the United States or who arrives in the United States" to seek asylum, "irrespective of such [noncitizen]'s status."  *Id.* § 1158(a)(1).  Asylum is a discretionary form of relief that is available to individuals who have a "well-founded fear of persecution" on account of their membership in certain protected groups.  *Id.* §§ 1101(a)(42)(A), 1158(b)(1)(A).

Noncitizens may also apply for withholding of removal and CAT protection, which are non-discretionary forms of relief.  *See id.* § 1231(b)(3)(A); *INS v. Stevic*, 467 U.S. 407, 421 n. 15, 422 (1984).  To obtain withholding of removal or CAT protection, a noncitizen must show that it

is more likely than not he would be persecuted or tortured in a particular country—a higher standard than asylum.  8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.16(b), (c)(2).

Noncitizens who are not in removal proceedings may apply for asylum "affirmatively" before United States Citizenship and Immigration Services ("USCIS"), an agency within the Department of Homeland Security ("DHS").  *See* 8 C.F.R. §§ 208.2(a), 208.9.  This case, however, concerns "defensive" claims for asylum, withholding of removal, and CAT protection, which are adjudicated by EOIR in immigration court as a defense to a noncitizen's removal.

From the outset, the Trump administration has engaged in a self-declared effort to limit the availability of asylum relief to noncitizens and to deter future migrants from seeking asylum in the United States.  Since 2018, the administration has issued a firestorm of rules and proclamations limiting access to asylum relief including, but not limited to:  banning individuals who enter the United States between ports of entry from obtaining asylum; illegally disqualifying from asylum eligibility any individual who transits through a third country before arriving at the United States' southern border; and instituting the Migrant Protection Protocols ("MPP"), which have required more than 60,000 individuals to wait in Mexico in life-threatening conditions while their asylum claims are adjudicated.  Compl. ¶¶ 32–39.  These efforts have accelerated in the last few months.  In December 2020 alone, the administration issued five other immigration-related rules in addition to the Rule challenged here, all of which affect access to asylum, withholding of removal, and CAT protection, and many of which have been challenged in court.  Compl. ¶ 38.

## II.  THE CHALLENGED RULE AND ITS IMPACT ON PLAINTIFFS

Plaintiffs are four nonprofit legal service organizations that serve immigrants around the country.  Compl. ¶ 15; *see* Exhibits A–D (Plaintiffs' Declarations).  Plaintiff National Immigrant Justice Center ("NIJC") provides comprehensive legal services to indigent noncitizens around the country.  *Id.* ¶ 16.  Plaintiff Immigrant Defenders Law Center ("ImmDef") provides universal

representation to immigrants and refugees in immigration proceedings throughout Southern California. *Id.* ¶ 17. Plaintiff Florence Immigrant and Refugee Rights Project ("Florence Project") provides free legal and social services to adults and unaccompanied children in immigration custody in Arizona, including at the U.S.-Mexico border. *Id.* ¶ 18. Plaintiff Las Americas Immigrant Advocacy Center ("Las Americas") provides free and low-cost legal services to low-income immigrants and refugees in Ciudad Juarez, Mexico, West Texas, and New Mexico. *Id.* ¶ 18. All four organizations serve immigrants in removal proceedings who are defensively claiming asylum, withholding of removal, and/or CAT protection. All four organizations will be negatively affected by this Rule, forcing Plaintiffs to adjust their services in response to the Rule's changes. *See infra* Argument, § II.

The final Rule drastically restricts asylum access for nearly all asylum seekers in removal proceedings and devastates Plaintiffs' missions. First, it imposes an arbitrary and nearly-impossible-to-meet 15-day filing deadline for affected noncitizens to file an application—with documentary support and, potentially, proof of payment of the fee—and provides that all such claims will be deemed waived if the deadline is not met. *See* 85 Fed Reg. 81,751; Compl. ¶¶ 42–66. The Rule's imposition of such a short deadline contradicts Congress' decision in the INA to provide noncitizens with a full year in which to apply for asylum, 8 U.S.C. § 1158(a)(2)(B), and defies the INA's lack of a deadline withholding of removal or protection under the CAT, mandatory forms of relief that are also sought through the submission of an asylum application. *See id.* § 1231(b)(3). As explained further *infra* Argument § I.D.1, it will be nearly impossible for most asylum seekers to meet this deadline, so countless deserving applications will be denied because of the Rule. The result will be the removal of many noncitizens to countries from which

they fled for fear of persecution or torture.  If given effect the deadline will apply to nearly all asylum applicants.[1]  *See* Compl. ¶¶ 46, 56–57, 68–69.

The Rule also requires that asylum applications be rejected if they are not accompanied by proof of payment of any applicable application fee.  *See* 85 Fed. Reg. 81,750–51 (to be codified at 8 C.F.R. §§ 1003.24(c)(1), 1003.31(b), 1103.7(a)(3), 1208.3(c)(3), 1208.4(d)(2)).  On August 3, 2020, the Trump administration—for the first time in United States history—sought to make the United States the only country in the world to charge a non-waivable application fee for asylum, by promulgating a final rule ("USCIS Fee Rule") that established a non-waivable $50 application fee.  Compl. ¶¶ 68–69.  The USCIS Fee Rule has been enjoined in separate litigation,[2] but if it ever takes effect, the Rule challenged here will require that proof of payment of the fee to USCIS be included with every asylum application sent to EOIR, on pain of rejection.  *See* 85 Fed. Reg. 81,750–51.  EOIR promulgated this requirement despite clear evidence that many asylum applicants—particularly those in detention—will have no access to either the funds or the methods of payment that USCIS accepts.  Compl. ¶¶ 240–43.

The Rule also requires IJs to reject claims if they discover at any time—even at a final hearing after all evidence has been heard—that a noncitizen's application did not contain an answer to a single question, even if the question was plainly inapplicable.  85 Fed. Rev. 81,750–51 (to be codified at 8 C.F.R. § 1208.3(c)(3)).  Noncitizens therefore will face the possible rejection of their

---

[1] As explained below, the Rule works in tandem with the December 11 Rule, which was enjoined shortly after Plaintiffs filed the Complaint on Friday, and which drastically expanded the population subject to the 15-day deadline.  *See Pangea Legal Serv. v. DHS*, No. 20-cv-09258-JD, 2021 WL 75756  (N.D. Cal. Jan. 11, 2021).

[2] *See Nw. Immigrant Rights Project v. USCIS*, No. 19-3283, 2020 WL 5995206, at *33 (D.D.C. Oct. 8, 2020).  This existing injunction means there is currently no applicable asylum application fee, so Plaintiffs do not further address the fee-related portion of the Rule in this Motion, although Plaintiffs' procedural and lack-of-legal-authority arguments would invalidate the Rule in full, including the fee-related portions, and Plaintiffs reserve their rights to further challenge the fee-related portions of the Rule in the event that the existing injunction is set aside.

applications on technical grounds at all points in the process, and will not know until their claims are finally adjudicated whether EOIR will reject their applications as incomplete.

In addition, the Rule also makes it more difficult for asylum seekers to present their claims to IJs.  It authorizes IJs to rely on evidence from U.S. Government sources without assessing their credibility, while simultaneously erecting barriers to reliance on other sources of evidence, including evidence that contradicts U.S. Government evidence.  85 Fed. Reg. 81,751 (to be codified at 8 C.F.R. § 1208.12(a)).  It does so despite commenters' accounts of bias in State Department country-condition reports, and notwithstanding the fact that reliable nongovernmental sources are more likely to delve into specific issues or events relevant to a particular asylum case. Compl. ¶¶ 82–84.  The Rule also authorizes IJs to act as advocates rather than adjudicators by proffering their own evidence, even though the INA withholds that authority.  85 Fed. Reg. 81,751; Compl. ¶¶ 86–90.  The Rule will therefore unfairly make IJs both advocates and adjudicators in every asylum claim.

Finally, the Rule shoehorns a statutorily inapplicable, overly narrow definition of "exceptional circumstances" from a different part of the INA to restrict IJ authority to continue asylum hearings beyond the 180-day period set by statute for their adjudication—a period the Government is almost never able to meet.[3]  8 U.S.C. § 1158(d)(5)(a)(iii); Compl. ¶¶ 91–99.  EOIR adopted this new deadline without considering how IJs would be able to meet it, or what its consequences for asylum seekers would be.

---

[3] Immigration cases before EOIR of all kinds took an average of 184 days to adjudicate in 1998, which steadily increased to an average of 533 days by 2019, according to Syracuse University's nonprofit data research center "TRAC."  *See Immigration Court Processing Time by Outcome*, TRAC Immigration, https:// trac.syr.edu/ phptools/immigration/court_backlog/court_proctime_outcome.php (select "Average Days" under "What to Tabulate"; "All" under "Outcome Type"; and "Entire US" under "Fiscal Year 2021").

## ARGUMENT

Plaintiffs request that the Court grant a temporary restraining order and preliminary injunction staying the effective date of the Rule until the final adjudication on the merits of Plaintiffs' Complaint, or, in the alternative, a stay pursuant to 5 U.S.C. § 705.  *See Nw. Immigrant Rights Project v. USCIS*, No. 19-3283, 2020 WL 5995206, *32–33 (D.D.C. Oct. 8, 2020). Plaintiffs meet the standards for these forms of relief:  (i) they are likely to succeed on the merits of their claims, (ii) they will experience irreparable harm without a stay, and (iii) the balance of equities and the public interest weigh in favor of the relief.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15, 46 (D.D.C. 2020) (applying preliminary injunction standard to § 705 and granting partial stay).

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS BECAUSE THE RULE IS CONTRARY TO LAW, ARBITRARY AND CAPRICIOUS, INCONSISTENT WITH U.S. OBLIGATION'S UNDER TREATIES & INTERNATIONAL LAW, AND UNCONSTITUTIONAL

### A.   Count 1:  Defendant McHenry Lacked Authority to Issue the Rule

At the outset, the Rule was issued without statutory authority because it was signed solely by EOIR's Director, Defendant McHenry, who has no statutory or delegated authority to engage in notice-and-comment rulemaking.  The INA expressly provides that "[t]he *Attorney General* shall establish such regulations, . . . delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" his powers and duties under the INA.  8 U.S.C. § 1103(g)(2) (emphasis added).  And the Attorney General has never delegated authority to the Director of EOIR to engage in notice-and-comment rulemaking.

The sole published delegation of authority from the Attorney General to the EOIR Director is 8 C.F.R. § 1003.0(b).  That provision allows the EOIR Director to "[i]ssue operational instructions and policy, including procedural instructions regarding the implementation of new

statutory or regulatory authorities." *Id*. § 1003.0(b)(1)(i).   It explicitly distinguishes between "operational instructions," "policy", and "procedural instructions," on the one hand, and "new . . . regulatory authorities," on the other, and thus does not allow the EOIR Director to issue regulations.   *Id*.   The final Rule does not describe any other source of delegated authority for the Director of EOIR to issue the Rule, and Plaintiffs are aware of none.   Consistent with this analysis, every one of the regulatory provisions that the Rule amends was promulgated by the Attorney General, not the EOIR Director.   *See* Compl. ¶ 101.   Because Defendant McHenry was without statutory or delegated authority to issue the Rule, the issuance of the Rule was "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and "not in accordance with law," *id.* § 706(2)(A), and the Rule in its entirety should be set aside.

### B.   Count 2:  The Rule Violates the APA

The final Rule violates the APA in multiple ways.   The APA requires agencies to provide notice of proposed rules and the proposed legal bases for those rules, 5 U.S.C. § 553(b)(2), (3), in order to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation," *id.* § 553(c).   Notice must afford interested parties "a reasonable opportunity to participate in the rulemaking process."   *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) (internal quotation marks omitted).   Further, the APA forbids agencies from implementing rules that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).   EOIR failed to satisfy both of these requirements.   Because the APA requires the Court to "hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law," *id.* § 706(2)(D), the entire Rule is invalid.

1.   <u>EOIR Provided an Insufficient Comment Period</u>

Even though the Rule potentially affects a significant number of the hundreds of thousands of noncitizens seeking asylum and related protection in the United States,[4] as well as organizations like Plaintiffs that support and represent such asylum seekers, EOIR issued the rule on an expedited timeframe, providing only 30 days for comments—only half the time generally considered reasonable under Executive Orders 12,866 and 13,563 and D.C. Circuit precedent.  *See Executive Order No. 12,866*, 58 Fed. Reg. 51,735 (Oct. 4, 1993); *Executive Order 13,563:  Improving Regulation and Regulatory Review*, 76 Fed. Reg. 3721 (Jan. 21, 2011); *see also Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) ("The Administrative Conference itself thus suggests a sixty-day period as a more reasonable minimum time for com[m]ent.").   Numerous commenters requested an extension, explaining that the timeframe did not allow them a meaningful opportunity to gather and submit data, views, and arguments.  Compl. ¶¶ 114–15 (citing comments); *see also* 85 Fed. Reg. 81,704 (commenters needed more time "to adequately consider and respond to the significance of the rule's proposed changes," particularly given many other recent "complex proposed rules on a wide range of immigration-related topics").

EOIR's only explanation for the 30-day comment period was that the issues the Rule addressed were "either already set by statute," "well-known to aliens and practitioners," or "well-established as immigration court practices."  *Id.*  EOIR is wrong.  As explained above, the Rule made significant changes to existing asylum regulations that were not known or knowable to Plaintiffs or similar organizations, much less to their clients.  The 30-day comment period also meant that EOIR closed the comment period for the Rule before it finalized the December 11 Rule, which made numerous substantive changes to asylum law that, among other things, dramatically

---

[4] In 2019, EOIR received 210,752 defensive applications for asylum.  *See* Dept. of Homeland Security, *Annual Flow Report, Refugees and Asylees: 2019*, Table 6b, https://www.dhs.gov/sites/default/files/publications/immigration-statistics/yearbook/2019/refugee_and_asylee_2019.pdf.

expanded the population of asylum seekers to whom the Rule's 15-day deadline applies, and therefore, as EOIR acknowledged, has significant "interplay" with this Rule.  85 Fed. Reg. 81,702.[5]  The 30-day period deprived interested parties of the opportunity to comment on the combined impact of the December 11 Rule and this Rule (plus the five other immigration rules promulgated in December 2020, *see* Compl. ¶ 38) and unjustifiably limited the quantity and quality of comments submitted.

> 2.   EOIR Unforeseeably Added an Additional Category of Asylum Applicants to Whom the 15-Day Deadline Would Apply

Between the NPRM and the Rule, EOIR also significantly expanded the scope of the new 15-day application deadline.  In the NPRM, EOIR proposed to apply the new deadline only in "asylum-and-withholding only" proceedings.  In the Rule, however, EOIR applied the deadline to "withholding only" proceedings as well.  85 Fed. Reg. 81,698–99.  This change matters because in Fiscal Year 2018 (the most recent year for which such statistics are available), there were just 726 asylum-and-withholding only proceedings, but 3,236 "withholding only" proceedings.  DOJ, Statistics Yearbook FY 2018, tbl.4, https://www.justice.gov/eoir/file/1198896/download.

Nothing in the NPRM discussed "withholding only" proceedings or provided notice that EOIR was considering imposing a 15-day deadline on proceedings other than "asylum-and-withholding only" proceedings.  EOIR's unpredictable expansion of the 15-day deadline thus deprived Plaintiffs and other commenters of the opportunity to anticipate and comment on the implications of the deadline for other proceedings.  *See* Ex. A, Declaration of Lisa Koop ("Koop Decl.") ¶ 25.  Consequently, the Rule is not a logical outgrowth of the rule proposed in the NPRM. *See, e.g.*, *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1115 (D.C. Cir. 2019) (holding that a final

---

[5] The December 11 Rule was preliminarily enjoined on Friday shortly after Plaintiffs filed this Complaint, *see Pangea*, 2021 WL 75756, but Plaintiffs do not know whether the Government will appeal, or for how long the injunction will last, so whether and when the December 11 Rule may ultimately take effect remains unclear.

rule was not logical outgrowth of NPRM).  Plaintiffs and others could not be expected to "divine [EOIR's] unspoken thoughts," *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1260 (D.C. Cir. 2005) (quotation marks omitted), of imposing a 15-day deadline on a separate category of proceedings when the NPRM provided no hint that EOIR might take that course.  "Something is not a logical outgrowth of nothing."  *Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994).

### 3. Multiple Interlocking Rulemakings Prevented Commenters From Assessing the Combined Effect of the Administration's Changes to Asylum Policy

EOIR issued the final Rule in the context of numerous pending rulemakings and extensive ongoing litigation concerning changes the administration seeks to make to the asylum and withholding of removal system.  *See* Compl. ¶¶ 129–31 (describing proposed rules).  As a result, EOIR admits that even today, the "the interplay and impact of all of the rules is speculative," and that "all, some, or none of the rules" may ultimately take effect.  85 Fed. Reg. 81,702.  Given this state of affairs, EOIR could not actually conduct *any* sound analysis of Rule's effects.  *See generally Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made" (internal quotation marks omitted)).  Similarly, commenters were prevented from meaningfully analyzing and commenting on the Rule, as multiple commenters explained.  Compl. ¶ 134.

### C.  Count 3:  The Rule Is Contrary to Law

Under the APA, the Court must "hold unlawful and set aside agency action . . . not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).  An "agency must have statutory authority for the regulations it wants to issue."  *Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451, 460 (D.C. Cir. 2017)

(Kavanaugh, J.).  An agency "literally has no power to act unless and until Congress confers power upon it." *Mozilla Corp. v. FCC*, 940 F.3d 1, 74 (D.C. Cir. 2019) (per curiam).  For the reasons set forth below, the Rule is contrary to law and must be enjoined.

1.   The 15-Day Application Deadline Is Contrary to the INA

EOIR's decision to impose a 15-day deadline for many asylum, withholding of removal, and CAT applications is contrary to and unauthorized by the INA.  The INA gives noncitizens one year from the date of their arrival in the United States to file their asylum applications.  *See* 8 U.S.C. § 1158(a)(2)(B).  Congress adopted this one-year deadline after rejecting a 30-day deadline given many of the same concerns raised here by commenters in response to the Rule.  *See* Compl. ¶ 149 (quoting Sen. Rep. 104-249, at 43 (1996)).  And Congress established no deadline at all for withholding of removal or CAT applications, which are mandatory forms of protection.  *See* 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 1208.16-18; *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 & n. 25 (1987).  Nothing in the INA authorizes the Attorney General or EOIR to set a different across-the-board deadline for an entire category of applicants that is different from the one Congress set, or to impose a deadline for filing withholding or CAT applications.  EOIR nonetheless claimed authority to impose the 15-day deadline as an exercise of gap-filling authority "in light of the [INA's] silence on a timeframe for filing applications in asylum-and-withholding-only proceedings." 85 Fed. Reg. 81,720.  But the INA is *not* silent on the timeframe for filing asylum applications.  It provides a one-year deadline.  8 U.S.C. § 1158(a)(1)(B).

EOIR also portrayed the 15-day deadline as an extension of IJs' authority under existing regulations to enter and enforce case-specific filing deadlines in individual proceedings, 85 Fed. Reg. 81,725 (citing 8 C.F.R. § 1003.31(c)).  But that circumscribed, case-specific, authority does nothing to support EOIR's claimed authority in the Rule to impose an across-the-board deadline on IJs and noncitizens that differs from the one-year deadline established by Congress.  The 15-

day deadline is therefore "in excess of statutory jurisdiction, authority, or limitations," and "not in accordance with law," and must be set aside.  5 U.S.C. § 706(2)(A), (C).

The 15-day deadline is also contrary to the statutory provisions entitling noncitizens, including asylum-seekers, to counsel of their choosing, as long as it comes at no expense of the government.  *See* 8 U.S.C. §§ 1229a(b)(4)(A), 1362.  As discussed *infra* Argument § II.A, the deadline all but eliminates the right to counsel in asylum proceedings for many applicants. Relatedly, the INA clearly contemplates access to *pro bono* service providers for asylum seekers, like Plaintiffs.  *See* 8 U.S.C. § 1158(d)(4); *O.A. v. Trump*, 404 F. Supp. 3d 109, 144 (D.D.C. 2019) (discussing this provision in the context of organizational standing).  Plaintiffs are tasked with providing the services contemplated by the INA, but will be significantly less able to do so under the Rule.  *See, e.g.*, Ex. B, Declaration of Laura St. John ("St. John Decl.") ¶¶ 39– 40 ("the Rule gives little to no weight to the ways in which this extremely tight 15-day filing deadline interferes with individuals' right to counsel and the ability of organizations like Florence Project to identify and place a case with *pro bono* counsel"); Ex. A, Koop Decl. ¶¶ 39 ("The effect of this new deadline on NIJC will be that we will no longer be able to serve nearly as many asylum applicants and our *pro se* support for unrepresented asylum seekers will be less effective.")

2.  <u>Allowing Immigration Judges to Enter Evidence into the Record Contradicts the INA and Improperly Turns Adjudicators into Advocates</u>

The Rule's amendment to 8 C.F.R. § 1208.12(a) to authorize IJs to enter evidence into the record is contrary to the INA.  Congress expressly set forth IJs' authority in the INA: an IJ "shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses."  8 U.S.C. § 1229a(b)(1).  Absent from the statute is *any* authority for IJs to admit their own evidence.  In contrast, the statute expressly provides that "the alien shall have a reasonable opportunity . . . to present evidence on the alien's own behalf."  *Id.* § 1229a(b)(4)(B).

That is no accident.  The prior version of that same statutory provision authorized IJs' predecessors, "special inquiry officer[s]," to "administer oaths, *present and* receive evidence, interrogate, examine, and cross-examine the alien or witnesses."  8 U.S.C. § 1252(b) (1994) (emphasis added).  "When Congress amends legislation, courts must 'presume it intends [the change] to have real and substantial effect.'"  *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) (quoting *Stone v. INS*, 514 U.S. 386, 397 (1995)).  And here, Congress' decision to delete the words "present and" when it readopted and renumbered this provision in 1996 unambiguously shows that Congress had determined that IJs should *not* present their own evidence.  *Cf. Doe v. Chao*, 540 U.S. 614, 622 (2004) ("drafting history showing that Congress cut out the very language in the bill that would have authorized" litigant's reading); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").  "Congress' rejection of the very language that would have achieved the result the Government urges here weighs heavily against the Government's interpretation."  *Hamdan v. Rumsfeld*, 548 U.S. 557, 579–80 (2006).  In short, the Rule purports to overturn this congressional decision, so the Court must set the Rule aside as "not in accordance with law" and "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(A), (C).

EOIR wrongly argues that IJs already had authority to offer their own evidence.  85 Fed. Reg. 59,695 (Sept. 23, 2020).  EOIR relies principally on the Board of Immigration Appeals' decision in *In re S-M-J-*, 21 I. & N. Dec. 722, 727 (BIA 1997), but the BIA in *S-M-J-* construed the pre-1994 statute allowing an IJ to "present and receive evidence."  *Id.* (quoting 8 U.S.C. § 1252(b) (1994)).  The same is true of *Constanza-Martinez v. Holder*, 739 F.3d 1100, 1102 (8th Cir. 2014).  EOIR's reasoning conflates IJs' duty to "establish the record" and "develop the

record"—which IJs can appropriately carry out by examining and cross-examining witnesses—with converting the IJ to an advocate in an asylum claim, which the INA does not authorize. *See, e.g.*, *Yang v. Elroy*, 277 F.3d 158, 162 (2d Cir. 2002); *see also Richardson v. Perales*, 402 U.S. 389, 409–10 (1971) (noting that social security hearing examiners do not act as counsel, but are instead responsible for developing the facts). EOIR's misleading reliance on these outdated and inapposite authorities provides no adequate justification for the Rule. This change has serious implication for Plaintiffs. They will now have to defend against evidence introduced by the IJ, including evidence sourced from the U.S. government over which any objection they raise likely will be rejected given such evidence's presumed credibility. *See infra*, Argument § II. This change will require them to litigate sensitive and time-intensive questions of bias in numerous cases. *See* Ex. A, Koop Decl. ¶¶ 65–66 Ex. B, St. John Decl. ¶ 28.

   3.   Requiring IJs to Adjudicate Applications within 180 Days Absent Exceptional
        Circumstances Misinterprets the INA and Prioritizes Expediency over Fairness

The Rule's provisions requiring IJs to adjudicate asylum claims within 180 days absent an exceedingly narrow definition of exceptional circumstances and restricting IJs' authority to grant continuances or adjournments that extend adjudication past 180 days also contradicts the INA. The INA states that asylum claims should be adjudicated within 180 days, absent "exceptional circumstances." 8 U.S.C. § 1158(d)(5)(A)(iii). But the INA does not define "exceptional circumstances" for purposes of that provision. The Rule renders that existing statutory deadline much more restrictive by adopting a narrow, inapposite definition of exceptional circumstances:

> [T]he term *exceptional* circumstances refers to exceptional circumstances (such as battery or extreme cruelty to the alien or any child or parent of the alien, serious illness of the party or immigration judge, or serious illness or death of the spouse, child, or parent of the alien, but not including less compelling circumstances) beyond the control of the parties or the immigration court.

8 C.F.R. § 1003.10(b).  That definition comes, with slight modifications, from the INA's statutory definition of "exceptional circumstances" that excuse a noncitizen's failure to appear for a scheduled hearing.  *See* 8 U.S.C. § 1229a(b)(5)(A), (C)(i), (e)(1).  But Congress expressly limited that definition so that it applied *only* for purposes of excusing a failure of a noncitizen to appear for a scheduled court hearing—a much more serious matter than an ordinary extension of time. *See id.*  Applying it to "exceptional circumstances" in § 1158 contravenes Congress' intent.

4.  <u>The Rule Is Inconsistent with the United States Obligations Under Treaties & International Law</u>

The Rule violates the United States' *non-refoulement* obligation under: (1) the 1967 Protocol Relating to the Statue of Refugees (which binds adhering parties to the United Nations Convention Relating to the Status of Refugees—in respect of "refugees"),[6] (2) the Convention Against Torture,[7] and (3) the International Covenant on Civil and Political Rights ("ICCPR").[8]  In general terms, these treaties define the *non-refoulement* principle as an obligation to not expel a person to another state "in pursuance of a decision reached in accordance of law" where that person's life or freedom would be threatened on account of her race, religion, nationality, membership in a particular social group or political opinion, or there are substantial grounds to believe that person would be in danger of being subjected to torture.

Despite those commitments, the Rule accords more weight to compliance with procedural obstacles than it does to the risk of unlawfully returning noncitizens to their persecutors.  In particular, the United States' *non-refoulement* obligations prohibit noncitizens from being removed to countries where they will face persecution.  Compl. ¶¶ 279–80 (citing international

---

[6] Protocol Relating to the Status of Refugees art. 1, Oct. 4, 1967, T.I.A.S. No. 6577, 606 U.N.T.S. 267.

[7] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 119 STAT. 2740, 1465 U.N.T.S. 85.

[8] Int'l Covenant on Civil and Political Rights, Dec. 16, 1966, T.I.A.S. No. 92-908, 999 U.N.T.S. 1057.

treaties).  The Rule violates those obligations by *requiring* IJs to dismiss asylum, withholding of removal, and CAT claims submitted by noncitizens who are unable to submit an application before the 15-day deadline, purely on the basis of these noncitizens' inability to meet procedural requirements, even if the noncitizen will face persecution if removed.  *See Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1093 (9th Cir. 2020), *cert. granted*, No. 19-1212, 2020 WL 6121563 (U.S. Oct. 19, 2020) (concluding that MPP protocols requiring noncitizens to wait in life-threatening conditions in Mexico fail to comply with U.S. non-refoulement obligations).

**D.   Count 4: The Rule Is Arbitrary and Capricious**

The Rule also violates the APA's basic "requirement of reasoned decisionmaking."  *Grace v. Barr*, 965 F.3d 883, 908 (D.C. Cir. 2020) (citation omitted).  In promulgating the Rule, EOIR utterly failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. 29, 43 (1983) (quotation marks omitted).  Given this failure, and for the reasons described below, the Rule is arbitrary and capricious under 5 U.S.C. § 706(2)(A) and must be set aside.

1.   <u>The 15-Day Deadline Is Arbitrary and Capricious</u>

The 15-day deadline for many asylum, withholding of removal, and CAT applications is arbitrary and capricious.  In imposing that new deadline, EOIR failed to consider important aspects of the problem it was purporting to address—the backlog of asylum cases—and offered explanations running counter to the evidence before it.  *See State Farm*, 463 U.S. at 43.  The Rule introduces unnecessary and burdensome procedural requirements that will lead to the denial of meritorious claims.  For example, Plaintiffs will have to rush to prepare these applications in an impossibly short period of time, and then inevitably face more motions to amend or supplement them later in the proceedings to make a better record.  *See* Ex. B, St. John Decl. ¶ 46.  EOIR offered no adequate response to the numerous comments explaining the problems with the 15-day

deadline.  *See, e.g.*, *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 740–42 (D.C. Cir. 2019) (agency action is arbitrary and capricious where agency fails to "adequately address the harms" caused by its actions); .

a.   EOIR Failed to Consider How Noncitizens Could Comply with the Deadline

The overwhelming evidence before EOIR showed that many noncitizens will be unable to submit their applications within the new 15-day deadline.  As commenters explained, noncitizens face a daunting succession of barriers when attempting to complete asylum applications.  *See* Compl. ¶ 159–202 (describing hardships faced by noncitizens).  EOIR failed to consider each of these barriers and provided no justification for imposing the 15-day deadline in spite of them.

(1)   *Language barriers and translation needs*

The I-589 application form—the form used to apply for asylum, withholding of removal, and CAT protection—and its corresponding 14 pages of instructions are offered only in English, the form must be completed only in English, and all accompanying documentation must be translated into English—a language that the many asylum seekers cannot speak, read, or write. Compl. ¶ 161–63.  Finding translators is particularly challenging for detained noncitizens, who often have no access to translators while in custody.  *Id.*  The demand on these interpretation services will grow and legal services organizations, like Plaintiffs, will have to pay higher rates for faster appointment times and increase the translation services they provide during their representation or through *pro se* assistance programs.  Ex. C, Declaration of Lindsay Toczylowski ("Toczylowski Decl.") ¶ 29; Ex. B, St. John Decl. ¶ 35.

Despite acknowledging that the 15-day deadline "applies principally to detained" noncitizens, 85 Fed. Reg. 81,702, EOIR did not explain how detained noncitizens—who, among many other restrictions, cannot accept incoming phone calls and have limited ability to place calls—could possibly obtain translator assistance in time to meet the Rule's 15-day deadline.  Ex.

D, Bischoff Decl. ¶ 35; Ex. C Toczylowski Decl. ¶ 23; Ex. A Koop Decl. ¶ 36.  Instead, EOIR baldly asserted without evidence that it "believes the 15-day deadline provides sufficient time for the alien, in coordination with counsel, an interpreter, or translator if the alien so chooses, to apply for relief."  85 Fed. Reg. 81,713.  And EOIR did not acknowledge the burden that would be placed on organizations providing services to detained populations, including trainings on navigating the process *pro se*. To the contrary, EOIR disregarded the Legal Orientation Program ("LOP"), "), an EOIR sponsored program that provides *pro se* services nationwide, on the baseless belief that the program did not provide a benefit.  *See* Compl ¶¶ 187–88 (discussing 85 Fed. Reg. 81,717 n.32).

EOIR also stated that "[t]ens of thousands of aliens—and hundreds of thousands in recent years . . . —whose first language is not English file for asylum every year, and there is simply no indication that applicants cannot complete the application and file it within a few weeks."  85 Fed. Reg. 81,713.  EOIR also relied on a very narrow provision with a 10-day deadline for "alien crewmembers" to apply for asylum, but that provision applies to an exceptionally narrow population.  85 Fed. Reg. 81,711; *see* 8 C.F.R. § 1208.5(b)(1)(ii).  But there is no 15-day deadline now, so the fact that many noncitizens are *currently* able to apply for asylum within the current 365-day deadline does not suggest that they will be able to do so within 15 days.

(2)     *Access to counsel*

The I-589 is a complex, 12-page form with 14 pages of instructions and over a hundred questions, many of which raise highly technical legal issues.  Compl. ¶¶ 169–70.  The 14-page instructions only add to the complexity; for example, by requiring applicants who do not submit corroborating evidence to explain why they failed to do so in the application's Supplement B.  I-589 Instructions, part 1.  As numerous commenters explained, these forms are challenging for even experienced practitioners to understand and complete, and they are almost impossible for even English-speaking non-lawyers to accurately understand without counsel.  *Id.* ¶ 172.  Numerous

providers of *pro bono* legal services to noncitizens explained that the 15-day deadline would seriously impair their ability to represent asylum-seekers. *Id.* ¶¶ 173–74. No commenters who provide legal services to noncitizens favored the Rule's 15-day deadline or suggested that it would aid in their representation of asylum-seekers. *Id.* 175.

Although EOIR was obligated to "confront the problem[s] in a reasoned manner," *Mozilla Corp.*, 940 F.3d at 67, and "articulate a satisfactory explanation for its action," *State Farm*, 463 U.S. at 43, EOIR had no answer to commenters' concrete claims that a 15-day deadline would preclude representation. EOIR cited no evidence that the 15-day deadline will do anything to alleviate the broader set of "delays at the immigration court" that the 2016 survey discussed. EOIR nevertheless stated—with no evidentiary basis—that most applicants subject to the 15-day deadline would have access to counsel if they so desired. *See* 85 Fed. Reg. 81,735.

EOIR's statement relies on its misleading interpretation of the fact that *currently*, "85% of aliens with pending asylum cases have representation." *Id.* That statistic does not (and cannot) reflect the likely effects of the 15-day deadline, as it is based on the entire lifespan of a case and provides no information about how many noncitizens, especially detained noncitizens, have counsel at or within 15 days of their first master calendar hearing. More nuanced studies found that only 6.9% of noncitizens obtained counsel within one month of being issued a notice to appear, and that four months later, 70% remained unrepresented. Compl. ¶181 (citing TRAC Immigration Study). EOIR's statistic also fails to differentiate between detained and non-detained applicants, even though detained asylum seekers are much less likely to be represented, and as commenters explained, noncitizens who are fortunate enough to obtain representation are less likely to have their cases quickly dismissed, and are thus overrepresented among still pending asylum cases. *Id.* ¶ 182  The evidence before EOIR therefore showed that noncitizens in "asylum-and-withholding

only" proceedings will very likely be unrepresented at their initial master calendar hearings and unable to obtain counsel within the 15-day deadline.

EOIR argued that even if noncitizens could not obtain representation within the 15-day deadline, noncitizens could obtain counsel "at any point in the proceedings, including after filing an application."  85 Fed. Reg. 81,735.  This explanation is cold comfort for those asylum-seekers whose cases will be dismissed because they are unable to file an application in the first place.  *See* Compl. ¶ 186 (citing comments regarding need for counsel to complete I-589).  Worse, EOIR had the audacity to suggest that the deadline might actually *improve* representation.  85 Fed. Reg. 81,735.  EOIR's sole support for that remarkable conclusion was a single, 2016 survey of legal services providers that addressed the effect of unspecified "delays at the immigration court."  *See* 85 Fed. Reg. 81,735; Compl. ¶ 178.  But, that survey said nothing about the impact of a shortened 15-day deadline on representation, or even about the timing of asylum applications in general.

The 15-day deadline will also affect *pro se* detained individuals who receive assistance from EOIR's LOP, which is one of the central mechanisms for providing access to legal information to detained noncitizens, including by Plaintiffs.  *See* Compl. ¶ 187–88.  About 24% of LOP participants do not receive any services until after their first master calendar hearing.  *See* 85 Fed. Reg. 81,716.  That would leave them with fewer than 15 days in which to complete their application.   Commenters raised this point, but EOIR discounted it, arguing that the LOP "provide[s] no benefit" to noncitizens, citing longer lengths of detention and similar outcomes for people served by LOP.  *See id.* at n.32.  EOIR ignored the well-documented reasons for the longer detention time of LOP participants and outcomes in their cases when promulgating the Rule.  *See* Compl. ¶ 188.  EOIR's discounting of the importance of the LOP program is arbitrary and capricious in light of Congress' express requirement that EOIR continue to fund that program.  *See*

Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. B, tit. II (2020) (providing $734 million to EOIR, "of which not less than $22,500,000 shall be available for services and activities provided by the [LOP]").  EOIR thus violated the APA when it failed to grapple with how its new policy would affect its statutory mandate.  *Grace*, 965 F.3d at 901.

(3)   <em>Corroborating Evidence</em>

The I-589 and its accompanying instructions require noncitizens to provide a large amount of evidence, translated into English, that corroborates their answers to the questions on the form. As commenters explained, noncitizens often do not must obtain it from the countries from which they fled.  Compl. ¶¶ 190–91.  Yet EOIR provided no explanation for how noncitizens could possibly obtain such evidence within the 15-day deadline.  Indeed, EOIR appeared to concede that noncitizens generally could not do so, but argued that doing so was unnecessary because the application itself could be filed within 15-days and noncitizens "may amend or supplement the application later in proceedings, pursuant to an [IJ's] discretion."  85 Fed. Reg. 81,712.  But IJs can and do refuse to allow supplementation, so noncitizens must ensure that their initial applications are complete at the time of submission.  Moreover, even where corroborating evidence is not required, the form requires detailed information, such as the names, addresses, and dates of attendance of every school attended, all employers in the last five years, and immigration history, which—commenters explained—applicants often do not know, and must learn from records available only in the countries from which they fled.  Compl. ¶ 194.

EOIR also argued that, "particularly for meritorious claims, an alien may not need extensive documentation to support his or her claim because an alien can meet the relevant burden of proof through credible, persuasive, and specific testimony."  85 Fed. Reg. 81,712.  But both the I-589 instructions and longstanding precedent require noncitizens to provide corroborating evidence where possible, and encourage IJs to discredit testimony that is uncorroborated.  I-589

Instructions, Part VII ("You must submit reasonably available corroborative evidence showing (1) the general conditions in the country from which you are seeking asylum, and (2) the specific facts on which you are relying to support your claim."); *see also, e.g.*, *Sidhu v. INS*, 220 F.3d 1085, 1091 (9th Cir. 2000) ), *as amended on denial of reh'g* (Sept. 27, 2000) ("[W]here material corroborating evidence was easily available to the asylum seeker," such as "[m]embership records contained in the files of a Nicaraguan church," "failure to produce such evidence can constitute substantial evidence supporting an adverse credibility determination.").   Thus, forgoing documentation is an extremely risky choice for a noncitizen.

(4)   *Trauma*

EOIR's consideration of the 15-day deadline did not account for the fact that asylum seekers and torture survivors flee unspeakable violence in search of safety and suffer from lingering effects of trauma.  Commenters explained that many refugees experience Post Traumatic Stress Disorder and other mental health challenges that make it difficult for them to recount their challenges.  Compl. ¶¶ 197–98.  Commenters also explained that it is very common for these noncitizens to struggle to articulate their persecution, particularly at the early stages of their cases.  *Id.* ¶ 199.  Having an attorney can assist with this process, but as already explained, the 15-day deadline will also interfere with access to counsel.  But EOIR failed to engage with these difficulties for trauma victims, instead rejecting the numerous comments to this effect as "generalizations and unpersuasive."  85 Fed. Reg. 81,713.

b.   <u>EOIR Completely Failed to Consider the Effect of the 15-Day Deadline on the Categories of Noncitizens Actually Subject to It</u>

Both the expansion of "asylum-and-withholding only" proceedings to include noncitizens in expedited removal (in the December 11 Rule) and the expansion of expedited removal to include all noncitizens present for less than two years are being challenged in court.  *See Pangea Legal*

*Serv.*, 2021 WL 75756, at *1; *Make the Rd. N.Y., Inc. v. Wolf*, 962 F.3d 612 (D.C. Cir 2020).  EOIR

admits that "the interplay and impact of all of the rules is speculative at the present time,

particularly due to ongoing and expected future litigation, which may allow all, some, or none of

the rules to ultimately take effect."  85 Fed. Reg. 81,702.  And while the December 11 Rule was

preliminarily enjoined on the same day Plaintiffs filed their Complaint, *see Pangea*, 2021 WL

75756, Plaintiffs do not know whether the Government will appeal or when, if ever, the December

11 Rule will take effect.  As a result of these interlocking rulemakings and litigation, EOIR did not

know when it promulgated the Rule, and still does not know today, whether the 15-day deadline

will affect just a small portion of asylum applicants or substantially all of them.  And though EOIR

argues that it has weighed the benefits and drawbacks of the deadline "in tandem with other rules,"

85 Fed. Reg. 81,702, the substance of EOIR's justifications belie that statement, because they do

not address whether the 15-day deadline is properly applied to any particular group of noncitizens.

    c.   <u>EOIR Entirely Failed to Consider Whether and How the Deadline Would Apply</u>
<u>to Noncitizens Subject to the Migrant Protection Protocols</u>

Under the MPP, many asylum seekers are forced to wait in Mexico while their asylum

claims are adjudicated.  *See* Kirstjen M. Nielsen, DHS, *Policy Guidance for Implementation of the*

*Migrant Protection Protocols* (Jan. 25, 2019), https://www.dhs.gov/sites/default/files/

publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf.  Despite multiple

comments on the topic, *see* Compl. ¶ 209, EOIR entirely failed to consider whether and how the

15-day deadline would apply to and affect noncitizens who are subject to the MPP, and provided

no justification for imposing that deadline on such noncitizens.

The multiple interacting rulemakings, along with in-progress litigation, leave it unclear

whether such noncitizens are subject to the deadline.  Noncitizens in the MPP are ostensibly having

their claims addressed under 8 U.S.C. § 1225(b)(2), which would place them outside the expedited

removal proceedings that are to be covered by "asylum-and-withholding only" proceedings.  But the Ninth Circuit has suggested that such noncitizens are in fact governed by § 1225(b)(1), *see Innovation Law Lab*, 951 F.3d at 1073, which would place them within the expedited removal proceedings and thus potentially subject to the deadline if the December 11 Rule takes effect. Although commenters pointed out this ambiguity, *see* Compl. ¶ 211, the final Rule does nothing to resolve it.[9]  C*f. Mozilla*, 940 F.3d at 67 (agency "was required to grapple with the lapse in legal safeguards that its reversal of policy triggered").  This point is important, because noncitizens subject to the MPP would face even greater difficulties in meeting the 15-day deadline than other noncitizens.  *See* Compl. ¶¶ 212–17 (citing comments describing dangerous living conditions, lack of access to translators, logistical concerns, and other difficulties noncitizens in MPP would face if subject to Rule).  These factors make noncitizens subject to MPP among the most vulnerable of asylum seekers; in turn, they are also the most likely to be prejudiced by the Rule.  The Rule's 15-day deadline would prevent many—if not all—of these noncitizens from filing their I-589s.

d.  <u>EOIR's Argument that Noncitizens Will Have More Than 15-Days to Apply In Practice Does Not Justify the Rule</u>

In the final rule, EOIR argued that in practice, noncitizens will have more than 15 days to complete their applications, because they can begin to work on their applications before their first IJ hearing.  *E.g.*, 85 Fed. Reg. 81,714.   But, even if some noncitizens arrive with knowledge of their asylum eligibility and can start their applications before their first IJ hearing, EOIR still provides no basis for concluding that they will be able to complete the application form in time, given all of the barriers discussed above.  It also does not address the fact that even noncitizens who ultimately obtain representation will often not be able to do so before their first IJ hearing,

---

[9] The preamble to the final rule refers to the MPP in the context of the requirement to submit proof of payment of a $50 application fee, 85 Fed. Reg. 81,731—a requirement that applies to *all* asylum applications—but does not address whether noncitizens subject to MPP are also subject to the 15-day application deadline.

and, therefore, counsel will still have no more than 15 days to complete asylum applications.  If EOIR believed that the additional time was necessary, it could and should have established a longer deadline running from receipt of the application form, to ensure that noncitizens receive adequate time.  By instead basing the deadline on the first IJ hearing, EOIR provided no assurance that noncitizens will have any longer than the 15-day period in which to apply.

   e. <u>The Rare Possibility of an Extension for Good Cause Does Not Justify the Rule</u>

   EOIR referred in the final Rule to the possibility of an extension of time for "good cause." 85 Fed. Reg. 81,701.  But moving for such an extension would require the noncitizen to know that such relief is available and to request it within the 15-day period, before her opportunity to apply is deemed waived and she is removed.  Many of the same barriers that will preclude noncitizens from completing application forms on time will also preclude them from seeking extensions of time, especially if they are unrepresented.  Moreover, for the reasons given above, the need for additional time is likely to be the rule, not the exception, and it makes no sense for EOIR to set a 15-day deadline that will usually need to be extended.

   f. <u>EOIR Offered No Evidence that its 15-Day Deadline Will Speed Up Asylum Adjudication</u>

   Despite EOIR's claim that the Rule's 15-day deadline aims to speed up the adjudication of asylum claims, *e.g.*, 85 Fed. Reg. 81,701, EOIR has provided no evidence that delays in the filing of asylum applications are responsible for the current backlog, or that imposing a 15-day deadline will in any way speed up the process.  The Rule is arbitrary and capricious because it is neither "logical and rational," *Michigan v. EPA*, 576 U.S. 743, 750 (2015) nor "supported by substantial evidence," *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007).  As EOIR itself emphasizes, under current law, IJs already can and do impose their own case-specific filing deadlines, which enables IJs to ensure that asylum applications are filed promptly enough that they

do not delay the adjudication of a noncitizen's claims, without requiring them to be filed more quickly than necessary for that purpose.  *See* 85 Fed. Reg. 81,720.  Missing from the Rule is any explanation of how the 15-day deadline will better promote prompt adjudication than this current, case-by-case, approach.  Imposing a one-size-fits-all deadline based on the date of the first hearing does nothing to ensure timely case completion.  On the contrary, this new deadline will cause many more motions to amend or supplement to be filed, which could ultimately even slow down the adjudication process.  Compl. ¶ 226

> 2.  The Provision that EOIR May Reject Trivially Incomplete Applications At Any Time Is Arbitrary and Capricious

EOIR's decision to require IJs to reject asylum applications as incomplete at any time, if even a single inapplicable question is left unanswered, and then to permanently reject them if the issue is not corrected within 30 days, is also arbitrary and capricious.  EOIR's elimination of the existing 30-day timeline for IJs to reject incomplete applications, *see* 8 C.F.R. § 1208.3(c)(3), belies EOIR's purported focus on accelerating the adjudication of asylum claims.  And EOIR has no explanation of how requiring IJs to reject applications based on blank answers to inapplicable questions will aid in the prompt adjudication of asylum claims.  To the contrary, it will only serve to add an unnecessary barrier to the adjudication of meritorious claims.

Commenters explained that this requirement also will lead EOIR to reject applications with blanks in response to clearly inapplicable questions, such as leaving dates of employment blank after stating "none" for employment history, or leaving a middle name blank because the noncitizen does not have one.  Compl. ¶ 228  Moreover, without a lawyer, and often with no or limited English literacy, many applicants will not know that leaving a question blank will result in their application being rejected.  *Id.* ¶ 229.  EOIR agrees that the Rule will cause applications to be rejected for these reasons, but points out that the previous regulations contained that same

language about responding to each question.  85 Fed. Reg. 81,727.  EOIR ignores, however, that

up to now, the effect of that language has been tempered by the previous regulation's provision

that applications be "deemed complete" if not returned to the applicant within 30 days, 8 C.F.R.

§ 1208.3(c)(3)—a provision that the Rule eliminates.  Under the new Rule, noncitizens could

therefore have their applications rejected even at their asylum hearings for failing to respond to

questions that plainly did not apply to them.

 This concern is not hypothetical—rejection for failure to respond to inapplicable questions

has already occurred in thousands of cases under a similar rule applicable to USCIS, which USCIS

has agreed to revisit after being sued over the change.  *See Ombudsman Alert: Recent Updates to*

*USCIS Form Instructions*, Dep't. of Homeland Sec. (Jan. 23, 2020), https:// www.dhs.gov/blog/

2020/01/23/ombudsman-alert-recent-updates-uscis-form-instructions; *Vangala v. USCIS*, No. 20-

cv-08143 (N.D. Cal. filed Nov. 19, 2020).  EOIR offered no explanation for why rejecting

applications for failing to respond to inapplicable questions will serve the purposes of the asylum

system Congress created, or lead to any other efficiencies or advantages for EOIR.  To the contrary,

rejecting applications on such technicalities converts the I-589 form from a mechanism that aids

efficient and just adjudications into a trap to justify denial of asylum claims regardless of merit.

 Moreover, even as it eliminates EOIR's deadline and therefore gives EOIR unlimited time

to review asylum applications for completeness, the Rule introduces a new, 30-day deadline for

noncitizens to correct any inadequacies in their asylum applications.  *See* 85 Fed. Reg. 81,750–51

(to be codified at 8 C.F.R. § 1208.3(c)(3)).  This 30-day deadline is problematic for all noncitizens

seeking asylum, given the myriad reasons a noncitizen may not timely receive a rejected

application, but it will cause particular issues for noncitizens in MPP.  Commenters explained that

noncitizens in MPP are far less likely to have counsel, especially since the COVID-19 pandemic

has closed the border in many places.  *See* Compl. ¶ 236.  Additionally, commenters pointed out,

if EOIR returns a rejected I-589, most people in MPP will be unable to receive them due to lack

of fixed address in the camps.  *Id*. ¶ 237.  Commenters submitted evidence that shelters housing

noncitizens in MPP have been unable to deliver hundreds of letters to their residents for that reason.

Id.  EOIR ignored the commenters' arguments and evidence in promulgating the final Rule, and

thus entirely failed to consider it.

3.   Requiring IJs to Adjudicate Applications Within 180 Days Absent Exception
     Circumstances Is Arbitrary and Capricious

The Rule's provisions requiring IJs to adjudicate asylum claims within 180 days absent an

extraordinarily narrow and logically inapposite definition of exceptional circumstances, and

restricting IJs' authority to grant continuances or adjournments that will extend adjudication past

180 days, are also arbitrary and capricious.  EOIR did not consider how IJs could meet the 180-

day deadline in the absence of the narrowly defined exceptional circumstances, given that they

have almost never been able to do so before.  The National Association of Immigration Judges

explained that "the overwhelming numbers of applicants in 2020 make it impossible to meet the

180-day deadline while ensuring due process."  National Association of Immigration Judges,

Comment at 2 (Oct. 23, 2020), https:// www.regulations.gov/document?D=EOIR-2020-0005-

1701.  EOIR entirely failed to consider what changes IJs will need to make to their handling of

asylum claims in order to meet the newly restrictive deadline, and did nothing in the Rule to make

faster adjudication possible.  EOIR thus did not consider the inevitable side-effects of requiring

IJs to dramatically speed up asylum adjudication.  *See, e.g.*, *United Keetoowah Band*, 933 F.3d at

740–42.  The Rule's stated goal is illusory— it creates a situation that will penalize noncitizens

applying for asylum while making it even less likely that their claims will be timely adjudicated.

4.   Heightening the Evidentiary Burden for Non-Governmental Sources Prejudices
     Noncitizens, Is Unnecessary, and Further Politicizes EOIR Proceedings

The Rule's changes to 8 C.F.R. § 1208.12(a) to lower the evidentiary standard for admitting

evidence from governmental sources while heightening the standard for nongovernmental sources

is also arbitrary and capricious.   This new, two-tiered system in which evidence by non-

governmental sources can only be considered if deemed "credible and probative" whereas IJs "may

rely" on evidence from the Executive Branch without such an analysis results in a system in which

the Executive Branch not only prosecutes and adjudicates asylum cases, but also provides favored

evidence even though it is not *per se* more reliable than non-governmental sources.

In  defending  this  two-tiered  standard,  EOIR  contends  that  government  evidence

"warrant[s] particular consideration because of their credible source."  85 Fed. Reg. 81,737.   In

fact, however, commenters explained that U.S. Government sources are *not* inherently credible in

the asylum context.  *See* Compl. ¶ 253 (citing comments).  By establishing a presumption that U.S.

Government evidence is credible and probative and making it very difficult to introduce contrary

evidence, the effect of the two-tiered standard in the Rule is specifically to allow IJs to consider

and rely on evidence from U.S. Government sources that may *not* be credible or probative.

EOIR did not explain why allowing IJs to consider and rely on non-credible or non-

probative U.S. Government sources would aid in the adjudication of asylum claims, and thus failed

to justify the regulatory change actually being made.   Nor did EOIR acknowledge or consider the

persistent and growing concerns pointed out by commenters with the accuracy and credibility of

U.S. Government sources like State Department reports.  This provision also will make it harder

for noncitizens to introduce specific evidence from local sources that may not be covered at all by

U.S. Government sources, thereby prejudicing their claims.  Here too, EOIR does not explain or

justify why this outcome would help adjudication of asylum claims.

5.   Allowing Immigration Judges to Enter Evidence into the Record is Arbitrary and Capricious

The Rule's amendment to 8 C.F.R. § 1208.12(a) authorizing IJs to enter their own evidence into the record is both contrary to the INA, as explained above, and arbitrary and capricious.  The INA guarantees noncitizens a "reasonable opportunity to examine the evidence."  8 U.S.C. § 1229a(b)(4)(B).  EOIR undermines that guarantee by allowing IJs to admit their own favored evidence on their own motion, subject only to an opportunity for the noncitizen to object to it at the time of presentation.  *Id.*

**E.   Count 5:  The Rule Violates Due Process and Is thus Unconstitutional**

The Fifth Amendment of the United States Constitution declares that "[n]o person . . . shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V. A "fundamental requirement" of the Due Process Clause of the Fifth Amendment is the "opportunity to be heard at meaningful time and in meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal citations omitted).  The Supreme Court has held that the fundamental requirements of procedural due process include:  notice of the government's proposed action, an opportunity for a fair hearing before an impartial decision-maker, the right to present evidence and confront the government's evidence, and the right to be represented by counsel. *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004); *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 542 (1985); *Ward v. Vill. of Monroeville*, 409 U.S. 57, 61-62 (1972); *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972).  This procedural due process right provides a right to fundamental fairness in the adjudication of their asylum claims, which are often a matter of life and death for the respondent. *See, e.g.*, *Salazar-Gonzales v. Lynch*, 798 F.3d 917, 921 (9th Cir. 2015); *Rodrigues-Laira v. INS*, 282 F.3d 1218, 1226 (9th Cir. 2002); *Olabanji v. INS*, 973 F.2d 1232, 1234 (5th Cir. 1992).

Despite these requirements, the Rule violates due process by imposing the unnecessarily procedural obstacles described above, including the 15-day application deadline and the requirement to pay all filing fees in advance, whether or not any payment method is as a practical matter available, which will be impossible for many noncitizens to surmount.  The Rule also violates due process by allowing IJs to rely on non-credible, non-probative government-authored evidence while restricting non-governmental evidence, and by allowing IJs to admit their own favored evidence.

### F.  Count 6:  Defendants Violated the Regulatory Flexibility Act by Improperly Ignoring and Discounting the Impact of the Rule on Small Entities, in Violation of the Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA") requires agencies to either publish final analyses of how their rules will affect "small entities" or for "the head of the agency" to certify that there is no such effect.  5 U.S.C. §§ 603, 604, 605.  EOIR did neither.  While EOIR purported to issue such a certification, it issued by Defendant McHenry and not by the Attorney General, who is the actual "head of the agency."  Compl. ¶¶ 330–31.  And regardless, EOIR's certification was incorrect. EOIR concluded that the Rule did not trigger the RFA because the Rule "applies to asylum applicants, who are individuals, not entities."  85 Fed. Reg. 81,747.  But while the Rule does regulate asylum applicants, it also directly regulates organizations who represent asylum applicants, like Plaintiffs Florence Project, Las Americas, and ImmDef (all small entities within the meaning of the RFA, Compl. ¶ 326), by requiring them to comply with the Rule's procedural requirements, such as the 15-day application deadline, when they represent asylum-seeking clients. Thus, EOIR was therefore required to conduct an RFA analysis in promulgating the Rule, but failed to do so.  *See Aeronautical Repair Station Ass'n v. FAA*, 494 F.3d 161, 176–77 (D.C. Cir. 2007).

***

For all of the reasons described above, the Rule is invalid and cannot be imposed on Plaintiffs and their clients.  Accordingly, the Court must stay the effective date of the Rule, and enjoin its implementation and enforcement.

## II.   PLAINTIFFS AND THE ASYLUM SEEKERS THEY REPRESENT FACE IMMEDIATE AND IRREPARABLE HARM ABSENT PRELIMINARY RELIEF

A preliminary order is warranted here because Plaintiffs and their clients face immediate and irreparable harm absent an order enjoining the Rule and preventing its harmful effects.[10] *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 289 (D.D.C. 2017).  In support of this motion, each plaintiff organization has submitted a declaration explaining the imminent harm to their organization.  *See, e.g.*, Ex. A, Koop Decl. ¶¶ 74-81; Ex. C, Toczylowski ¶ 41–50; Ex. B, St. John Decl. ¶¶ 78–91; Ex. D, Declaration of Brooke Bischoff ("Bishoff Decl.") ¶ 58–67.  Thus, Plaintiffs will suffer irreparable harm before a decision on the merits of their Complaint can be rendered.

To demonstrate irreparable harm, Plaintiffs must first demonstrate that the harm is "certain and great," "actual and not theoretical," and so "imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm."  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (citation omitted).  Second, the harm "must be beyond remediation."  *Id.*  The D.C. Circuit has held that an organization suffers irreparable injury where defendants' action will "perceptibly impair[]" its programs and "directly conflict" with its mission, and where "there can be no do over and no redress."  *Open Communities All. v. Carson*, 286 F.

---

[10] Because, if implemented, the Rule would directly and concretely harm Plaintiffs' ability to carry out their missions and implementation and enforcement of the Rule will force Plaintiffs to use their resources to counteract such harm, Plaintiffs have standing to challenge the Rule.  *See, e.g.*, *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (setting forth two prongs of organizational injury).  A host of court decisions have recognized harms virtually identical to these as sufficient for organizational standing.  *See, e.g.*, *Nw. Immigrant Rights Project*, 2020 WL 5995206, *6–9.

Supp. 3d 148, 178 (D.D.C. 2017) (quoting *League of Women Voters*, 838 F.3d at 8); *see also Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (looking to whether "a defendant's conduct has made the organization's activities more difficult" or "conflict[s] with the organization's mission").  As described below, Plaintiffs satisfy this test:  absent injunctive relief, Plaintiffs will suffer immediate and irreparable harm.

## A.   The Rule Will Directly Jeopardize Plaintiffs' Ability to Carry Out Their Missions and Require Plaintiffs to Divert Significant Resources Away From Their Work

Without an order enjoining the Rule, the dramatic procedural changes it proposes will impact a significant percentage of each Plaintiff's caseload, Ex. A, Koop Decl. ¶ 15, Ex. C, Toczylowski Decl. ¶ 22; Ex. B, St. John Decl. ¶¶ 24–26; Ex. D, Bischoff Decl. ¶ 7, and, as described below, will immediately jeopardize Plaintiffs' ongoing programs, force them to divert resources, put their funding at risk, and frustrate their respective missions by gravely harming their clients.  Plaintiffs' missions variously are to defend and uphold the legal rights of immigrants to seek safety and security in the United States.  The Rule frustrates these missions by denying the legal rights of immigrants and making immigration representation costlier and more time- and labor-intensive and, under this Rule in particular, next to impossible. *See, e.g.*, Ex. C, Toczylowski Decl. ¶ 5; Ex. D, Bischoff Decl. ¶¶ 6, 18, 20; Ex. A, Koop Decl. ¶ 7; Ex. B, St. John Decl. ¶ 10.

First, the Rule's arbitrary, 15-day filing deadline will interfere with Plaintiffs' ability to form attorney-client relationships with many of the noncitizens they would otherwise serve.  Ex. A, Koop Decl. ¶¶ 29–48; Ex. B, St. John Decl. ¶¶ 11, 28, 35; Ex. D, Bischoff Decl. ¶ 51.  Many potential clients may be removed to countries where they face torture and persecution for failing to file a timely application before Plaintiffs are even able to meet them.  Ex. A, Koop Decl. ¶¶ 27, 30.  Even when Plaintiffs are able to meet potential clients in advance of the 15-day deadline, the increased burden on Plaintiffs will be immense:  Plaintiffs will have to quickly adjust schedules,

jump through significant logistical hurdles (particularly for detained clients and those subject to MPP), and expend additional cost on phone, travel, and mailing for clients on an expedited timeline.  Ex. A, Koop Decl. ¶ 39; Ex. D, Bischoff Decl. ¶¶ 31–39.  In many cases, even with Plaintiffs' best efforts, meeting the 15-day deadline will be impossible, and immigrants with valid claims will inevitably be removed and placed in harm's way.  Ex. B, St. John Decl. ¶¶ 24–42.

Relatedly, the abbreviated timeline for filing applications for relief also will reduce Plaintiffs' ability to rely on their *pro bono* and volunteer programs, which significantly augment the amount of asylum seekers that they each can serve.  Ex. B, St. John Decl. ¶¶ 12, 24, 40 ("Indeed, this rule effectively eliminates the opportunity for Florence Project to identify and place a case with pro bono counsel before the I-589 is filed."); *see also* Ex. A, Koop Decl. ¶¶ 46–47; 76–77.  Plaintiffs cannot recruit, refer, and train a *pro bono* team to represent an asylum seeker in the timeline imposed by the Rule.  Ex. D, Bischoff Decl. ¶¶ 61–63.  As such, it will be harder to place *pro bono* cases and more work will fall on in-house staff as their capacity is being squeezed by the Rule.  *See* Ex. A, Koop Decl. ¶ 40; Ex. B, St. John Decl. ¶ 40.  Even if a *pro bono* attorney ultimately took a case, Plaintiffs' staff will have to dedicate additional time to mentorship given the compressed timeline, substantive changes, and dire consequences that the Rule introduces.  Ex. A, Koop Decl. ¶ 76; Ex. B, St. John Decl. ¶ 83.  Plaintiffs will also have to devote significant time to developing new written materials for *pro bono* attorneys.  Ex. A, Koop Decl. ¶ 78; Ex. B, St. John Decl. ¶ 87.  Plaintiffs NIJC and Florence Project, for example, provide written practice advisories for *pro bono* attorneys as well as for *pro se* respondents that will have to be rewritten— in Florence Project's case in both Spanish and English.  Ex. B, St. John Decl. ¶ 86; Ex. A, Koop Decl. ¶ 78.

The Rule's adoption of an evidentiary double-standard for asylum hearings and placing primacy on U.S. Government-authored evidence undermines Plaintiffs' ability to represent their clients.  Ex. A, Koop Decl. ¶¶ 64–66; Ex. B, St. John Decl. ¶¶ 60–62; Ex. C, Toczylowski Decl. ¶¶ 37–40.  The Rule will require Plaintiffs to spend more time gathering evidence and arguing for its acceptance into the record at every asylum hearing.

The Rule's changes to the 180-day statutory deadline for the adjudication of asylum claims, including the narrow "exceptional circumstances" definition and the restrictions on continuances, will impair Plaintiffs' ability to represent many of their most vulnerable clients, by preventing adequate interviews and evidence gathering.  Ex. A, Koop Decl. ¶¶ 67–73 (describing lengthy process of gathering evidence, conducting forensic and psychological evaluations, and preparing clients for hearings); Ex. C, Toczylowski Decl. ¶¶ 34–36; Ex. B, St. John Decl. ¶¶ 50, 67–77 (describing that "[i]ndividuals who are experiencing serious mental health conditions are particularly at risk of having their applications wrongfully denied and being removed under this provision of the Rule"); *see also* Ex. D, Bischoff Decl. ¶¶ 46–52 ("Often we have 5-7 meetings with a client before they even feel comfortable telling us enough information for just their declaration.").  Expediting these processes may harm the client and hinder the lawyer's ability to adequately interview the client—particularly the many clients that have suffered significant trauma and may require additional time to feel comfortable relaying their story to Plaintiffs.  *See* Ex. D, Bischoff Decl. ¶¶ 22, 50; Ex. C, Toczylowski Decl. ¶ 19.  The effort to expedite these cases inevitably will also increase Plaintiffs' costs.  Particularly for Plaintiffs Las Americas and Florence Project, who work in more remote areas with fewer resources, it will be extremely difficult to coordinate and obtain all necessary services for their case in the Rule's arbitrary and unforgiving timeframe.  Ex. D, Bischoff Decl. ¶¶ 18, 49; Ex. B, St. John Decl. ¶ 3.  Plaintiffs may have to stop

accepting the more complicated cases that would require this kind of costly support, even when those cases involve vulnerable clients who may be in the greatest need of help.  Ex. D, Bischoff Decl. ¶ 48; *see also* Ex. B, St. John Decl. ¶ 77 (discussing complex Franco cases for intellectually disabled individuals).

Importantly, this deadline will also stop noncitizens with collateral claims to relief (like a U-Visa, which is available to a survivor of crime) from being able to wait out the adjudication of that claim.  Even though some of these remedies can be pursued abroad, if a client is deported before that collateral application is adjudicated, it will be much more costly and difficult for Plaintiffs to continue representation.  In some cases, this will end their ability to pursue the claim altogether.  Additionally, the only exception to the 180-day deadline is an extremely narrow "extraordinary circumstances" exception, which will cost Plaintiffs more time and resources to research, litigate, and appeal, and will be difficult to attain for pro se litigants.  *See* Ex. D, Bischoff Decl. ¶¶ 46–52; Ex. B, St. John Decl. ¶ 50.  All of these changes will result in more denied applications without fully-developed records, requiring more appeals that are more complicated and difficult to litigate.  *See* Ex. A, Koop Decl. ¶ 22; Ex. D, Bischoff Decl. ¶¶ 47, 64; Ex. C, Toczylowski Decl. ¶¶ 44–45.  Pursuing those appeals will reduce Plaintiffs' capacity even further, forcing Plaintiffs to devote resources that would otherwise be used to help assist new clients.  Ex. D, Bischoff Decl. ¶ 64.

All of these changes will come at the expense of other, priority work.  Ex. A, Koop Decl. ¶ 46.   It will also take a health toll on the employees at Plaintiff organizations, who will have more work, worse outcomes, and higher rates of burnout and attrition.  Ex. C, Toczylowski Decl. ¶¶ 44–45; Ex. B, St. John Decl. ¶ 88.  In turn, this will cost Plaintiffs more in recruitment, hiring, and training staff.  *Id.*  These harms frustrate Plaintiffs' missions, which are to ensure access to

legal remedies, provide legal representation, and promote a fair and just immigration system.  Ex. C, Toczylowski Decl. ¶ 5; Ex. D, Bischoff Decl. ¶¶ 6, 18, 20; Ex. A, Koop Decl. ¶ 7; Ex. B, St. John Decl. ¶ 10.

The resulting potential increase in removal orders will result in clients' increased need for social services, and the deterioration of their mental and emotion health as they face prolonged detention and a system without a fair chance to present their claims.  Ex. C, Toczylowski Decl. ¶¶ 47–48; Ex. D, Bischoff Decl. ¶ 41; Ex. B, St. John Decl. ¶ 89.  As such, the Rule will burden Plaintiffs' social service and humanitarian assistance programs, like the food, supplies, and educational programs that Las Americas provides to their clients in MPP.  Ex. D, Bischoff Decl. ¶ 40.  Without those ongoing programs, Plaintiffs will need to dedicate more staff time and resources to support individuals in need of social services.

Finally, Plaintiffs ImmDef and Florence Project each receive funding to represent clients who are disabled or otherwise incompetent to represent themselves, as part of the National Qualified Representatives Program.  Ex. C, Toczylowski Decl. ¶ 10; Ex. B, St. John Decl. ¶ 19. As the expense per client increases due to the complications from the Rule, the number of NQRP clients they accept will necessarily decrease.  Ex. C, Toczylowski Decl. ¶ 43; Ex. B, St. John Decl. ¶¶ 42, 76.  Noncitizens with disabilities who are unrepresented are even less likely to be able to navigate these detailed requirements.  They will be deported at higher rates and require more complicated appeals or motions to reopen, especially in Arizona where they are often not properly identified as members of a class action, *Franco v. Holder*, the settlement of which entitles them to reopen prior proceedings.  Ex. B, St. John Decl. ¶¶ 41–42, 50; *see also* Ex. C, Toczylowski Decl. ¶ 35.  In sum, Plaintiff organizations will experience a blistering and cascading string of irreparable harm within days of the Rule going into effect, harming their core programs, reducing the number

of clients they can represent, diverting resources to training and fundraising, and harming the overall financial health of the organizations.

### B.   The Final Rule Deprived Plaintiffs of Procedural Protections Under the APA, Causing Immediate and Irreparable Harm.

Plaintiffs face additional harm insofar as they are "being irreparably deprived of a procedural protection to which they are entitled under the APA, because the agency has not considered the comments that Plaintiffs would have submitted as part of the required notice and comment process." *Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 61 (D.D.C. 2019), *rev'd on other grounds and remanded*, 962 F.3d 612 (D.C. Cir. 2020) (internal quotation marks and citation omitted).  Due to the truncated 30-day comment period, Plaintiffs were unable to meaningfully comment on all aspects of the Rule, which constitutes irreparable harm.  *Cf. Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002) ("If a party claiming the deprivation of a right to notice-and-comment rulemaking under the APA had to show that its comment would have altered the agency's rule, section 553 would be a dead letter.").

### C.   The Rule Will Contravene Plaintiffs' Organizational Visions by Precluding Meritorious Claims of Asylum Seekers

The Rule will also harm Plaintiffs' missions by severely limiting noncitizens' access to the asylum system in this country, making it impossible for many asylum-seekers with meritorious claims to apply for and obtain asylum, and causing countless individuals to be removed to countries where they will face persecution or torture.  *See, e.g.*, Ex. A, Koop Decl. ¶¶ 22–23 (estimating NIJC Asylum Project will have to turn away 11 or 12 more asylum-seeking families in the first month of Rule's effect); Ex. C, Toczylowski ¶ 50 ("Rather than helping immigrants—those with so-called "meritorious" claims or otherwise—receive a more efficient adjudication on their claims, the Rule strips due process for all asylum seekers, degrades the appearance of impartiality in immigration court, and creates a fast track to deport as many people as possible.").

Once premature and wrongful orders of removal are issued and immigrants are removed, there is no second chance and no redress—not for Plaintiffs, nor their clients.  This harm is particularly egregious in the many instances where the Rule will send noncitizens home despite them having otherwise facially valid claims for protection.  Every noncitizen who, because of the Rule, has their application wrongfully denied, is not able to be represented by Plaintiffs, has their rights waived, or is removed to certain torture and persecution is an irreparable harm to Plaintiffs.

The Rule also erodes noncitizens' due process protections by impeding their access to counsel in immigration proceedings and by requiring EOIR to reject asylum applications if it discovers at any time a single unanswered question, thus cutting off access to substantive forms of immigration relief for which Plaintiffs' clients remain legally eligible.  *See* Ex. D, Bischoff Decl. ¶ 43 ("These provisions do not serve any rational purpose and are harsh and unforgiving to asylum applicants. It is particularly concerning that this type of picayune error could be used to deny withholding of removal and protection under the CAT, which are mandatory forms of protection that must be awarded to qualified applicants. Based on my experience, I expect that many applicants with meritorious asylum claims will be deported based on these types of errors."); *see also* Ex. A, Koop Decl. ¶¶ 39; 61–63; Ex. C, Toczylowski Decl. ¶ 21; Ex. B, St. John Decl. ¶ 47. The Rule undermines decisional autonomy and deprives noncitizens of a neutral adjudicator. These changes are likely to result in more denials of relief for represented individuals and *pro se* respondents alike, all of whom it is Plaintiffs' mission to serve.  *See, e.g.*, Ex. C, Toczylowski Decl. ¶ 5; Ex. D, Bischoff Decl. ¶ 6.

## III. THE BALANCE OF THE EQUITIES FAVORS PLAINTIFF AND IMMEDIATE INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST

To enjoin the Rule, Plaintiffs must establish that the balance of equities tips in their favor, and an injunction is in the public interest.  *Immigrant Legal Res. Ctr. v. Wolf*, No. 20-CV-05883-

JSW, 2020 WL 5798269, at *3 (N.D. Cal. Sept. 29, 2020).  Where, as here, "the government is a party these . . . two factors merge."  *Id.*  Both factors support the issuance of the preliminary relief that Plaintiffs seek to preserve the status quo pending full adjudication on the merits of Plaintiffs' Complaint.  *See Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) ("The primary 'purpose of a preliminary injunction is to preserve the object of the controversy in its then existing condition—to preserve the status quo.'");  *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 901 F. Supp. 2d 54, 56 (D.D.C. 2012) (the standard for issuance of a preliminary injunction is lower when requested relief would preserve the status quo).

As described above, Plaintiffs and their clients will suffer irreparable harm if the Rule is given effect.  *See, e.g.*, *Immigrant Legal Res. Ctr.*, 2020 WL 5798269, at *18 (finding that the public interest favored enjoining or staying the effective date of a Final Rule that would "prevent vulnerable and low-income applicants from applying for immigration benefits, . . . block access to humanitarian protections, and . . . expose those populations to further danger").  In contrast, an order granting preliminary relief preserving the status quo cannot harm Defendants.  Defendants "cannot suffer harm from an injunction that merely [prevents] an unlawful practice."  *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017).  Moreover, there is always "a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."  *Nken v. Holder*, 556 U.S. 418, 436 (2009).  Absent injunctive relief, there is a substantial risk that immigrants will be wrongfully denied asylum based on the Rule, *see supra* Argument § II.  There is also "a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  *League of Women Voters*, 838 F.3d at 12 (internal quotation marks and citation omitted); *see Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326–27 (D.C. Cir. 1998) (the "public interest

balance plainly would weigh in favor of an injunction" where an agency fails to adhere to statutory standards); *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) (finding public interest in having "administrative agencies comply with their obligations under the APA"); *see also Gomez v. Trump*, 2020 WL 5367010, at \*34 (D.D.C. Sept. 4, 2020) (finding "a substantial public interest" in having government agencies comply with the APA), *amended in part*, 2020 WL 5886855 (D.D.C. Sept. 14, 2020), *appeal docketed* Sept. 28, 2020; *Ramirez v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 7, 33 (D.D.C 2018) ("The public interest surely does not cut in favor of permitting an agency to fail to comply with a statutory mandate.").

## IV. THE FINAL RULE SHOULD BE STAYED PURSUANT TO 5 U.S.C. § 705 AND ENJOINED IN ITS ENTIRETY

To prevent this irreparable harm to Plaintiffs, this Court should stay the effective date of the Rule pursuant to 5 U.S.C. § 705 and order injunctive relief to effectuate that stay.  Under the APA, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.  The factors considered when issuing such a stay substantially overlap with the factors for a granting a preliminary injunction.  *Immigrant Legal Res. Ctr.*, 2020 WL 5798269, at \*4.

A Section 705 stay is the ordinary and appropriate remedy where, as here, a challenged agency action will cause irreparable harm "pending conclusion of the review proceedings." *Gomez*, 2020 WL 5367010, at \*37 (explaining that Section 705's "grant of power to 'issue all necessary and appropriate process' includes the power to compel agency inaction when necessary 'to preserve status or rights pending conclusion' of the action").  This Court has equitable authority to stay the effective date of the Rule in its entirety, on a nationwide basis, and should reject any

invitation by Defendants to constrict the scope of preliminary relief.  *See E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 855 (9th Cir. 2020) ("[N]ationwide or other broad injunctions are appropriate when necessary to remedy a plaintiff's harm.")  "[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."  *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (citation and alterations omitted); *see also Gomez*, 2020 WL 5367010, at *36–37 (rejecting government's "suggest[ion] that the holding in *National Mining* does not control . . . in a preliminary posture").  In the context of the APA, "a nationwide remedy is necessary to provide complete relief for promulgation of an unlawful rule" because "halting the rule's application to the [Plaintiffs] may lessen the real-world impact of the unlawful rule on [them,] but does not fully redress 'the violation established'—that is, the promulgation of an unlawful rule."  *D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 49 (D.D.C. 2020); s*ee, e.g.*, *Immigrant Legal Resource Ctr.*, 2020 WL 5798269, at *20 (staying effective date of entire fee rule); *Barr*, 964 F.3d at 856 ("Vacatur of an agency rule prevents its application to all those who would otherwise be subject to its operation.")

Nationwide relief is also appropriate here because the record establishes that implementation of the Rule would have nationwide impact and would cause injuries of sufficient similarity to each of the Plaintiffs and to their clients throughout the country.  *See, e.g.*, *Hias, Inc. v. Trump*, No. 20-1160, 2021 WL 69994, at *11 (4th Cir. Jan. 8, 2021) (district court did not abuse its discretion in issuing nationwide injunction where "refugee resettlement program by its nature impacts refugees . . . throughout the country") *U.S. Dep't of Agric.*, 444 F. Supp. 3d at 50–51 (nationwide relief appropriate where plaintiffs in different states would suffer similar harm).  As discussed above, the Rule interferes with Plaintiffs' organizational missions and threatens their

funding.   Complete relief for Plaintiffs must remedy both harms.   *Barr*, 964 F.3d at 856.   In fulfilling their missions to assist asylum seekers across the country throughout the lifetime of their cases, Plaintiffs, like NIJC, operate directly on the U.S./ Mexico border in three different states, and place a heavy focus on serving detained noncitizens.  See Compl. ¶ 18; Ex. D, Bischoff Decl. ¶ 11; Ex. A, Koop Decl. ¶ 18; Ex. B, St. John Decl. ¶ 13.  Thus, Plaintiffs "'do not operate in a fashion that permits neat geographic boundaries'" for injunctive relief.   *Id.* (quoting *E. Bay Sanctuary Covenant v. Trump*, 950 F. 3d 1242, 1282–83 (9th Cir. 2020).

Moreover, "cases implicating immigration policy have a particularly strong claim for uniform, nationwide relief."  *Innovation Law Lab*, 951 F.3d at 1094–95; *see Arizona v. United States*, 567 U.S. 387, 401–02 (2012) (federal law contemplates a "comprehensive and unified" immigration policy); *see also Hias, Inc.*, 2021 WL 69994, at *11 (upholding nationwide injunction where injunction only as to plaintiffs "would cause inequitable treatment of refugees and undermine the very national consistency that the Refugee Act is designed to protect").   As described above and in the declarations accompanying this Motion, if the Rule becomes effective, tens of thousands of noncitizens seeking asylum will be denied a meaningful opportunity to apply for asylum, and many will be wrongfully deported from the United States as a result.  *See supra* Argument § II.  Additionally, were the Court to limit the scope of relief, "thousands of individual lawsuits would likely follow"—in the form of additional lawsuits challenging the Rule—"and the potentially disparate outcomes of those cases would result in widespread administrative confusion."  *Gomez*, 2020 WL 5367010, at *37 (recognizing that multiple lawsuits "cannot be the outcome that [the government] desire[s]").  Such a result would undermine "our country's strong interest in the uniform application of immigration law and policy."  *Id.* (collecting cases).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant a stay under 5 U.S.C. § 705 to postpone the effective dates of the Rule until the resolution of this case, or in the alternative, a preliminary injunction under Rule 65 enjoining implementation of the Rule nationwide pending resolution of Plaintiffs' claims on the merits.  Pursuant to Local Civil Rule 65.1(d), Plaintiffs request that this motion be heard on an expedited basis to avoid the irreparable harm to Plaintiffs and the public if the Rule takes effect on January 15, 2021.

Dated: January 12, 2021

Respectfully submitted,

/s/ Kristen A. Lejnieks

Keren Zwick (D.D.C. Bar. No. IL0055)
Mark Fleming
NATIONAL IMMIGRANT JUSTICE CENTER
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
Telephone: (312) 660-1370
Email: kzwick@heartlandalliance.org
Email: mfleming@heartlandalliance.org

Sarah Thompson (D.D.C. Bar No. CA00073)
NATIONAL IMMIGRANT JUSTICE CENTER
PO Box 124975
San Diego, CA 92112
Telephone: (312) 660-1370
Email: sthompson@heartlandalliance.org

Kristen A. Lejnieks (DC Bar No. 502136)
Parker A. Rider-Longmaid (DC Bar No. 1552207)[*]
JONES DAY
51 Louisiana Ave, NW
Washington, DC 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
Email: kalejnieks@jonesday.com
Email: priderlongmaid@jonesday.com

David R. Fox (DC Bar No. 1015031)
Laura Diss Gradel
JONES DAY
100 High Street, 21st Floor
Boston, MA 02100
Telephone: (617) 960-3939
Facsimile: (617) 449-6999
Email: drfox@jonesday.com
Email: lgradel@jonesday.com

David Ledet
JONES DAY
500 Grant Street Suite 4500
Pittsburgh, PA 15219
Telephone: (412) 394-7271
Facsimile: (412) 394-7959
Email: dledet@jonesday.com

*Counsel for Plaintiffs*

---

[*] D.D.C. Bar application pending.